# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### (EASTERN DIVISION)

|  |  |
|---|---|
| In re: | Chapter 11 |
| COSI, INC., *et al.*,[1] | Case No. 16- *13704* |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF PATRICK BENNETT, INTERIM CEO AND PRESIDENT OF THE DEBTORS, IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

I, Patrick Bennett, being fully sworn, hereby declare that the following is true and accurate to the best of my knowledge information and belief:

1.     I am the Interim Chief Executive Officer and President of Cosi, Inc., one of the above-captioned debtors and debtors-in-possession ("COSI"). COSI is the parent company of the following related debtors and debtors-in-possession: Xando Cosi of Maryland, Inc. ("Xando"), Cosi Sandwich Bar, Inc. ("CSB"), Hearthstone Associates, LLC ("HALLC"), and Hearthstone Partners, LLC ("HPLLC"). COSI, Xando, CSB, HALLC and HPLLC are collectively referred to herein as the "Debtors" or the "Company". Xando, CSB, HALLC and HPLLC are collectively referred to as the "Subsidiaries". An Organizational Chart for the Debtors is attached as **Exhibit A**.

2.     I also have a management role in each of the Subsidiaries. Specifically, I serve as the Interim Chief Executive Officer and President of Xando and CSB. COSI is the manager of HALLC and HPLLC. In my capacity as CEO and/or Manager of COSI and its Subsidiaries, I am familiar with day-to-day operations as well as business and financial matters.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of the federal tax identification number for each of the Debtors, are Cosi, Inc. (3745), Xando Cosi of Maryland, Inc. (2196), Cosi Sandwich Bar, Inc. (0910), Hearthstone Associates, LLC (6267), and Hearthstone Partners, LLC (9433). The Debtors' corporate offices are located at 294 Washington Street, Suite 510, Boston, MA 02108.

3.      I have been involved in the day-to-day operations of COSI and the Subsidiaries since August 22, 2016, when I was appointed Interim CEO and President.  Prior to that time, I served as a Member of the Board of Directors, having joined the Board in April, 2014.  I am also a shareholder of COSI and my stock interest consists of 95,983 shares.

4.      My background and relevant business experience includes significant experience assisting both public and private companies during periods of unrest.  In such situations, I have assembled strong executive teams in order to improve the complex situations in which the businesses found themselves.  Further, I have extensive experience in developing and implementing strategic growth plans to increase both the market share and revenue of distressed companies.  Additionally, I have broad knowledge and experience in both financial markets and regulated industries.  While serving as Interim CEO and President of COSI, I am also the President and Founder of CEO Strategies Group, LLC, a consulting firm which specializes in assisting CEO's of small to mid-sized companies fulfill their business strategies and goals.  Before that position, from 2008-2011, I served as President and CEO of Covad Communications (now known as MegaPath Corporation), a national supplier of voice and data communications.  From 2001-2008, I was the Executive Vice President of Strategic Imperatives at Covad Communications (now known as MegaPath Corporation).  In addition to the Board of Directors of COSI, I have served on the Board of Directors for Trans World Corporation, Altius Communications, Livewire Mobile, Eastern Technology Council, and Philadelphia Development Corporation.

5.      Except as otherwise indicated, all statements in this Declaration are based upon (a) my knowledge as Interim CEO and President since August 2016 and my participation on the Board of Directors since April 2014; (b) my review of relevant documents, including books and

records of COSI and the Subsidiaries, (c) information supplied to me by other members of

COSI's management team and/or outside professionals, and (d) my opinion based on my

experience and knowledge of COSI's and the Subsidiaries' operations and financial affairs.

6.      As the Interim CEO and President, and through my participation on the Board of

Directors, I participated in the decision by the Board to cause the Debtors to file voluntary

petitions for relief pursuant to chapter 11 of title 11 of the United States Code, §§ 101-1532 (the

"Bankruptcy Code").  Ultimately, the Board authorized the bankruptcy filings and the Debtors

filed these cases on September 28, 2016 (the "Petition Date").

7.      To minimize any adverse effects on their business as a result of the

commencement of these Chapter 11 Cases, the Debtors intend to request various types of relief

in certain "first day" applications and motions (collectively, the "First Day Motions").  The goal

of the First Day Motions, among other things, is to: (a) continue with the Debtors' operations in

the ordinary course of business while operating in chapter 11 with minimal disruption;

(b) maintain the confidence and support of key constituencies; (c) establish procedures for the

smooth and efficient administration of these Chapter 11 Cases; and (d) accomplish a sale of the

Debtors' core business enterprise in a swift manner.  To maximize value in these Chapter 11

Cases, it is crucial for the Debtors to maintain the support of restaurant operations and other

employees, vendors, and customers (among others).  The Debtors must also maintain day-to-day

operations with minimal disruption.

8.      Along with the First Day Motions, the Debtors have filed the Declaration of

Edward Schatz, The O'Connor Group, Inc., Acting Chief Financial Officer of the Debtors, in

Support of Chapter 11 Petition and First Day Pleadings (the "Schatz Declaration").  I have

reviewed the Schatz Declaration and I concur with the statements made by Mr. Schatz therein.  I

submit this Declaration in further support of the First Day Motions and to provide additional

background regarding the events leading to the filing of the Chapter 11 Cases and the Debtors'

efforts to either restructure the Debtors' businesses or accomplish a sale as a going concern, to

maximize value.  I believe that the sale proposed by the Debtors is the best option for the

Debtors and their many constituencies.

9.      Except as otherwise indicated, all statements in this Declaration are based on my

personal knowledge, my review of relevant documents, or my opinion based upon my experience

and knowledge of the Debtors' operations and financial condition.  If I were called upon to

testify, I could and would testify to each of the facts set forth herein based on such personal

knowledge, review of documents, or opinion.  I am authorized to submit this Declaration on

behalf of the Debtors.

## I.      GENERAL BACKGROUND

### A.      The Chapter 11 Cases.

10.      As discussed above, the Debtors commenced the Chapter 11 Cases on September

28, 2016 by filing chapter 11 petitions in bankruptcy.

11.      The Debtors continue to operate their business and manage their properties as

debtors-in-possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No

trustee, examiner or statutory committee has been appointed in the Chapter 11 Cases.

### B.      Overview of the Debtors' Business.

12.      COSI is an international fast-casual restaurant company featuring its crackly-crust

flatbread made fresh throughout the day and specializing in  a variety of made-to-order hot and

cold sandwiches, salads, bowls, breakfast wraps, "Squagels®" (square bagels), melts, soups,

flatbread pizzas, S'mores, snacks, desserts, and a large offering of handcrafted, coffee-based, and

specialty beverages. COSI prides itself on using the best ingredients, including foods containing high quality proteins, and products devoid of high-fructose corn-syrup and preservative and additives.

13.     The original COSI was founded by Drew Harre who traveled to Italy from Paris, France in an effort to create the perfect bread for a sandwich. While in Italy, he served as an apprentice to two brothers who baked using a centuries-old flatbread recipe. After concluding his apprenticeship, Mr. Harre traveled back to Paris and, in 1989, opened the first COSI restaurant. A few years later, two American brothers, Shep and Jay Wainwright, discovered COSI in Paris and convinced Mr. Harre to sell them the rights to the restaurant outside of Paris. Thereafter, the Wainwright Brothers opened the first COSI restaurant in America – New York City – in 1996.[2]

14.     As of June 27, 2016, the end of the Company's fiscal second financial quarter, there were approximately 107 COSI restaurants operating in the United States, the United Arab Emirates, and Costa Rica. Immediately prior to the Petition Date, of the total restaurants, 72 locations were company-owned, while the remaining 35 locations were franchise-owned.

15.     COSI is also heavily involved in its respective communities and has partnered with a number of food banks including the Greater Boston Food Bank, Food Bank for New York City, Greater Chicago Food Depository, Philabundance (in Philadelphia), and others, to donate 10 cents to them every time a customer purchases a cup of coffee at one of its locations. In 2015, COSI donated approximately $40,000.00 to food banks.

16.     As noted above, prior to the Petition Date, the Debtors had 72 debtor-owned locations and 35 franchised locations in the United States, the United Arab Emirates, and Costa

---

[2]     COSI was incorporated in Delaware on May 15, 1998. The first COSI restaurant was opened in New York in 1996 by CSB, a Delaware corporation, organized on July 24, 1996. CSB eventually became a wholly-owned subsidiary of Cosi, Inc., after Xando and CSB entered into a merger agreement dated October 4, 1999.

Rica. Also prior to the Petition Date, the Debtors employed approximately 1,555 people, 82% of whom worked on a part-time basis.

17.     As of the end of the Company's fiscal second quarter of 2016 (i.e., as of June 27, 2016), the Debtors had consolidated net sales of $22.3 million, with net losses of approximately $3.1 million and cash on hand of approximately $3 million. Since the close of the Company's fiscal second quarter of 2016, sales have deteriorated further, losses have increased, and cash on hand has decreased to approximately $950,000 in the operating account as of the Petition Date.[3]

18.     To attempt to preserve the core business enterprise and provide the best opportunity to deliver a return to creditors and preserve a significant number of jobs, immediately prior to the Petition Date, the Debtors identified the store locations with the most significant losses (the "Exit Stores"), closed those store locations, and reduced their workforce accordingly. As a result, between approximately September 26, 2016 and the Petition Date, the Debtors closed approximately 29 locations and laid off approximately 450 full and part-time employees (the "Exit Store Layoffs").

19.     The Debtors have preserved the remaining viable locations (the "Core Stores") and jobs for the remaining approximately 1,100 full and part-time employees with the hopes of identifying a buyer to accomplish a turnaround of the core business.

**C.     The Debtors' Corporate Structure.**

20.     As noted above, the parent Debtor, COSI, was first established in New York in 1996 and incorporated in Delaware in 1998. COSI is the parent company for the Subsidiaries. In 2002, COSI became a publicly traded company on the Nasdaq exchange under the symbol "COSI".

---

[3]     The Debtors also have multiple depository accounts which are maintained at locations in proximity to the Debtors' restaurants and which have varying balances depending on day-to-day operations and restricted cash accounts, all of which are not included in the operating account balance above.

21.     Over the years, COSI has grown through strategic acquisition, company-owned

store expansion, and the growth of franchise agreements and catering opportunities.

22.     A corporate organization chart reflecting the Debtors' current corporate structure

is attached hereto as **Exhibit A**.

23.     Most members of the Debtors' management are located at the Debtors' support

center in Boston, Massachusetts including senior management, human resources,

accounting/finance, operations support, license administration, and other administrative

functions associated with the Company.

**D.       The Debtors' Capital and Debt Structure.**

24.     In April of 2014, the Debtors entered into a series of financing transactions with

three senior lenders, Milfam II LP ("Milfam"), AB Opportunity Fund LLC ("AB Opportunity")

and AB Value Partners, L.P. ("AB Value"; collectively with Milfam and AB Opportunity, the

"Senior Secured Lenders"). The financing by the Senior Secured Lenders is referred to herein as

the "2014 Financing."

25.     In connection with the 2014 Financing with the Senior Secured Lenders, COSI

executed promissory notes (the "Senior Secured Notes") in favor of the Senior Secured Lenders[4]

which have principal balances as follows:

| | |
|---|---|
| Milfam | $5 million |
| AB Opportunity | $2 million |
| AB Value | $500,000 |

26.     Also in connection with the 2014 Financing, two of the Subsidiaries, Xando and

CSB, are obligated to the Senior Secured Lenders on certain guaranties (the "Guaranties")

---

[4]     The Debtors reserve all rights for themselves and their successors to challenge the validity and/or enforceability
of the Senior Secured Notes, the 2014 Financing and any and all documents related thereto or executed prior or
subsequent to.

pursuant to which Xando and CSB have guaranteed COSI's obligations to the Senior Secured

Lenders.

27.    Each of the Senior Secured Notes and the Guaranties related to the 2014

Financing contains a grant of an interest in each respective Debtor's collateral which

(substantially) reads as follows:

> The [Company or Guarantor] hereby grants to Lender, [subject to certain
> permitted liens], a continuing first priority security interest in all assets of
> the [Company or Guarantor] whether now owned or hereafter acquired,
> including all proceeds therefrom...

28.    Also in connection with the 2014 Financing, COSI provided the Senior Secured

Lenders with a Pledge Agreement by which COSI pledged its ownership interest in one of the

Subsidiaries, HALLC, to the Senior Secured Lenders.  As noted previously, HALLC is the 100%

owner of the operating subsidiary HPLLC.  The Senior Secured Lenders have no direct collateral

interest in HPLLC.  As part of the debtor-in-possession financing, however, the Debtors will be

granting a lien on HPLLC's assets to the Senior Secured Lenders (in their capacity as DIP

Lenders).

29.    Very recently, in September of 2016, the Senior Secured Lenders requested that

the Debtors confirm their collateral obligations by executing a Collateral Agreement.  As a result

of the Senior Secured Lenders' requests, on September 9, 2016, all of the Debtors, except

HPLLC, entered into a Collateral Agreement prepared by the Senior Secured Lenders (the "2016

Collateral Agreement").

30.    The 2016 Collateral Agreement provided a more detailed description of all of the

assets in which certain of the Debtors granted security interests to the Senior Secured Lenders.

COSI, Xando, CSB and HALLC are parties to the 2016 Collateral Agreement.

31.    Since executing the 2016 Collateral Agreement, the Debtors have determined that the original collateral description in the Senior Secured Notes was an insufficient grant of an interest in the Debtors' collateral pursuant to the Uniform Commercial Code, Article 9, Section 108, which governs the sufficiency of collateral descriptions in a security agreement and renders ineffective "supergeneric" collateral descriptions.  As a result, the 2016 Collateral Agreement provided each of the Senior Secured Lenders with a significant enhancement of its collateral position which the Debtors may be able to challenge under certain provisions of the Bankruptcy Code including, among others, preference avoidance and recovery provisions.

32.    The Senior Secured Lenders have informed the Debtors that they believe they have defenses to any actions the Debtors may take to avoid the Senior Secured Lenders' interests.  As discussed briefly below and in detail in the pleadings filed by the Debtors, the Debtors and the Senior Secured Lenders have agreed to address the disputes related to the 2014 Financing and the 2016 Collateral Agreement, in summary, as follows: (i) the Senior Secured Lenders (or their nominee) will fund the Debtors' operations during this Chapter 11; (ii) the Senior Secured Lenders (or their nominee) will be the stalking horse bidder for the purchase of the Debtors out of Chapter 11; (iii) the Senior Secured Lenders will be restricted regarding their ability to "credit bid" in the sale process; and (iv) all issues related to the potential to challenges to the 2014 Financing and the 2016 Collateral Agreement will be preserved for a later determination in these bankruptcy cases.

E.    **Events Leading to Chapter 11 Cases.**

33.    In its fiscal year ended December 31, 2015, the Debtors recorded revenue of $89,890,000 and a net operating loss of $15,655,000.

34.     The Debtors' cash flow available for operations and for debt service has been negatively impacted by overall economic conditions within the "fast-casual restaurant" industry, which has negatively impacted sales and restaurant-level profits.  As a result, the Debtors have been unable to fund much-needed capital expenditures required for many locations to remain competitive within their market and to become profitable.

35.     In addition, significant operating losses associated with certain locations have placed an insurmountable burden on cash flow in both the short and long-term.  Available cash resources have been required to pay critical vendors (to ensure the supply of products and services) and landlords (to cure defaults and prevent lease terminations at the more valuable locations).

36.     I, along with the Board of Directors and the management team, have continued to investigate and pursue the capital sources needed to fund the turnaround that is needed to place the Debtors on a path to profitability.  Unfortunately, due to the capital markets' view of the approximately 29 underperforming restaurants and the cost of exiting those restaurants, combined with a continued decline in sales revenues, even from the cash flow positive restaurants, and the Debtors' inability to reach cash flow breakeven, the Company has not been able to obtain sufficient capital to continue their operations.

37.     In order to prevent a potential for the full shut-down of operations, to preserve the jobs of more than 1,000 employees working at the viable locations (i.e., the Core Stores), to protect the interests of their creditors and landlords, and to allow a process in which all constituencies are protected in a process conducted in an orderly fashion, the Debtors have instituted these Chapter 11 proceedings.

**F.**     **Restructuring and Sale Efforts.**

38.     Beginning in late 2015, the Company began efforts to streamline its cost structure

and realign its operational structure to improve cash flow.  The Company substantially reduced

its overhead (i.e., sales, general and administration, "SG&A") and restructured its operating

model to create efficiencies and improve cash flow.  These efforts began to show results in early

2016 and supported internal projections that the Company would be cash flow positive in the

second half of 2016.  However, beginning in April 2016, sales trends began to deteriorate.  Those

trends continued to worsen as the year unfolded to the point that sales compared to the same

period in the prior year for restaurants in operation in both periods (sales comps) were negative

10% in August compared to positive 5% in the first quarter.  The deteriorating sales are at least

partially due to macro-economic issues as the restaurant industry as a whole and the fast-casual

sector in particular are experiencing decreasing sales trends.

39.     Although prior to the downturn in sales the Company was projecting to be cash

flow positive by the second half of 2016, the Company did not expect to generate enough cash to

be able to repay its debt when it became due in April and May of 2017.  Therefore, the Company

began exploring means to recapitalize its balance sheet or otherwise raise capital in early 2016.

These efforts included sales of assets, such as company restaurants to current or new franchisees,

entering into area franchise agreements with new franchisees, sales of equity, convertible

debentures or preferred stock through private or public transactions, refinancing its debt with

new bank financing and other transactions.  While the Company was involved in many

discussions with multiple parties regarding these potential transactions, due in part to not yet

being cash flow positive and in part to the decreasing sales trends, the Company was not able to

consummate any of these transactions.  As sales continued to deteriorate, the Company's cash

flow became more negative. The Company's Board of Directors, which had been meeting

monthly, began to meet weekly to assist management in exploring the different efforts to

recapitalize or raise capital as well as analyzing ways to improve operations and reverse the

decreasing sales trend. Also, certain Board members began to participate in meetings and calls

with potential investors and lenders. The Company also met with two different investment

banking firms that specialize in small cap restaurant companies to explore the possibility of a

sale of the Company to a strategic or financial buyer. Again, Board members participated in

these discussions. Each of these firms individually determined that given the financial condition

of the Company, the Company would not be able to find a buyer at this time. In addition to

having to fund or finance the purchase of the public stock, a buyer would need to fund or finance

the negative cash flow of the Company, the lease termination costs to exit underperforming

restaurants, investments in the operations and/or marketing of the Company to attempt to

increase sales and the retirement of the debt.

40.     After weighing alternatives, the Company engaged Midtown Partners, a boutique

investment banking firm specializing in raising capital for distressed companies. Midtown

introduced several potential investors to the Company and extensive discussions were held with

them. The major stumbling blocks with consummating a transaction with these parties were the

deteriorating financial condition of the company, including negative sales trends and increasing

negative cash flow, and the impending debt coming due in April 2017. The Company's revised

plan to get to cash flow positive and restructure the balance sheet included closing approximately

29 underperforming restaurants, which closures were going to cost approximately $4 to $5

million in lease termination costs, $5 million to fund negative cash flow from the remaining

operations for 6 to 9 months thereafter and $2 to $3 million to invest in operations, marketing

and other efforts to increase sales.  In addition, the Company would need to refinance the $7.5

million of debt.  The Company discussed with Midtown multiple strategies to raise capital,

including the possibility of a three-step process to raise $3 to $5 million in a private placement

(PIPE) immediately, $5 million in a public offering 60 days later and a $10 million rights

offering a couple of months after that.  However, the Company could not identify find investors

willing to commit to the PIPE without extending the debt.  The Company also engaged in

discussions with other potential investors who approached the Company unsolicited as well as

certain potential investors that were known to members of the Board or management.  None of

the efforts produced commitments for financing.

41.     In the midst of these discussions, the Board terminated the CEO based on the

continued deterioration of operations and financial results and failed efforts to recapitalize the

Company.  The Board determined, among other things, that the prior CEO's failure to appreciate

the severity of the Company's problems resulted in the Company's failure to address operational

issues in a methodical and efficient manner and caused extensive waste of effort, time and

resources in pursuing transactions with parties who, after conducting their diligence, were

disappointed with the true state of the Company's condition.  The Board also felt that appropriate

discussions were not had with current lenders to attempt to get the debt extended or otherwise

refinanced.

42.     In August of 2016, the Board appointed me as Interim CEO.  As Interim CEO I

attempted to stabilize the work force and improve operations while at the same time conducting

the discussions described above with Midtown, and together with other members of management

and certain board members, meeting with many potential investors and having numerous

discussions with the current lenders. The Company also engaged The O'Connor Group, Inc.

("TOG"), a firm with extensive turnaround and restructuring experience. TOG, after a thorough investigation of short-term operational needs, confirmed the Company's view that its financial situation was very critical and that time was running short on being able to raise the amount of capital needed to keep the Company solvent.

43.     COSI has received expressions of interest regarding the Core Stores and, therefore, I believe there are potential purchasers who will consider bidding against the stalking horse bid submitted by the Senior Secured Lenders. Further, in light of the restrictions on the Senior Secured Lenders' right to credit bid, I believe that the sale of the Debtors' business through a sale under Bankruptcy Code § 363 is the best route to maximize the value of the Debtors' operations. The Debtors believe that a Section 363 sale as a going concern is in the best interest of the Debtors, their employees, their creditors, and other interested parties.

## II.     FIRST DAY MOTIONS

### A.     The First Day Motions are Necessary and Appropriate.

44.     I am familiar with the various types of relief requested in the Debtors' First Day Motions, including the proposed debtor-in-possession financing and sale of the Debtors' assets and all matters related to the Debtors' employees, including the employees impacted by the Exit Store Layoffs.

45.     In addition, I have reviewed the Schatz Declaration and I concur with the statements made by Mr. Schatz therein. I believe that the relief requested in the First Day Motions is in the best interest of the Company and its creditors. The proposed debtor-in-possession financing is reasonable and necessary. Absent immediate and uninterrupted access to adequate financing, I believe that the Debtors will not have sufficient liquidity to sustain their business and maximize the value of the Debtors' assets. In addition, without the debtor-in-

possession financing, I believe that it would be impossible to continue operations and maintain enterprise value for any of the Debtors, including HPLLC.  Among other things, the COSI parent company provides all support for the HPLLC operations, including the valuable use of the COSI brand.  As a stand-alone entity, without access to the COSI brand and its SG&A support, HPLLC would likely be unable to raise the capital it needs immediately to remain viable.

**B.**     **The Necessity of the Key Employee Retention Program ("KERP").**

46.     As a multi-unit fast-casual restaurant chain, the retention of trained employees is critical to maintaining the value of the enterprise.  Certainly, the remaining COSI employees are necessary and vital to ensuring that operations continue uninterrupted during the Chapter 11 period.

47.     As a result of the potential for employee losses and the damage that would do to value, the Company has requested approval of a Key Employee Retention Program (a "KERP") which will provide certain employees with financial incentives to remain with the Company (the "Retention Benefits").  Specifically, the participants in the proposed KERP identified to date are approximately 125 valuable, hard-to-replace employees, most of whom are non-insiders at the corporate manager or store manager level (the "Participants").  The KERP is intended to incentivize these employees to remain with the Company as the Company transitions under a buyer, as well as to help manage the Company's ongoing operations and the administration of the Company during the Chapter 11 Cases.

48.     Under the proposed KERP, KERP Participants will have the ability to receive three cash "bonus pool" payments, payable as follows: (a) 30-day pay-out equal to 30% of the designated bonus pool; (b) 60-day pay-out equal to 30% of the designated bonus pool; and (c) 90-day pay-out equal to 40% of the designated bonus pool.  The proposed designated bonus

amounts for each Participant range from $710 to $8,000.  The total proposed amount anticipated
to be paid under the KERP is approximately $258,000.

49.    I believe the KERP is necessary and appropriate and, as such, the Debtors seek
approval of the KERP and the employee Retention Benefits as part of their First Day Motions.

### III.    CONCLUSION

50.    Accordingly, for the reasons stated herein, as well as set out in the Schatz
Declaration and in each of the first day applications and motions, the Debtors respectfully
request that the First Day Motions be approved.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief.

Executed this _28_ day of September, 2016.

Patrick Bennett
Interim CEO and President
Cosi, Inc.

# EXHIBIT A

## COSI, INC. LEGAL ORGANIZATION CHART
### (as of 04/01/2016)

| Name | State of Incorporation | Date of Incorporation / Date became Cosi, Inc. Subsidiary | Ownership | Parent / Subsidiary |
|---|---|---|---|---|
| Cosi, Inc. | Delaware | May 15, 1998 | Public Company | Parent |
| **Wholly-Owned Subsidiaries of Cosi, Inc.** | | | | |
| Xando Cosi of Maryland, Inc.<br><br>Note: Entity is party to certain leases and/or holds certain liquor licenses<br>(Also Guarantor on Miller / Berger debt) | Maryland | April 11, 2002 | 100% by Cosi, Inc. | Subsidiary |
| Cosi Sandwich Bar, Inc.<br><br>Note: Entity is a party to certain leases<br>(Also Guarantor on Miller / Berger debt) | Delaware | June 30, 1998 | 100% by Cosi, Inc. | Subsidiary |
| Cosi MDS, Inc.<br><br>Note: Entity is inactive and being allowed to dissolve. | Delaware | March 29, 2004 | 100% by Cosi, Inc. | Subsidiary |
| Hearthstone Associates, LLC | Massachusetts | October 5, 2005 (became subsidiary of Cosi, Inc. upon Merger (1) | 100% by Cosi, Inc. | Subsidiary |
| **Indirect Subsidiaries of Cosi, Inc.** | | | | |
| Hearthstone Partners, LLC | Massachusetts | November 17, 2005 (became subsidiary of Cosi, Inc. upon Merger (2) | 100% by Hearthstone Associates, LLC | Indirect Subsidiary |

(1) Hearthstone Associates, LLC, became a wholly-owned subsidiary of the Company on April 1, 2015, pursuant to a merger with and into Cosi-Hearthstone Merger Sub, LLC, a wholly-owned subsidiary of the Company, whereby Hearthstone Associates, LLC, was the surviving entity ("Hearthstone Merger").

(2) Hearthstone Partners, LLC, is a wholly-owned subsidiary of Hearthstone Associates, LLC, and thus became an indirect subsidiary of the Company upon completion of the Hearthstone Merger on April 1, 2015.



[1] Cosi MDS, Inc. has no operations and will be dissolved under state law.

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### (EASTERN DIVISION)

In re:

COSI, INC., *et al.*,[1]

Debtors.

Chapter 11
Case No. 16-*13704*

**(Joint Administration Requested)**

## DECLARATION RE: ELECTRONIC FILING

PART I – DECLARATION OF PETITIONER

I, Patrick Bennett, Interim Chief Executive Officer and President of the above-captioned

Debtors, **hereby declare under penalty of perjury** that all of the information contained in my

Declaration in Support of Chapter 11 Petition and First Day Pleadings (singularly or jointly the

"Document"), filed electronically, is true and correct.  I understand that this DECLARATION is

to be filed with the Clerk of Court electronically concurrently with the electronic filing of the

Document.  I understand that failure to file this DECLARATION may cause the Document to be

struck and any request contained or relying thereon to be denied, without further notice.

I further understand that pursuant to the Massachusetts Electronic Filing Local Rule

(MEFLR)-7(a) all paper documents containing original signatures executed under the penalties

of perjury and filed electronically with the Court are the property of the bankruptcy estate and

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of the federal tax identification number for each of the Debtors, are Cosi, Inc. (3745), Xando Cosi of Maryland, Inc. (2196), Cosi Sandwich Bar, Inc. (0910), Hearthstone Associates, LLC (6267), and Hearthstone Partners, LLC (9433).  The Debtors' corporate offices are located at 294 Washington Street, Suite 510, Boston, Massachusetts 02108.

shall be maintained by the authorized CM/ECF Registered User for a period of five (5) years

after the closing of this case.

Dated: September _28_, 2016

_(signature)_ (Affiant)

Patrick Bennett
Interim CEO and President
Cosi, Inc.

PART II – DECLARATION OF ATTORNEY (If Affiant is Represented by Counsel)

I certify that the affiant signed this form before I submitted the Document, I gave the

affiant a copy of the Document and this DECLARATION, and I have followed all other

electronic filing requirements currently established by local rule and standing order.  This

DECLARATION is based on all information of which I have knowledge and my signature below

constitutes my certification of the foregoing under Fed. R. Bankr. P. 9011.  I have reviewed and

will comply with the provisions of MEFR 7.


Dated: ___9/28___, 2016     Signed: _____
                                    Joseph H. Baldiga, Esq.
                                    Attorney for Affiant