## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## (EASTERN DIVISION)

In re:

**COSI, INC.,** *et al.,*[1]

**Debtors.**

**Chapter 11**
**Case No. 16-** *13704*

**(Joint Administration Requested)**

## DECLARATION OF EDWARD SCHATZ, THE O'CONNOR GROUP, INC., ACTING CHIEF FINANCIAL OFFICER OF THE DEBTORS, IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

I, Edward Schatz, being fully sworn, hereby declare that the following is true to the best of my knowledge, information and belief:

1.     I am currently acting as the Chief Financial Officer of each of the above-captioned debtors and debtors-in-possession ("COSI"). COSI is the parent company of the following related debtors and debtors-in-possession: Xando Cosi of Maryland, Inc. ("Xando"), Cosi Sandwich Bar, Inc. ("CSB"), Hearthstone Associates, LLC ("HALLC"), and Hearthstone Partners, LLC ("HPLLC"). COSI, Xando, CSB, HALLC and HPLLC are collectively referred to herein as the "Debtors" or the "Company". Xando, CSB, HALLC and HPLLC are collectively referred to as the "Subsidiaries".

2.     I have been the Chief Financial Officer since September 6, 2016, when the Board of Directors engaged The O'Connor Group, Inc. ("TOG") as a financial consultant. I am familiar with the Debtors' day-to-day operations, financial condition, books and records, and business affairs.

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of the federal tax identification number for each of the Debtors, are Cosi, Inc. (3745), Xando Cosi of Maryland, Inc. (2196), Cosi Sandwich Bar, Inc. (0910), Hearthstone Associates, LLC (6267), and Hearthstone Partners, LLC (9433). The Debtors' corporate offices are located at 294 Washington Street, Suite 510, Boston, MA 02108.

3.  My background and relevant business experience includes industry experience in retail, manufacturing, high-tech, distribution, and transportation, focusing on turnarounds of middle market companies of various natures. In addition to turnarounds, I have significant experience in out of court wind downs, liquidations, bankruptcy and divestures of distressed businesses, as well as advisory services. Before joining TOG in 2002 and becoming a Senior Managing Director, I was manager of the Transaction Service Group at PwC, where I provided financial due diligence services to our clients. Prior to that role, I was an auditor with Deloitte. I received my BS in Accounting from Roger Williams University, and am a CIRA (Certified Insolvency and Restructuring Advisor). I am also a member of the Association of Insolvency and Restructuring Advisors and the Association for Corporate Growth, as well as a member of the Board of Directors of The Turnaround Management Association.

4.  On September 28, 2016 (the "Petition Date"), the Debtors commenced these cases (the "Chapter 11 Cases") by each filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code, §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Massachusetts (the "Court").

5.  From the date of the Debtors' engagement of TOG to the Petition Date, I spent considerable time analyzing the Debtors' books and records and assessing the Debtors' options from a financial perspective. I oversaw the preparation of the proposed budget for the Chapter 11 operational period (discussed further below) and I have worked closely with other members of the Debtors' management team and with the bankruptcy professionals to prepare for these Chapter 11 Cases.

6.  To minimize any adverse effects on their business as a result of the commencement of these Chapter 11 Cases, the Debtors have requested Court approval of multiple "first day" applications and motions (collectively, the "First Day Motions"). The goal of the First Day

Motions, among other things, is to: (a) continue with the Debtors' operations in the ordinary course of business while operating in chapter 11 with minimal disruption; (b) maintain the confidence and support of key constituencies; (c) establish procedures for the smooth and efficient administration of these Chapter 11 Cases; and (d) accomplish a sale of the Debtors' core business enterprise in a swift manner. To maximize value in these Chapter 11 Cases, it is crucial for the Debtors to maintain the support of restaurant operations and other employees, vendors and customers (among others). The Debtors must also maintain day-to-day operations with minimal disruption.

7.    I have reviewed and am familiar with the Declaration of Patrick Bennett, Interim CEO and President of the Debtors, in Support of Chapter 11 Petition and First Day Pleadings (the "Bennett Declaration") also submitted in support of these Chapter 11 Cases and First Day Motions.

8.    I submit this Declaration in support of the First Day Motions. Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of relevant documents or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of documents or opinion. I am authorized to submit this Declaration on behalf of the Debtors.

## I.    GENERAL BACKGROUND

### A.    The Chapter 11 Cases.

9.    As discussed above, the Debtors commenced the Chapter 11 Cases on September 28, 2016 by filing chapter 11 petitions in bankruptcy.

10.     The Debtors continue to operate their business and manage their properties as

debtors-in-possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No

trustee, examiner or statutory committee has been appointed in the Chapter 11 Cases.

**B.      Overview of the Debtors' Business.**

11.     As discussed in detail in the Bennett Declaration, COSI is an international fast-

casual restaurant company featuring its crackly-crust flatbread made fresh throughout the day and

specializing in  a variety of made-to-order hot and cold sandwiches, salads, bowls, breakfast

wraps, "Squagels®" (square bagels), melts, soups, flatbread pizzas, S'mores, snacks, desserts,

and a large offering of handcrafted, coffee-based, and specialty beverages.  COSI prides itself on

using the best ingredients, including foods containing high quality proteins, and products devoid

of high-fructose corn-syrup and preservative and additives.

12.     As of June 27, 2016, the end of the Company's fiscal second financial quarter,

there were approximately 107 COSI restaurants operating in the United States, the United Arab

Emirates, and Costa Rica.  Immediately prior to the Petition Date, of the total restaurants, 72

locations were company-owned, while the remaining 35 locations were franchise-owned.

13.     Also prior to the Petition Date, the Debtors employed approximately 1,555 people,

81.8% of whom worked on a part-time basis.

14.     As of the end of the Company's fiscal second quarter of 2016 (i.e., as of June 27,

2016), the Debtors had consolidated net sales of $22.3 million, with net losses of approximately

$3.1 million and cash on hand of approximately $3 million.  Since the close of the Company's

fiscal second quarter of 2016, sales have deteriorated further, losses have increased, and cash on

4

hand has decreased to approximately $950,000 in the operating account as of the Petition Date.[2]

15.     To attempt to preserve the core business enterprise and provide the best opportunity to deliver a return to creditors and preserve a significant number of jobs, immediately prior to the Petition Date, the Debtors identified the store locations with the most significant losses (the "Exit Stores"), closed those store locations, and reduced their workforce accordingly. As a result, between approximately September 26, 2016 and the Petition Date, the Debtors closed approximately 29 locations and laid off approximately 450 full and part-time employees (the "Exit Store Layoffs").

16.     The Debtors have preserved the remaining viable locations (the "Core Stores") and jobs for the remaining approximately 1,100 full and part-time employees with the hopes of identifying a buyer to accomplish a turnaround of the core business.

C.     **The Debtors' Corporate Structure.**

17.     As noted above, the parent Debtor, COSI, was first established in New York in 1996 and incorporated in Delaware in 1998.  COSI is the parent company for the Subsidiaries.  In 2002, COSI became a publicly traded company on the Nasdaq exchange under the symbol "COSI".

18.     Over the years, COSI has grown through strategic acquisition, company-owned store expansion, and the growth of franchise agreements and catering opportunities.

19.     A corporate organization chart reflecting the Debtors' current corporate structure is attached hereto as **Exhibit A**.

20.     Most members of the Debtors' management are located at the Debtors' support center in Boston, Massachusetts including senior management, human resources,

---

[2]     The Debtors also have multiple depository accounts which are maintained at locations in proximity to the Debtors' restaurants and which have varying balances depending on day-to-day operations and restricted cash accounts, all of which are not included in the operating account balance above.

5

accounting/finance, operations support, license administration, and other administrative functions associated with the Company.

**D.     The Debtors' Capital and Debt Structure.**

21.     In April of 2014, the Debtors entered into a series of financing transactions with three senior lenders, Milfam II LP ("Milfam"), AB Opportunity Fund LLC ("AB Opportunity") and AB Value Partners, L.P. ("AB Value"; collectively with Milfam and AB Opportunity, the "Senior Secured Lenders"). The financing by the Senior Secured Lenders is referred to herein as the "2014 Financing."

22.     In connection with the 2014 Financing with the Senior Secured Lenders, COSI executed promissory notes (the "Senior Secured Notes") in favor of the Senior Secured Lenders[3] which have principal balances as follows:

|             |              |
| ----------- | ------------ |
| Milfam          | $5 million   |
| AB Opportunity  | $2 million   |
| AB Value        | $500,000     |

23.     Also in connection with the 2014 Financing, two of the Subsidiaries, Xando and CSB, are obligated to the Senior Secured Lenders on certain guaranties (the "Guaranties") pursuant to which Xando and CSB have guaranteed COSI's obligations to the Senior Secured Lenders.

24.     Each of the Senior Secured Notes and the Guaranties related to the 2014 Financing contains a grant of an interest in each respective Debtor's collateral which (substantially) reads as follows:

---

[3]     The Debtors reserve all rights for themselves and their successors to challenge the validity and/or enforceability of the Senior Secured Notes, the 2014 Financing and any and all documents related thereto or executed prior or subsequent to.

Client Matter/27288/1/A3472814.DOC

The [Company or Guarantor] hereby grants to Lender, [subject to certain permitted liens], a continuing first priority security interest in all assets of the [Company or Guarantor] whether now owned or hereafter acquired, including all proceeds therefrom…

25.     Also in connection with the 2014 Financing, COSI provided the Senior Secured Lenders with a Pledge Agreement by which COSI pledged its ownership interest in one of the Subsidiaries, HALLC, to the Senior Secured Lenders.  As noted previously, HALLC is the 100% owner of the operating subsidiary HPLLC.  The Senior Secured Lenders have no direct collateral interest in HPLLC.  As part of the debtor-in-possession financing, however, the Debtors will be granting a lien on HPLLC's assets to the Senior Secured Lenders (in their capacity as DIP Lenders).

26.     I recently learned that on September 9, 2016, all of the Debtors, except HPLLC, entered into a Collateral Agreement prepared by the Senior Secured Lenders (the "2016 Collateral Agreement").

27.     I understand that the Debtors and the Senior Secured Lenders have agreed to address disputes related to the 2014 Financing and the 2016 Collateral Agreement, in summary, as follows: (i) the Senior Secured Lenders (or their nominee) will fund the Debtors' operations during this Chapter 11; (ii) the Senior Secured Lenders (or their nominee) will be the stalking horse bidder for the purchase of the Debtors out of Chapter 11; (iii) the Senior Secured Lenders will be restricted regarding their ability to "credit bid" in the sale process; and (iv) all issues related to the potential to challenges to the 2014 Financing and the 2016 Collateral Agreement will be preserved for a later determination in these bankruptcy cases.

## II.     FIRST DAY MOTIONS

28.     The Debtors have filed a number of First Day Motions which address issues necessary to operate during the Chapter 11 period.  The Debtors have also requested that the

7

Court conduct a hearing as soon as possible to hear the First Day Motions (the "First Day

Hearing"). A description of each of the First Day Motions is provided below.

**A.**   **Motion of the Debtors for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases and For Extension of Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs**

29.    The Debtors have requested entry of an order directing the joint administration of

the Chapter 11 Cases and the consolidation thereof for procedural purposes only (the "Joint

Administration Motion"). Many of the motions, applications, hearings, and orders that will arise

in these Chapter 11 Cases will affect all Debtors. As a result, the interests of all stakeholders,

including creditors and other parties in interest, will be best served by the joint administration of

these Chapter 11 Cases, for procedural purposes only.

30.    In addition, the Debtors operate on a fully consolidated basis. All receipts flow

into a joint operating account and all operating expenses are paid from that joint operating

account. The Debtors request only joint administration of these cases at this point and, at a later

date, will consider whether full consolidation is appropriate.

31.    The Debtors request that the joint administration of their cases be maintained under

the case name and number assigned to "Cosi, Inc." which is the parent company and which has

its headquarters in downtown Boston. The Debtors also request that the Clerk of the Court

maintain one file and one docket for all of the Chapter 11 Cases under the Cosi, Inc. case name

and number.

32.    The Debtors also request that a separate docket entry be made on the dockets of the

other Debtors' Chapter 11 bankruptcy cases, substantially as follows:

> An order has been entered in this case directing the procedural
> consolidation and joint administration of the chapter 11 cases of Cosi, Inc.,
> Xando Cosi of Maryland, Inc., Cosi Sandwich Bar, Inc., Hearthstone
> Associates, LLC, and Hearthstone Partners, LLC, which have concurrently
> commenced Chapter 11 cases. The docket in the Chapter 11 case of Cosi,

8

Inc., Case No. 16-_____( ) should be consulted for all matters affecting this case.

33.     The Debtors further request that the caption of these Chapter 11 Cases be modified as follows to reflect their joint administration under the lead chapter 11 case of COSI as described in detail in the Joint Administration Motion:

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **COSI, INC.,** *et al.*, | **Case No. 16-** |
| **Debtors.** | **(Jointly Administered)** |

34.     In addition, the Debtors seek authority to file the Debtors' monthly operating reports on a consolidated basis if the Debtors determine, after consultation with the United States Trustee, that consolidated reports would further administrative economy and efficiency without prejudice to any party in interest and that the reports would accurately reflect the Debtors' consolidated business operations and financial affairs.

35.     Finally, the Debtors seek an extension of the deadline to file their Schedules and Statements of Financial Affairs to October 28, 2016.  The Debtors' immediate objectives in these Chapter 11 Cases require ensuring that the Debtors have the Court authority necessary to continue operating at the majority of their locations.  Accordingly, the Debtors anticipate that they will need additional time to accurately prepare their Schedules.

Client Matter/27288/1/A3472814.DOC

**B.**     <u>Retention of Professionals</u>

    **i.**     **Application by Debtors for Order Approving Retention of Mirick O'Connell
DeMallie & Lougee LLP as Counsel to the Debtors**

    36.     The Debtors seek to employ and retain Mirick O'Connell DeMallie & Lougee LLP

("Mirick O'Connell") as their principal bankruptcy counsel to represent them as debtors-in-

possession in these bankruptcy cases effective as of the Petition Date.  Accordingly, the Debtors

respectfully request the entry of an order authorizing them to employ and retain Mirick

O'Connell as their attorneys under a general retainer to perform the legal services that will be

necessary during these chapter 11 cases.

    37.     The Debtors have selected Mirick O'Connell because this case is likely to be

complex and will require counsel to the Debtors with extensive experience in restructuring

insolvent companies, including utilizing Bankruptcy Code § 363 to accomplish a sale "free and

clear" where appropriate.  Mirick O'Connell has extensive experience and knowledge in the field

of reorganization, restructuring, debtors' and creditors' rights and business reorganizations under

chapter 11 of the Bankruptcy Code.  In addition, Mirick O'Connell has worked with the Debtors

pre-petition and become familiar with the Debtors' businesses and affairs and many of the

potential legal issues which may arise in the context of these Chapter 11 Cases.  Accordingly, the

Debtors believe that Mirick O'Connell is both well-qualified and able to assist it in these chapter

11 cases.

    38.     The Debtors have selected Mirick O'Connell because they believe Mirick

O'Connell is needed for the Debtors to properly perform their duties and functions while in

bankruptcy; Mirick O'Connell has extensive experience in matters of this character; and the

Debtors believe that Mirick O'Connell is well-qualified and uniquely able to represent them in

these proceedings in an efficient and timely manner.

Client Matter/27288/1/A3472814.DOC

39.   The professional services which Mirick O'Connell will provide to the Debtors include, but are not limited to, the following:

a.   legal services with respect to the Debtors' powers and duties as a debtors-in-possession in continuing the management and operation of their businesses and properties;

b.   appearing before this Court, any appellate courts and protect the interests of the Debtors' estates before such courts;

c.   meeting with the United States Trustee to ensure compliance with all requirements overseen by the United States Trustee as part of the Chapter 11 process;

d.   preparing necessary applications, motions, complaints, answers, responses, orders, reports, and other legal papers;

e.   representing the Debtors in any matters involving contests with secured and unsecured creditors;

f.   attending meetings and negotiating with representatives of creditors or other parties in interest as required of the Debtors;

g.   negotiating and preparing sale documents to accomplish a sale of the Debtors' assets as a going concern in a prompt and efficient manner and, if necessary, preparing a bankruptcy plan and disclosure statement and pursuing confirmation and approval thereof;

h.   advising the Debtors in connection with any contemplated sales of certain assets;

i.   taking actions to protect and preserve the Debtors' estates as necessary and as issues arise; and

11

j.   performing all other legal services for the Debtors which may

be necessary and herein.

**ii.     Application by Debtors for Order Approving Retention of The O'Connor Group, Inc. as Financial Advisors to the Debtors**

40.     The Debtors seek to employ The O'Connor Group, Inc. (i.e., TOG) as their financial consultants during the Chapter 11 Cases to assist the Debtors in connection with carrying out their financial duties and responsibilities during the bankruptcy case.

41.     Among other things, TOG will provide necessary services to the Debtors by filling the role of interim Chief Financial Officer ("CFO").  I will serve as CFO.

42.     The Debtors have selected TOG as their financial consultants during the pendency of these Chapter 11 Cases because of the need for specialized expertise that the TOG possesses and which the Debtors require.  The Debtors' existing management has only limited knowledge of the bankruptcy process and the requirements placed on debtors-in-bankruptcy.

43.     Further, the Debtors require assistance in the role of CFO and believe TOG can provide the needed services, with me serving in the role of CFO.  Among other things, the Debtors' current CFO announced his resignation in August 2016 and his last day of employment with the Debtors was September 23, 2016.  Due to the Debtors' current financial circumstances and contemplated bankruptcy sale, the CFO role will be filled for only a short period of time and during that time, it will benefit from my specialized experience.

44.     The Debtors believe that the services of TOG are necessary for the effective administration of their bankruptcy cases.  As noted above and set forth in more detail in the TOG Retention Application, subject to further order of this Court, TOG will provide financial consulting services to the Debtors including those typically provided by a CFO in a bankruptcy

sale such as the sale to be proposed by the Debtors.  Those services include, but are not limited to:

    a.  lead in all financial matters related to the Chapter 11 Cases;

    b.  manage efforts to enhance cash flow and improve profitability during the Chapter 11 Cases;

    c.  business advice and consultation regarding the proposed sale;

    d.  preparation of bankruptcy financial reporting for the Court, the U.S. Trustee and any Creditors' Committee;

    e.  cash and vendor management efforts;

    f.  lease and contract rejection issues and resulting claim mitigation;

    g.  oversee, manage and augment the finance and accounting staffing in preparation of reports and analysis to support the efforts of the Chapter 11 Cases;

    h.  assist with communications and negotiations with the Senior Secured Lenders and other constituents of the Debtors' business as required during Chapter 11; and

    i.  any other tasks required by the Debtors during the Chapter 11 Cases.

**C.**   **Debtors' Motion for Entry of an Order (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Hearing on Further Use of Cash Collateral, and (IV) Granting Related Relief**

    45.   The Debtors request the authority to use cash collateral and grant adequate protection to the Senior Secured Lenders in the form of replacement liens and the other protections described in the Motion to Use Cash Collateral.

13

46.     One of the Debtors' pressing concerns is the need for the immediate use of Cash Collateral pending a final hearing on the Motion to Use Cash Collateral. The Debtors require the use of Cash Collateral in order to meet their expenses and maintain the operation of their business. Without the use of Cash Collateral, the Debtors' operations will be substantially and irreparably harmed.  The continued operation of the Debtors' business is essential to their operation during this case.  In order to avoid immediate and irreparable harm to the Debtors' estate, the Debtors require the use of Cash Collateral to pay, among other things, payroll, utilities, taxes, insurance, and other ordinary business costs and expenses.

47.     The Debtors' ordinary course operations generate Cash Collateral through the sale of food and related items.

48.     As noted above, the Senior Secured Lenders assert security interests in some or all of the Debtors' Cash Collateral.  The Debtors have determined that the Senior Secured Lenders' security interests, however, may be avoidable.  As a result, the Debtors and the Senior Secured Lenders have agreed to the Debtors' use of cash collateral with a full reservation of rights regarding the rights of the Debtors (or their successors) to challenge the Senior Secured Lenders' liens.

49.     As adequate protection for any interest in Cash Collateral which Lenders may have, the Debtors are willing to grant Lenders replacement liens in the Debtors' post-petition Cash Collateral, to the same extent, priority and validity as its pre-petition liens, if any, and only to the extent that the Debtors diminish such Cash Collateral.  The proposed replacement liens should provide sufficient adequate protection to prevent any diminution in value to the collateral.

50.     The Debtors seek to use Cash Collateral in accordance with its proposed budget attached to the Cash Collateral Motion.

51.     The Debtors' assets consist primarily of: (i) cash; (ii) inventory; (iii) fixed assets; and (iv) accounts receivable. As of the Petition Date, the Debtors, on a consolidated basis, had approximately $950,000 of cash in the operating account.[4] In addition, as of August 26, 2016, the Debtors' general ledger reflected inventory with a book value of approximately $882,000,[5] fixed assets with a book value of approximately $9.2 million, and accounts receivable (i.e., short term credit card receivables) of approximately $1.2 million.[6]

52.     As discussed above, as of the Petition Date, the principal balance of the Senior Secured Lenders' debt is $7,500,000 (the "Pre-petition Obligations"). I understand that the Senior Secured Lenders assert that the Pre-petition Obligations are secured by a lien on substantially all of the Debtors' assets and that the Debtors assert that the liens securing the Pre-petition Obligations are avoidable.

53.     The Debtors require immediate authority to use Cash Collateral to fulfill their day-to-day operations so as to preserve the going concern value of the Debtors.

54.     I believe that the Debtors' use of Cash Collateral is absolutely essential for the Debtors' continued operations and is therefore in the best interest of creditors and these bankruptcy estates.

**D.      Motion of the Debtors to Approve Debtor-in-Possession Financing**

55.     The Debtors and the Senior Secured Lenders have also agreed to the terms of post-petition debtor-in-possession financing (the "DIP Financing"). The DIP Financing is described in detail in the Motion to approve same filed herewith. In sum, the Senior Secured Lenders have

---

[4]     As noted previously, the Debtors also have multiple depository accounts which are maintained at locations in proximity to the Debtors' restaurants and which have varying balances depending on day-to-day operations and restricted cash accounts, all of which are not included in the operating account balance above.

[5]     The consolidated retail value of the Debtors' inventory was approximately the same as book value.

[6]     These figures are given on a consolidated basis. The Debtors are investigating the extent to which the Senior Secured Lenders have an interest in Cash Collateral, if any, as to each specific Debtor.

Client Matter/27288/1/A3472814.DOC

agreed to provide up to $4.1 million in post-petition financing to fund operations during the Chapter 11 period. They (or their nominee) have submitted a bid to purchase the Debtors for $6.8 million. The Senior Secured Lenders may only credit bid up to the value of the DIP Lien amount and issues related to the avoidability of the pre-petition liens are preserved.

56.     The proposed DIP Financing is reasonable and necessary. Absent immediate and uninterrupted access to adequate financing, I believe that the Debtors will not have sufficient liquidity to sustain their business and maximize the value of the Debtors' assets. In addition, without the debtor-in-possession financing, I believe that it would be impossible to continue operations and maintain enterprise value for any of the Debtors, including HPLLC. Among other things, the COSI parent company provides all support for the HPLLC operations, including the valuable use of the COSI brand. As a stand-alone entity, without access to the COSI brand and its SG&A support, HPLLC would likely be unable to raise the capital it needs immediately to remain viable.

**E.    Debtors' (I) Motion for a Scheduling Order Regarding Sale and Sale Procedures Issues and (II) Request for Emergency Hearing**

57.     The Debtors have also filed a Motion seeking to establish a schedule regarding the proposed sale (and related sale procedures) of substantially all of the Debtors' assets.

58.     The goal of the Debtors' proposed sale is to maximize the value of the Debtors' assets, but limit the borrowing required caused by operating a loss.

59.     As set forth in the Bennett Declaration, prior to the Petition Date, the Company vetted many turnaround strategies and a potential sale of the Company with multiple investors, lenders, strategic buyers. The Company will ensure that all such parties who expressed interest in purchasing the Company are notified of the proposed sale, and will work diligently during the sale process to attempt to solicit bids against the stalking-horse bid.

F.      **Debtors' Motion for Order (I) Authorizing (a) Payment of Pre-Petition Wages, Salaries and Employee Benefits, (b) Reimbursement of Employee Business Expenses, and (c) Payment of Other Employee Related Amounts; and (II) Authorizing Applicable Banks and Other Financial Institutions to Receive, Process, Honor and Pay All Checks and Drafts Drawn on Debtors' Bank Accounts Relating to the Foregoing**

60.     The Debtors have requested that this Court enter an Order (I) authorizing (a) payment of pre-petition wages, salaries and employee benefits, (b) reimbursement of employee business expenses, and (c) payment of other employee-related amounts; and (II) authorizing applicable banks and other financial institutions to receive, process, honor and pay all checks and drafts drawn on debtors' bank accounts relating to the foregoing (the "Wage Motion"). The Wage Motion also includes a request for authority to honor any uncashed checks for wages paid to employees who were laid off shortly before the Petition Date.

61.     Regarding the Debtors' current employees, the continued maintenance of employee pay and benefits is essential to the ongoing and valued services of the Debtors' employees. Accordingly, the Debtors have sought authority to pay certain pre-petition obligations to their employees. These pre-petition obligations include various sums for: wages and salaries, federal and state withholding taxes, contributions to employee benefit plans and payment of health insurance claims and all other employee benefits that the Debtors pay in the ordinary course of business, as well as reimbursable expenses as defined in the Wage Motion (collectively, the "Employer Obligations"). Furthermore, as a service to its employees, the Debtors withhold certain amounts from their employees' paychecks for the benefit of designated recipients for various purposes, including, without limitation, the payment of wage garnishments. The Debtors withhold such amounts and pays them directly to the appropriate entity.

62.     The Debtors currently have approximately 1,100 employees at its Core Stores. In order to ensure that their current employees are paid in the ordinary course when compensation

payments become due, the Debtors have specifically requested that the order approving the Wage

Motion also provide that the banks providing the accounts from which disbursements are

authorized to service and administer the accounts as described above without interruption, and, in

the usual and ordinary course of business, to receive, process, honor and pay any and all

electronic or wire transfers, checks and drafts drawn on the Debtors' accounts, whether presented

for payment before or after commencement of these Chapter 11 Cases by the holder thereof,

provided that sufficient funds are in the Debtors' accounts to cover them.

63.   **Wages, Salaries and Compensation.**   In the ordinary course of their business, the

Debtors issue payroll checks on a bi-weekly basis.  Employees are paid bi-weekly on Mondays

for the two preceding weeks.  Currently, all employees have been paid for the payroll period

ending September 19, 2016.  As of the Petition Date, the employees will not have been paid for

the partial payroll period from September 20 through September 27, 2016.  Employees would

normally be paid for this pay period on October 10, 2016.

64.   Pre-petition, the average aggregate gross bi-weekly payroll to all employees in the

Core Stores was approximately $970,000.[7]  The October 10, 2016 payroll will include 8 pre-

petition days and, therefore, the Debtors estimate that, from the October 10th payroll,

approximately $554,000 is scheduled to be paid on account of pre-petition wages and salaries.

65.   In the Wage Motion, the Debtors seek authority to pay the pre-petition wages and

salaries in the ordinary course when due.  The Debtors also believe that those amounts are due

and owing to Debtors' employees for services rendered within the 180-day period immediately

preceding the Petition Date.  Further, to the Debtors' knowledge, no employee is individually

owed more than $12,850 on account of wages either: (i) paid to employees impacted by the Exit

---

[7]   Prior to the Exit Store Layoffs, the Debtors' average aggregate gross bi-weekly payroll to all employees was
approximately $1,400,000.  The Exit Store Layoffs decreased the workforce by approximately 31%.  Therefore,
the Debtors have estimated the new average aggregate gross bi-weekly payroll will be approximately $970,000.

Store Layoffs prior to the Petition Date or (ii) with respect to remaining employees, earned from September 20 through September 27, 2016.

66.   In addition to pre-petition wages and salaries, the Debtors have incurred pre-petition obligations to former employees for accrued vacation and personal time off and have incurred pre-petition obligations to employees for vacation, holiday, sick leave, and severance pay.  In the Wage Motion, the Debtors seek the authority, in their discretion, to pay former employees and employees to the extent that any amounts may be owed to them as it may become due.  Ultimately, however, the Buyer will assume those obligations in the ordinary course regarding the employees at the Core Stores.[8]

67.   Although the Debtors seek authority to make the requested payments, they do not believe that the Court should direct them to pay any specific claim.  Additionally, notwithstanding anything to the contrary, the payment of any claims pursuant to the Order approving the Wage Motion, if entered, shall neither (i) make such obligation an administrative expense of the Debtors' estates nor (ii) constitute approval by the Court of any employee plan or program including any bonus plans.

68.   **Employee Insurance Benefits**.  The Debtors maintain a self-insured group health insurance plan to provide employees with certain insurance and other similar benefits such as health, dental, accidental death and dismemberment, short term disability and long term disability benefits (the "Employee Insurance Benefits").  The Plan provides that the Debtors are responsible for all covered claims to a maximum limit of $100,000 per participant and an additional aggregating maximum limit of $50,000 for the plan year.  Benefits paid in excess of these limits are reimbursed to the plan under a stop-loss policy.  In addition, the Debtors have an

---

[8]   All employees from the Exit Stores who were laid off were paid their unused paid time off (i.e., PTO) upon layoffs.

Client Matter/27288/1/A3472814.DOC

aggregate stop-loss policy whereby the Debtors' liability for total claims submitted cannot exceed a pre-determined dollar factor based upon, among other things, past years' claims experience, actual claims paid, the number of plan participants and monthly accumulated aggregate deductibles. The Debtors did not exceed this pre-determined maximum during fiscal year 2015. For the Debtors' 2016 plan year, this pre-determined dollar amount is $1.1 million. As of June 27, 2016, the Debtors were required to carry a book entry for self-insurance reserves of $200,000. Thus, relief is sought simply to provide the Debtors authority to pay any amounts which may arise under the Debtors' self-insurance (although the Debtors will not be required to do so).

69.     Various insurance coverage is an important element of the Employee Insurance Benefits program. Employees and their families rely on the Debtors to provide continuing health care. Any failure to pay these amounts would be injurious to employee welfare, morale and expectations. To the extent that any claims or premiums for Employee Insurance Benefits remain unpaid on the Petition Date or are submitted after the Petition Date for pre-petition periods, the Debtors seek authorization to pay those amounts.

70.     The Debtors also wish to honor the claims under the policy of both exiting and continuing employees and have budgeted for payment of such claims in the Chapter 11 operating budget. Specifically, the Debtors have budgeted approximately $20,000 per week to satisfy such claims.

71.     **Pre-Petition Employee Benefits Withheld from Paychecks and Related Deductions**. The Debtors deduct from their employees' paychecks payroll taxes and the employees' portion of FICA and unemployment taxes, employee contributions for health benefits and legally ordered deductions such as wage garnishments, child support and tax levies, if any (the "Employee Deductions"). The Debtors forward amounts equal to any Employee Deductions from their main bank accounts to appropriate third-party recipients. Due to the commencement

20

of these Chapter 11 Cases, funds were deducted from employee salaries but may not have been forwarded to appropriate third-party recipients. The Debtors estimate that, regarding the Core Stores, they will withhold approximately $30,000 per bi-weekly payroll in Employee Deductions.[9]

72.    In the Wage Motion, the Debtors seek authority to forward the Employee Deductions, if any, to the appropriate parties.

73.    **Pre-Petition Reimbursable Expenses**. Prior to the Petition Date and in the ordinary course of their business, the Debtors reimbursed employees and officers for certain business-related expenses incurred in the scope of their employment, including, without limitation, business meals, phone costs and other miscellaneous business expenses incurred on behalf of the Debtors with the understanding that the employee would be reimbursed (the "Employee Expenses"). The Debtors believe that there are no outstanding Employee Expenses due, but seek authority to pay any claims for same that may arise, provided that no single expense report exceeds $1,000 per person and $10,000 in the aggregate for all expenses.

74.    **Employee Bonuses**. The Debtors maintain a bonus program based upon the achievement of three qualifiers: year over year comparable sales of 2.5% or greater; actual total controllable profit at or better than budget; and flow through of incremental budgeted sales by 45% or better. The bonuses are usually paid to general managers, area directors, regional directors, and catering executives on a monthly basis after finalizing the account period end process; however, the payment of these bonuses was delayed.

75.    From the October 10th payroll, approximately $20,000 is scheduled to be paid on account of bonuses.

---

[9]    The Debtors have arrived at the estimate by analyzing the actual payroll deductions from the week ending September 26, 2016 net of the Exit Stores.

21

76.   **Exit Store Layoffs.**  Regarding former employees of the Debtors, as noted above, immediately prior to the Petition Date, the Debtors identified the store locations with the most significant losses and closed those store locations (i.e., the Exit Stores) and reduced their workforce accordingly.  As a result, between approximately September 26, 2016 and the Petition Date, the Debtors closed approximately 29 locations and laid off approximately 450 full and part time employees (i.e., the Exit Store Layoffs).  Most of the employees impacted by the Exit Store Layoffs were lower wage, hourly workers.  In addition, many worked part-time.  The Debtors provided each employee a final check for all services provided to the Debtors through the last date of service, inclusive of earned but unused paid time off (i.e., PTO).

77.   Most of the former employees impacted by the Exit Store Layoffs have already received payment of their final check via direct deposit.  Of those employees who received a paper check, the Debtors expect that many of the former employees impacted by the Exit Store Layoffs have already deposited and/or cashed their final checks.  However, to the extent that any such checks are currently working through the banking systems, the Debtors request authority for the banks holding their payroll accounts to honor the final checks paid to employees who were part of the Exit Store Layoffs.

G.   **Debtors' Motion for Entry of Order Granting Authority to Continue to Use Certain of Their Pre-Petition Bank Accounts, Check Stock and Existing Business Forms**

78.   The Debtors also have requested authority to continue to use certain pre-petition bank accounts, check stock and existing business forms as described below.  To service its operations, the Debtors have a comprehensive cash management system in place, which is reviewed and monitored by the Debtors' internal accounting staff.  If the Debtors were required to close existing bank accounts and open new accounts, there would likely be a meaningful disruption in the Debtors' ability to collect and disburse funds in the ordinary course of their

Client Matter/27288/1/A3472814.DOC

operations.  As explained below, the Debtors use a centralized cash management system (the

"Cash Management System") to collect and transfer funds from and for, and to pay expenses

incurred by the Debtors.

79.    **Cash Management System**.  JPMorgan Chase Bank operates as the Debtors'

central bank.  The central bank has a main operating account and six zero balance accounts

(ZBAs) that are funded by the main operating account.  The Debtors have 10 regional depository

bank accounts at other multiple banks which are located in close proximity to each store to

provide for timely daily deposits.

80.    The Debtors receive deposits from store sales, house accounts and franchisee

royalties.  These funds are deposited into one of three depository zero balance accounts at

JPMorgan Chase.  Deposits are made daily by the stores from the previous days transactions.

Store sales tendered by Visa, MasterCard, American Express and Discover are settled into the

Merchant Card depository zero balance account and swept to the main operating account daily.

Monies deposited from the regional banks are swept directly into the main operating account bi-

weekly.  House account deposits and franchisee royalty payments are deposited when received

and funded directly into the main operating account.

81.    The Debtors maintain four (4) separate controlled disbursement zero balance

accounts each related to payroll, manual payroll, utilities, and vendor accounts payable (including

rents and sales taxes) and funded by the main operating account.  Payroll taxes, garnishments,

and 401k funds are pulled directly from the main operating account.

82.    All financial transactions are identified by different sequential numbers, tracked

internally by the Debtors' accounting system and reconciled monthly.  All discrepancies are

researched immediately and brought to management's attention if needed.

Client Matter/27288/1/A3472814.DOC

83.  **Intercompany Transfers.**  As noted previously, the Debtors operate on a fully consolidated basis and, therefore, they do not record intercompany transfers in the ordinary course.  Although the Debtors have the ability to "recreate" transfers between corporate entities, such exercise would be extremely time-consuming and potentially unnecessary.  The Debtors will consider at a later date whether to seek substantive consolidation of their estates.

84.  The Debtors are seeking authority to use the above described "cash management system" in the same manner as such accounts were used prior to the commencement of the Debtors' bankruptcy cases.

**H.  Debtors' Motion for an Order Authorizing (I) the Debtors to Remit and Pay Certain Taxes and Fees and (II) Financial Institutions to Process and Cash Related Checks and Transfers**

85.  The Debtors: (a) collect sales and use taxes from their customers for ultimate remittance to taxing authorities; (b) incur taxes, including gross receipt, franchise, real and personal property, income, entertainment, and other taxes in operating their business (items (a) and (b) together, collectively, the "Taxes"); (c) charge fees and other similar charges and assessments on behalf of various taxing, licensing, and other governmental authorities; and (d) pay fees to such authorities for licenses and permits required to conduct the Debtors' business in the ordinary course (items (c) and (d) together, collectively, the "Fees").  The Debtors pay the Taxes and Fees bi-weekly, monthly, quarterly, semi-annually, or annually to the respective taxing authorities (the "Authorities"), in each case as required by applicable laws and regulations.

86.  The Debtors seeks authority to pay any Taxes and Fees that were accrued pre-petition and in the ordinary course of business, but were not in fact paid or processed pre-petition, or were paid in an amount less than is actually owed, or to the extent any such payments made pre-petition were rejected, lost or otherwise not received in full by any Authority.

87.     Although the Debtors seek authority to make the requested payments, they do not believe that the Court should direct them to pay any specific Taxes or Fees. Additionally, the relief sought in this Motion is with respect to any Taxes and Fees that were currently owed as of the Petition Date or that were timely paid prior to the Petition Date, but such payment had not been processed as of the Petition Date.

88.     This Motion does not seek relief to pay past due Taxes or Fees as all Taxes and Fees are current.

89.     The Debtors' failure to pay the Taxes and Fees could have a material and adverse impact on its ability to operate in the ordinary course of business and thus impair this proceeding to the detriment of all constituents.

90.     Furthermore, many of the tax liabilities may constitute trust fund taxes that the Debtors have collected and holds in trust for the benefit of the Authorities. Therefore, such funds are not property of the estate. Moreover, to the extent that the Authorities would hold a secured or priority claim for the Taxes and Fees, payment of these amounts at this time will not give the Authorities any more recovery than they would otherwise be entitled to under the Bankruptcy Code.

91.     Accordingly, the Debtors seek entry of an order authorizing, but not directing, the Debtors to pay any Taxes and Fees that are determined to be owed without regard to whether such obligations accrued or arose before or after the Petition Date.

Client Matter/27288/1/A3472814.DOC

**I.     Debtors' Motion for Entry of an Order Authorizing the Debtors to Honor Certain Pre-Petition Obligations to Customers and to Otherwise Continue Customer Practices and Programs in the Ordinary Course of Business**

92.     The Debtors seek an Order authorizing the Debtors to honor or pay certain pre-petition obligations to its customers in the ordinary course of business (the "Motion to Honor Gift Cards and Customer Programs").

93.     Prior to the Petition Date and in the ordinary course of its business, the Debtors engaged in certain practices to maximize sales, engender customer loyalty, and develop and sustain brand loyalty and a positive reputation in the marketplace. These practices include, but are not limited to, the following: (i) a gift card program (the "Gift Card Program"); (ii) a loyalty rewards program (the "Loyalty Program"); and (iii) coupons/discounts (the "Discount Program"; collectively with the Gift Card Program and the Loyalty Program, the "Customer Programs").

94.     The Customer Programs, which are common place among establishments similar to those operated by the Debtors, are described in detail in the Motion to Honor Gift Cards and Customer Programs. The common goals of Customer Programs are to meet competitive pressures, ensure customer satisfaction, and generate brand loyalty and goodwill for the Debtors, thereby retaining current customers, attracting new ones, and ultimately improving the going concern value of the business.

95.     The Debtors wish to continue the Customer Programs post-petition in the ordinary course, which have been beneficial to their businesses (i.e., by honoring accrued rewards, pre-

petition coupons and outstanding gift cards).[10]  Such relief is necessary to preserve the Debtors'

critical customer relationships and goodwill for the benefit of the estates.

96.   As of the Petition Date, the Debtors have temporarily suspended ceased certain

aspects of the Gift Card Program which were in place prior to the Petition Date.  Specifically, the

Debtors have stopped (i) selling gift cards to their customers and (ii) offering customers the

option of loading additional funds onto pre-paid cards.  Subject to Court approval, the Debtors

wish to re-start the sales of Gift Cards post-petition and will segregate funds obtained from

customers post-petition toward the purchase of Gift Cards.

97.   The Debtors have accounted for honoring extant Gift Cards, loyalty rewards, and

discounts in their budget and believe that maintaining the Customer Programs will preserve the

going concern value of the business.

**J.    Motion of the Debtors for an Order Authorizing and Approving the Rejection of
Certain Unexpired Leases**

98.   The Debtors seek an Order authorizing the Debtors to reject certain unexpired

leases (the "Motion to Reject Leases").

99.   As noted above, prior to the Petition Date, the Debtors identified certain restaurant

locations that were unprofitable and did not fit into the Debtors' go-forward strategy, and

subsequently closed approximately 29 locations (i.e., the Exit Stores).

100.   The Debtors are the counterparty to several leasing arrangements covering certain

real property formerly used in connection with their pre-petition operations at the Exit Stores

---

[10]   As of the Petition Date, the Debtors estimate that customers had earned credits related to the Loyalty Program
equivalent to $603,000 in value.  Notably, however, the credits were earned over a long period of time and the
Debtors anticipate only a small portion will be redeemed during the Chapter 11 period.  On average, customers
typically redeem credits worth $20,000 per month.

As of the Petition Date, the amount of outstanding Gift Cards redeemable at the Debtors' locations totaled
approximately $1.64 million; however, a substantive portion of those Gift Cards are "stale" (i.e., $1,588,411.85 in
gift cards outstanding for more than 6 months, $866,901.08 of which has been outstanding for more than 60
months).

Client Matter/27288/1/A3472814.DOC

("the Exit Leases"). In order to avoid any unnecessary administrative obligations which may

arise under the Bankruptcy Code, the Debtors seek authority to reject the Exit Leases. All of

these stores were either unprofitable, geographically undesirable or had issues with leases, and

the carrying costs also made the Debtors less desirable to potential buyers. The Debtors have

ceased operations at the Exit Stores, and have either completely or substantially vacated the

premises. The Debtors have secured and removed personal property that, in their business

judgment, had more than a de minimis value to the Debtors and their estates, and have sought the

Court's approval to abandon any property thereafter remaining at the Exit Stores.

101.   The Debtors believe that the requested relief is vital to preserving the value of the

estates.

**K.**   **Motion to Approve Key Employee Retention Plan**

102.   As a multi-unit fast-casual restaurant chain, the retention of trained employees is

critical to maintaining the value of the enterprise. Certainly, the remaining COSI employees are

necessary and vital to ensuring that operations continue uninterrupted during the Chapter 11

period.

103.   As a result of the potential for employee losses and the damage that would do to

value, the Company has requested approval of a Key Employee Retention Program (a "KERP")

which will provide certain employees with financial incentives to remain with the Company (the

"Retention Benefits"). Specifically, the participants in the proposed KERP identified to date are

approximately 125 valuable, hard-to-replace employees, most of whom are non-insiders at the

corporate manager or store manager level (the "Participants"). The KERP is intended to

incentivize these employees to remain with the Company as the Company transitions under a

buyer, as well as to help manage the Company's ongoing operations and the administration of the

Company during the Chapter 11 Cases.

28

104.    Under the proposed KERP, KERP Participants will have the ability to receive three cash "bonus pool" payments, payable as follows: (a) 30-day pay-out equal to 30% of the designated bonus pool; (b) 60-day pay-out equal to 30% of the designated bonus pool; and (c) 90-day pay-out equal to 40% of the designated bonus pool.  The proposed designated bonus amounts for each Participant range from $710 to $8,000.  The total proposed amount anticipated to be paid under the KERP is approximately $258,000.

105.    I believe the KERP is necessary and appropriate and, as such, the Debtors seek approval of the KERP and the employee Retention Benefits as part of their First Day Motions.

### III.    CONCLUSION

106.    Accordingly, for the reasons stated herein and in each of the first day applications and motions, the Debtors respectfully request that the First Day Motions be approved.

29

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 28th day of September, 2016.

_____
Edward Schatz
Acting Chief Financial Officer of the Debtors and
Debtors-in-Possession

# EXHIBIT A

## COSI, INC. LEGAL ORGANIZATION CHART
### (as of 04/01/2016)

| Name | State of Incorporation | Date of Incorporation / Date became Cosi, Inc. Subsidiary | Ownership | Parent / Subsidiary |
|---|---|---|---|---|
| Cosi, Inc. | Delaware | May 15, 1998 | Public Company | Parent |
| **Wholly-Owned Subsidiaries of Cosi, Inc.** | | | | |
| Xando Cosi of Maryland, Inc.<br><br>Note: Entity is party to certain leases and/or holds certain liquor licenses<br>(Also Guarantor on Miller / Berger debt) | Maryland | April 11, 2002 | 100% by Cosi, Inc. | Subsidiary |
| Cosi Sandwich Bar, Inc.<br><br>Note: Entity is a party to certain leases<br>(Also Guarantor on Miller / Berger debt) | Delaware | June 30, 1998 | 100% by Cosi, Inc. | Subsidiary |
| Cosi MDS, Inc.<br><br>Note: Entity is inactive and being allowed to dissolve. | Delaware | March 29, 2004 | 100% by Cosi, Inc. | Subsidiary |
| Hearthstone Associates, LLC | Massachusetts | October 5, 2005 (became subsidiary of Cosi, Inc. upon Merger (1) | 100% by Cosi, Inc. | Subsidiary |
| **Indirect Subsidiaries of Cosi, Inc.** | | | | |
| Hearthstone Partners, LLC | Massachusetts | November 17, 2005 (became subsidiary of Cosi, Inc. upon Merger (2) | 100% by Hearthstone Associates, LLC | Indirect Subsidiary |

(1) Hearthstone Associates, LLC, became a wholly-owned subsidiary of the Company on April 1, 2015, pursuant to a merger with and into Cosi-Hearthstone Merger Sub, LLC, a wholly-owned subsidiary of the Company, whereby Hearthstone Associates, LLC, was the surviving entity ("Hearthstone Merger").

(2) Hearthstone Partners, LLC, is a wholly-owned subsidiary of Hearthstone Associates, LLC, and thus became an indirect subsidiary of the Company upon completion of the Hearthstone Merger on April 1, 2015.



[1] Cosi MDS, Inc. has no operations and will be dissolved under state law.

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## (EASTERN DIVISION)

In re:

COSI, INC., *et al.,*[1]

      Debtors.

Chapter 11
Case No. 16-_13704_____

**(Joint Administration Requested)**

### DECLARATION RE: ELECTRONIC FILING

    I, Edward Schatz of The O'Connor Group, Inc., Acting Chief Financial Officer of the

above-captioned Debtors, **hereby declare under penalty of perjury** that all of the information

contained in my Declaration in Support of Chapter 11 Petition and First Day Pleadings

(singularly or jointly the "Document"), filed electronically, is true and correct.  I understand that

this DECLARATION is to be filed with the Clerk of Court electronically concurrently with the

electronic filing of the Document.  I understand that failure to file this DECLARATION may

cause the Document to be struck and any request contained or relying thereon to be denied,

without further notice.

    I further understand that pursuant to the Massachusetts Electronic Filing Local Rule

(MEFLR)-7(a) all paper documents containing original signatures executed under the penalties

of perjury and filed electronically with the Court are the property of the bankruptcy estate and

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of the federal tax identification number for
each of the Debtors, are Cosi, Inc. (3745), Xando Cosi of Maryland, Inc. (2196), Cosi Sandwich Bar, Inc.
(0910), Hearthstone Associates, LLC (6267), and Hearthstone Partners, LLC (9433).  The Debtors' corporate
offices are located at 294 Washington Street, Suite 510, Boston, Massachusetts 02108.

shall be maintained by the authorized CM/ECF Registered User for a period of five (5) years

after the closing of this case.

Dated: September 28, 2016          _____ (Affiant)

                                   Edward Schatz
                                   Acting Chief Financial Officer
                                   Cosi, Inc.