**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)**

| | |
|---|---|
| **In re:** <br><br> **COSI, INC., *et al.*,**[1] <br><br> **Debtors.** | **Chapter 11** <br> **Case No. 16-13704-MSH** <br><br> **(Joint Administration Requested)** |

**DEBTORS' MOTION UNDER 11 U.S.C. §§ 105(a), 361, 362(c)(2), 363(e) AND 364
AND FED. R. BANKR. P. 2002, 4001 AND 9014 FOR ORDER
(I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION
FINANCING AND (II) GRANTING ADEQUATE PROTECTION
TO PREPETITION SECURED PARTIES**
**Emergency Hearing Requested**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Cosi, Inc., on behalf of itself and affiliated debtors and debtors-in-possession (collectively, the "Debtors"), pursuant to 11 U.S.C. §§ 105(a), 361, 362(c)(2), 363(e) and 364 and Fed. R. Bankr. P. 2002, 4001 and 9014, hereby requests that this Court enter an Order authorizing the Debtors to obtain post-petition financing, on the terms more fully described below, on an interim basis in the form submitted herewith, and on a final basis.  In support hereof, the Debtors represent as follows:

**Summary of Relief Requested Herein**

1.     By this motion (the "Motion"), the Debtors request entry of an interim order substantially in the form annexed hereto as ***Exhibit A*** (the "Interim Order") and thereafter a final order (the "Final Order" and, together, the "DIP Financing Orders") as follows:

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of the federal tax identification number for each of the Debtors, are Cosi, Inc. (3745) ("Cosi") and its subsidiaries, Xando Cosi of Maryland, Inc. (2196) ("Xando"), Cosi Sandwich Bar, Inc. (0910) ("CSB"), Hearthstone Associates, LLC (6267) ("HALLC"), and Hearthstone Partners, LLC (9433) ("HPLLC"; collectively with Xando, CSB, and HALLC, the "Subsidiaries").  The Debtors' corporate offices are located at 294 Washington Street, Suite 510, Boston, MA  02108.

    a.    authorizing, on an interim and permanent basis, the Debtors to:

        (i)    obtain, pursuant to sections 364(c), (d) and (e) of the Bankruptcy Code, postpetition financing in the form of a $4,100,000 debtor-in-possession credit facility (the "DIP Facility") pursuant to the terms set forth in the Debtor-In-Possession (DIP) Financing Term Sheet (the "Term Sheet"), a copy of which is annexed hereto as ***Exhibit B-1***, and a Secured Debtor-In Possession Promissory Note in substantially the form of the form of note annexed hereto as ***Exhibit B-*** 2 (the "DIP Loan Agreement"), by and among the Debtors and AB Opportunity Fund LLC ("AB Opportunity"), AB Value Partners, L.P. ("AB Value") and one or more entities affiliated with MILFAM II L.P. ("Milfam"; collectively with AB Opportunity and AB Value, the "DIP Lenders"); and

        (ii)    grant to the DIP Lenders: (A) pursuant to sections 364(c)(2), (c)(3) and (d), as security for repayment of all obligations arising under the DIP Facility, security interests in and liens on substantially all assets of the Debtors[2]; and (B) superpriority administrative expense claim status pursuant to sections 364(c), 503(b) and 507 of the Bankruptcy Code, all as more fully described below and in the Interim Order;

    b.    approving the terms and conditions of the Term Sheet with respect to the DIP Facility and the documents to be executed in connection therewith, including the DIP Loan Agreement, and authorizing the Debtors to execute and deliver, from time to time, all such documents, instruments and agreements and perform such other acts as may be required, necessary or desirable in connection with the DIP Facility including, without limitation, the payment of all fees, interest and charges required under the Term Sheet and set forth in the Interim Order;

    c.    authorizing, pursuant to the Interim Order, the Debtors to borrow funds under the DIP Facility and in accordance with the Budget, a copy of which is annexed hereto as ***Exhibit C*** (the "Budget") on an interim basis through and including the date of a final hearing on the Motion (the "Final Hearing");

    d.    authorizing the Debtors, after entry of a Final Order, to borrow funds under the DIP Facility on a permanent basis including to fund the Debtor's working capital needs and for other purposes as provided in the DIP Facility and in accordance with the Budget;

---

[2] Including the assets of HPLLC, which are not subject to existing liens.

2

Client Matter/27288/1/A3475226.DOCX[Ver:2]

  e. modifying the automatic stay under Section 362 of the Bankruptcy Code to the extent necessary to permit the DIP Lenders to implement the terms and other provisions of the Term Sheet and the DIP Financing Orders; and

  f. scheduling and approving the form and manner of notice of the Final Hearing.

**2.** The provisions described in Rule 4001(c)(1)(B)(i)–(xi) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and MLBR 4001-2 are set forth at the following sections of the Term Sheet and/or Interim Order, as applicable:

  (i) **Grant of Priority or a Lien on Property of the Estate:** Term Sheet page 2; Interim Order paras. 7, 8.

  (ii) **Adequate Protection for Existing Liens:** Term Sheet page 3; Interim Order para. 9.

  (iii) **Determination of Validity of Existing Claims:** Term Sheet page 3; Interim Order para. I.

  (iv) **Modification of the Automatic Stay:** Interim Order paras. 33, 34.

  (v) **Release, Waiver, or Limitation on Rights under section 506(c) Under Final Order:** Interim Order paras. 37, 38.

  (vi) **Limitation on Right to Seek Further Financing:** Interim Order para. 24(j).

  (vii) **Automatic Perfection of Liens:** Interim Order para. 11.

  (viii) **Indemnification of Lenders:** Interim Order para. 14.

  (ix) **Waiver of 506(c) Claims:** Interim Order para. 35.

  (x) **Lien Not Granted on Claims Arising under chapter 5, Except For section 549:** Interim Order: para. 8(a).

  (xi) **Disparate Carveouts:** Term Sheet page 11.

  (xii) **Payment of Secured Lenders' Expenses:** Term Sheet page 12; Interim Order paras. 5(b), 12.

3. The Debtors submit that the requested relief is critical to their ability to continue to operate as a going concern, and to preserve and protect the value of their assets and operations for the benefit of their stakeholders. As discussed more fully below, the Debtors require immediate access to working capital to fund and support ordinary business expenditures, including payroll and employee benefits, rent, utilities, and other overhead expenses. Absent immediate and uninterrupted access to adequate financing, the Debtors will not have sufficient liquidity to sustain any level of business activity. Immediate funding is required to continue ordinary course business operations and to preserve and maximize the value of the Debtors' assets.

4. Moreover, concurrently with this Motion, the Debtors are filing a motion (the "Sale Procedures Motion") seeking approval, on an expedited basis, of proposed sale procedures for the sale of substantially all of their assets, subject to higher and better offers. As discussed in the Sale Procedures Motion, an expedited sale of the Debtors' assets is critical and necessary to maximize the value of such assets for the benefit of all creditors. Thus, any inability or delay in obtaining funding pursuant to the DIP Facility will jeopardize not only the Debtors' business operations, but also its proposed sale and auction process, resulting in immediate and irreparable harm to the Debtors' creditors and estates. Accordingly, and as more fully set forth below, the Debtors submit that the financing arrangements proposed herein are reasonable and necessary, serve the best interests of the Debtors' creditors and estates, and should be approved in all respects.

5. In support of the Motion, the Debtors rely upon and fully incorporate herein by reference the *Declaration of Patrick Bennett, Interim CEO and President of the Debtors, in Support of Chapter 11 Petition and First Day Pleadings* (the "Bennett Declaration") and *Declaration of Edward Schatz, The O'Connor Group, Inc., Acting Chief Financial Officer of*

4

Document    Page 5 of 19

*the Debtors, in Support of Chapter 11 Petition and First Day Pleadings* (the "Schatz Declaration"; together with the Bennett Declaration, the "Declarations"), filed with the Court concurrently herewith.

In further support of this Motion, the Debtors submit the following:

**Jurisdiction and Venue**

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory predicates for the relief requested herein are sections 11 U.S.C. §§ 105(a), 361, 362(c)(2), 363(e) and 364 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and Federal Rules of Bankruptcy Procedure 2002, 4001 and 9014.

**Background**

2. On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code.

3. The Debtors continue to operate their business and to manage their property as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4. No trustee or examiner has been requested or appointed in these cases and no creditors' committee has been established in this case.

5. Each of the Debtors has filed a Motion for Order Authorizing Joint Administration of Chapter 11 Cases Pursuant to Federal Rule of Bankruptcy Procedure 1015 and MLBR 1015-1 for procedural purposes only under the case of Debtor Cosi, Inc.

6. Debtor Cosi, Inc. ("COSI") is an international fast casual restaurant company specializing in a variety of made-to-order hot and cold sandwiches, salads, bowls, breakfast wraps, "Squagels" (square bagels), melts, soups, flatbread pizzas, S'mores, snacks, desserts,

and a large offering of handcrafted, coffee-based, and specialty beverages. Prior to the Petition Date, the Debtors had 72 debtor-owned locations and 35 franchised locations in the United States, the United Arab Emirates, and Costa Rica. Also prior to the Petition Date, the Debtors employed approximately 1,555 people, 82% of whom worked on a part-time basis. As of the end of the Company's fiscal second quarter of 2016 (i.e., as of June 27, 2016), the Debtors had consolidated net sales of $22.3 million, with net losses of approximately $3.1 million and cash on hand of approximately $3 million. Since the close of the Company's fiscal second quarter of 2016, sales have deteriorated further, losses have increased, and cash on hand has decreased to approximately $950,000 in the operating account as of the Petition Date.[3] The Debtors' corporate headquarters are located in Boston.

7. The events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are set forth in the Declarations filed contemporaneously herewith and incorporated herein by reference.

8. To attempt to preserve the core business enterprise and provide the best opportunity to deliver a return to creditors and preserve a significant number of jobs, immediately prior to the Petition Date, the Debtors identified the store locations with the most significant losses (the "Exit Stores"), closed those store locations, and reduced their workforce accordingly. As a result, between approximately September 26, 2016 and the Petition Date, the Debtors closed approximately 29 locations and laid off approximately 450 full and part-time employees (the "Exit Store Layoffs").

9. The Debtors have preserved the remaining viable locations (the "Core Stores"), , consisting of approximately 43 locations, and jobs for the remaining approximately 1,100

---

[3] The Debtors also have multiple depository accounts which are maintained at locations in proximity to the Debtors' restaurants and which have varying balances depending on day-to-day operations and restricted cash accounts, all of which are not included in the operating account balance above.

6

full and part-time employees with the hopes of consummating a sale to a buyer to accomplish a turnaround of the core business and maximize the recovery to the estates.

### The Debtors' Secured Creditors

10. In April and May of 2014, the Debtors entered into a series of financing transactions with three senior lenders, Milfam, AB Opportunity and AB Value (collectively, in their capacity as pre-petition lenders, the "Senior Secured Lenders"). The financing by the Senior Secured Lender is referred to herein as the "2014 Financing."

11. In connection with the 2014 Financing with the Senior Secured Lenders, COSI executed promissory notes (the "Senior Secured Notes") in favor of the Senior Secured Lenders[4] which have <u>current</u> principal balances as follows:

| | |
|---|---|
| Milfam | $5,000,000 |
| AB Opportunity | $2,000,000 |
| AB Value | $   500,000 |
| Total | $7,500,000 |

12. Also in connection with the 2014 Financing, two of the Subsidiaries, Xando and CSB, are obligated to the Senior Secured Lenders on certain guaranties (the "Guaranties") pursuant to which Xando and CSB have guaranteed COSI's obligations to the Senior Secured Lenders.

13. Each of the Senior Secured Notes and the Guaranties related to the 2014 Financing contains a grant of an interest in each respective Debtor's assets. Also in connection with the 2014 Financing, COSI provided the Senior Secured Lenders with a

---

[4] Although the Debtors will be stipulating in the interim order as to the allowance validity of claims under the Senior Secured Notes, as set forth herein, except as specifically set forth in the Interim Order, the Debtors reserve all rights for themselves and their successors to challenge the validity and/or enforceability of the liens securing the Senior Secured Notes and the Senior Secured Lenders reserve all rights to defend such liens..

7

Pledge Agreement by which COSI pledged its ownership interest in one of the Subsidiaries, HALLC, to the Senior Secured Lenders. HALLC is the 100% owner of the operating subsidiary HPLLC. The Senior Secured Lenders filed financing statements in connection with these security interests. The Senior Secured Lenders have no direct collateral interest in HPLLC.

14. In September 2016, pursuant to the further assurances provisions of the Senior Secured Notes and in connection with restructuring discussions with the Debtors, the Senior Secured Lenders requested that the Debtors confirm and further assure their lien position by executing a Collateral Agreement. As a result of the Senior Secured Lenders' requests, on September 9, 2016, all of the Debtors, except HPLLC, entered into a Collateral Agreement (the "2016 Collateral Agreement"). The 2016 Collateral Agreement provided a more detailed description of all of the assets in which certain of the Debtors granted security interests to the Senior Secured Lenders in 2014. COSI, Xando, CSB and HALLC are parties to the 2016 Collateral Agreement. The Debtors believe and they have informed the Senior Secured Lenders that the Debtors may be able to challenge the liens granted to the Senior Secured Lenders under certain provisions of the Bankruptcy Code including, among others, preference avoidance.

15. The Senior Secured Lenders have informed the Debtors that they believe they have defenses to any actions the Debtors may take to avoid the Senior Secured Lenders' interests and that at least certain of the liens granted in connection with the 2014 Financing are not in any event avoidable, including the Senior Secured Lenders' asserted lien on intellectual property that is described in certain filings with the U.S. Patent and Trademark Office. In connection with the DIP Facility, the Debtors and the Senior Secured Lenders are fully reserving all rights with respect to the status of the prepetition liens, and all issues

related to the potential challenges to the liens securing the 2014 Financing and the 2016 Collateral Agreement will be preserved for later determination or resolution in these bankruptcy cases. In addition, in connection with this present dispute regarding the status of the prepetition liens, the Senior Secured Lenders have agreed, subject to the entry of the DIP Orders, that they will be restricted in their ability to "credit bid" the Senior Secured Notes in the sale process, while preserving all other rights in connection with their asserted status as secured creditors.

16. In addition to financing statements filed by the Senior Secured Creditors, there are UCC financing statements filed on behalf of First Franchise Capital Corporation, Santander Bank and American Express Bank. The obligations of the Debtors to each of those entities have been fully satisfied.

17. As set forth in the Term Sheet, the Senior Secured Lenders, in their capacity as DIP Lenders, have agreed, subject to entry of the DIP Orders, to make post-petition loans of up to $4,100,000 ($1,800,000 on an interim basis) to the Debtors to fund operations prior to the proposed sale of the Debtors' assets (the "DIP Loans") pursuant to, and on the terms set forth in the Debtors' Term Sheet and the Interim Order.

18. The DIP Lenders will receive liens on substantially all of the Debtors' assets (other than avoidance actions under section 544, 547 and 548 of the Bankruptcy Code) to secure the DIP Loans. The ultimate Interim Order and/or the Final Order may provide for the DIP Facility priming the liens of the Senior Secured Lenders with the consent of the Senior Secured Lenders. In addition, subject to the completion of due diligence and the execution and delivery of a stalking horse asset purchase agreement, the DIP Lenders have agreed to act as a stalking horse purchaser for the sale pursuant to section 363 and 365 of the Bankruptcy Code of substantially all of the Debtors' assets pursuant to a transaction in which the DIP

9

Lenders will credit bid their DIP obligations and provide substantial consideration to the estates.

## Relief Requested

19. The Debtors request the authority to enter into the DIP Loans to fund operational and administrative expenses until the Debtors can accomplish a sale of substantially all of their assets to the DIP Lenders or to another high bidder.

20. The principal terms of the DIP Facility are as follows:

| | |
|---|---|
| DIP Facility: | A senior secured, superpriority credit facility in an amount up to $4,100,000.00 ($1,800,000 on an interim basis) |
| Borrowers: | Each of the Debtors, jointly and severally. |
| DIP Lenders: | AB Opportunity, AB Value and Milfam, whose obligations will be several and not joint. |
| Purpose: | The DIP Facility will be used to finance working capital and general corporate purposes of the Debtors and for the payment of administrative expenses arising in the Debtors' chapter 11 cases, in each case in a manner consistent with the Budget. |
| Interest: | Twelve percent (12%) per annum. |
| Security and Superpriority Claim: | Superpriority Liens: To secure the prompt payment and performance of the DIP Obligations (as defined in the Interim Order), the DIP Lenders shall be granted, pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, priming, continuing, valid, binding, enforceable, unavoidable, and automatically perfected postpetition security interests and liens (as defined in the Interim Order, the "DIP Liens"), senior and superior to all other secured and unsecured creditors of the Debtors' estates, in and upon DIP Collateral (as defined in the Interim Order), which collateral includes all presently owned and hereafter acquired assets and real and |

|  |  |
|---|---|
|  | personal property of the Debtors. The DIP Lien shall be first, valid, prior, perfected, unavoidable and superior to any other liens and security interests except for valid and enforceable prepetition liens that are not avoided. Notwithstanding the foregoing, the DIP Liens shall not include, among other things, a lien on any avoidance action under chapter 5 of the Bankruptcy Code or the proceeds thereof, other than proceeds of any avoidance action brought pursuant to section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral. |
|  | <u>Superpriority Administrative Claim</u>:  All DIP Obligations shall be an allowed superpriority administrative expense claim (the "DIP Superpriority Claim" and, together with the DIP Liens, the "DIP Protections") with priority in the Debtors' case under sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and the estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in, arising, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. |
| Term: | All obligations under the DIP Facility, accrued or otherwise, will be due and payable in full on the earliest to occur of (i) the closing of a sale of all or a substantial part of the assets of the Debtors; or (ii) the three-month anniversary of the Petition Date; or (iii) the occurrence and declaration of an Event of Default (as defined in the Interim Order and the DIP Loan Agreement). |

11

| | |
|---|---|
| Remedies on Event of Default: | In addition to other customary remedies, the Interim Order provides upon the occurrence and continuance of any Event of Default and at any time thereafter, the DIP Lenders shall be entitled to declare a termination event and to exercise their rights and remedies without seeking relief from the automatic stay unless the Debtors obtain an order enjoining the DIP Lenders within three days. |

The Debtors believe that the terms of the DIP Facility pursuant to the DIP Financing Agreement are reasonable and fair under the circumstances and, therefore, that the financing provided under the DIP Facility serves the best interests of the Debtors, their creditors and their estates.

### **The Budget**

21. The Debtors have prepared the Budget that details the Debtors' proposed use of cash. The Budget spans the duration of the Debtors' expected operations from the Petition Date through the week beginning December 26, 2016 (the "Budget Period"). The Debtors anticipate closing the sale transaction during the week of November 28, 2016, and that the DIP Loans will be sufficient to fund operations until that date.

22. Among other things, the Budget identifies the Debtors' estimated receipts and expenses for the Budget Period. It also incorporates the funds from the DIP Loan. The Debtors believe that the Budget reflects a reasonable projection of their operations for the Budget Period.

23. The expenses set forth on the Budget are the ordinary course business expenses necessary to maintain the Debtors' operations and, therefore, to preserve the value of the Debtors' assets.

Client Matter/27288/1/A3475226.DOCX[Ver:2]

**Need for Financing**

24. The principal assets of the Debtors consist of cash, accounts receivable, equipment, inventory, general intangibles, intellectual property and leasehold interests. As a result of, among other things, sales declines in the Debtors' stores and other adverse business conditions, the Debtors do not have sufficient liquidity to meet their obligations and do not believe that any sources of capital will be forthcoming in the near or medium term to meet their past and present obligations. The Debtors have substantial payables outstanding to landlords, vendors, and other creditors, and have substantial continuing obligations to landlords and to employees which require immediate infusions of cash from outside sources.

25. After extensive discussions among the Debtors and the Senior Secured Lenders, the Debtors determined that a process for the sale of all or substantially all of their assets as soon as possible was the best option for preserving the going concern value of their businesses, preserving jobs, and maximizing the recovery to their creditors. The Debtors require the financing described in the Term Sheet and the Interim Order in order to fund the cash operating expenses of the Debtors during such sale process.

26. In light of the fact that all or substantially all of the Debtors' assets are subject to asserted liens[5], including the liens of the Senior Secured Lenders, and the fact that the DIP Lenders are knowledgeable about the Debtors' businesses as a result of, among other things, the pre-petition loans, the obtaining of the DIP Financing from the DIP Lenders is the only source of capital available to the Debtors to fund the sale process, in which the DIP Lenders have expressed interest in serving as a stalking horse bidder. If the Debtors do not obtain authorization to borrow and the DIP Loans are not approved, the Debtors will suffer immediate and irreparable harm, and the failure to obtain authorization would almost certainly

---

[5] With the exception of the assets of HPLLC.

cause material disruption to the sale process, which will ultimately cause irreparable harm to the Debtors and their estates, and creditors.

27.     The Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503 of the Bankruptcy Code, or other financing under sections 364(c) of the Bankruptcy Code, on equal or more favorable terms than those set forth in the Term Sheet and Interim Order.  A loan facility in the amount provided by the DIP Lenders is not available to the Debtors without granting the DIP Lenders the superpriority claims, liens, and security interests, pursuant to sections 364(c)(1), (2), and (3) of the Bankruptcy Code, as provided in this Interim Order and the Term Sheet.  After considering all alternatives, the Debtors have concluded, in the exercise of their prudent business judgment, that the proposed loan facility represents the best working capital financing available to them at this time and provides a path forward to a possible sale of all or substantially all of their assets to either entities affiliated with the DIP Lenders or other entities.

28.     Approval of the DIP Loans on the terms identified in this Motion is in the best interest of the Debtors, their estates, and their creditors.  Absent the DIP Loans, the Debtors would be required to cease operations.  The cessation of the Debtors' business operations would likely result in a significant devaluation of assets to the detriment of the Debtors and their creditors.

29.     The Debtors also submit that, other than the DIP Facility, there are no viable financing alternatives available to them under the circumstances.  In that regard, as described in more detail in the Declarations, prior to the Petition Date, the Debtors investigated several potential alternative sources of financing.

30.     Moreover, as noted, virtually all of the Debtors' assets are encumbered by liens and security interests.  Thus, even if alternative debtor in possession financing were available

14

on favorable terms and conditions and could be consummated in a time frame required to address the Debtors' immediate liquidity needs, the Debtors would be unlikely to obtain such financing absent the granting of a priming lien.

31. Thus, the Debtors are unable to obtain alternative postpetition financing through credit allowable as an administrative expense, or credit secured by liens on the Debtors' assets junior to the liens of the Senior Secured Lenders. Further, the Senior Secured Lenders consent to (and are providing) the proposed DIP Facility. In these circumstances, the Debtors, in the exercise of their considered business judgment and in consultation with their professional advisors, have determined that the financing provided by the DIP Facility is the most favorable under the circumstances and provides the Debtors the liquidity necessary to maintain the going-concern value of their business pending the conclusion of the Debtors' proposed sale process.

32. The DIP Facility, which is the product of arm's length negotiations between the DIP Lenders and the Debtors, provides the Debtors with continued financing pursuant to the terms of the Term Sheet, Budget and proposed Interim Order.

33. The Debtors will also provide adequate protection to the Senior Secured Lenders, on account of the secured portion of their prepetition claims (to the extent such liens are not ultimately avoided), in the form of post-petition liens on all of the Debtors' assets, excluding avoidance actions (the "Replacement Liens"), all of which are junior to the post-petition secured claims and liens of the DIP Lenders as set forth herein.

34. If the Debtors are unable to continue to operate their business as a going concern, the sale value of their business assets will be substantially devalued. The DIP Facility will therefore provide adequate protection to all secured creditors on account of their secured claims.

## The Granting of Senior Liens and Superpriority Administrative Claim Status to DIP Lenders in Connection with the DIP Facility is Warranted

35. Section 364 of the Bankruptcy Code authorizes this Court to allow the Debtors to obtain postpetition financing from the DIP Lenders in the manner proposed in the DIP Financing Agreement. As described above, as security for all borrowings under the DIP Facility, the Debtors propose to grant the DIP Lenders a superpriority administrative claim, and a first-priority lien and security interest in all of the assets of the Debtors.

36. The granting of superpriority administrative claim status is governed by section 364(c) of the Bankruptcy Code. Specifically, section 364(c) provides:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

37. As noted above, substantially all of the Debtors' assets are encumbered by liens granted in favor of the Senior Secured Lenders, and the Debtor is unable to obtain unsecured financing. Accordingly, Section 364(c) of the Bankruptcy Code is satisfied, and this Court is authorized to grant the DIP Lenders superpriority administrative claim status as provided in the Interim Order. By providing the financing required for the Debtors to continue operations and conduct a prompt all asset sale, the DIP Facility preserves value for all creditors.

38. Thus, for all of the reasons set forth above, the Debtors submit that the circumstances of this case require the Debtors to obtain financing pursuant to sections 364(c) and (d) of the Bankruptcy Code. The Debtors further submit that the terms of the DIP Facility and the Interim Order are fair, reasonable and necessary under the circumstances, and should be approved in their entirety.

### Modification of the Automatic Stay

39. The Interim Order provides that the automatic stay shall be modified to permit the Debtors to: (i) grant the security interests, liens and superpriority administrative expense claims described above with respect to the DIP Lenders and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) seek relief on 3 days' notice in the event that the DIP Lenders declare a default and seek to exercise their rights and remedies under the DIP Facility; and (iii) implement the Interim Order (and, if granted, the Final Order). The Debtors submit that stay modifications of the kind provided in the Interim Order are reasonable features of debtor-in-possession financing facilities, are appropriate under the circumstances that exist here, and should be approved.

### Request for Interim Approval

40. Pursuant to Bankruptcy Rule 4001(b)(2), a minimum of fourteen (14) days' notice is required before a final hearing on this Motion may commence. Upon request, however, the Court may conduct a preliminary expedited hearing on the Motion to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing. Fed. R. Bankr. P. 4001(b)(2). In accordance with Bankruptcy Rule 4001(b), the Debtors request that the Court conduct an expedited preliminary hearing on the Motion and authorize the Debtors' borrowing of up to $1,800,000 on an interim basis, pending entry of a final order. The Debtors submit that such relief is vital in order to maintain and finance the Debtors'

17

ongoing operations, preserve the going concern value of the Debtors' business and assets pending the conclusion of the proposed sale process, and, therefore, to prevent immediate and irreparable harm to the Debtors' estates. The Debtors further request that the Court schedule a hearing to consider entry of a Final Order.

41. The Debtors further submit that because the relief requested in this Motion is necessary to avoid immediate and irreparable harm, Bankruptcy Rule 6003 has been satisfied. Furthermore, to successfully implement the foregoing, the Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay under Bankruptcy Rule 6004(h).

### Notice and Hearings

42. Pursuant to MLBR 4001-2(b), the Debtors will serve this motion on (a) all known secured creditors, (b) any taxing authority that has a claim against the estate, (c) the 20 largest unsecured creditors, (d) the Office of the United States Trustee, (e) each known guarantor of the Debtors' obligations, and (f) all parties who have filed a notice of appearance in this case (the "Notice Parties"). The Debtors believe that such service provides sufficient notice in light of the nature of the relief requested and request that the Court approve such notice.

43. The Debtors further request that this Court schedule a final hearing (the "Final Hearing") on this Motion. Pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure, the Debtors request that they be authorized to provide notice of the Final Hearing by serving any interim order entered by the Court upon the Notice Parties and any statutory committee of unsecured creditors (or, if retained, its attorneys) in one of the following ways: (a) by this Court's CM/ECF System or (b) by first class mail. The cost of mailing notice to all creditors in this Chapter 11 case would be extremely expensive, and would not confer any

18

substantial benefit on the Debtors, their estate or creditors.  Moreover, notice to all creditors of a motion for authority to obtain the use of cash collateral is not required under Rule 4001(c) of the Federal Rules of Bankruptcy Procedure or MLBR 4001-2.

WHEREFORE, the Debtor respectfully requests that this Court enter an order:

A. Granting the within Motion; and

B. Entering an Interim Order, substantially in the form filed herewith, granting the relief requested herein.

Respectfully submitted,

**COSI, INC., XANDO COSI OF MARYLAND, INC., COSI SANDWICH BAR, INC., HEARTHSTONE ASSOCIATES, LLC, AND HEARTHSTONE PARTNERS, LLC**

By their proposed counsel,

/s/ Paul W. Carey
Joseph H. Baldiga, BBO # 549963
Paul W. Carey, BBO #566865
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Drive, Suite 400
Westborough, MA 01581-3926
Phone: (508) 898-1501
Fax:    (508) 898-1502
Email: bankrupt@mirickoconnell.com
Email: pcarey@mirickoconnell.com

Dated:  September 28, 2016

Client Matter/27288/1/A3475226.DOCX[Ver:2]