UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

| | |
|---|---|
| In re:<br><br>COSI, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br>Case No. 16-13704-MSH<br><br>(Joint Administration Requested) |

DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING USE
OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION,
(III) SCHEDULING A HEARING ON FURTHER USE OF CASH COLLATERAL,
AND (IV) GRANTING RELATED RELIEF
(Emergency Hearing Requested)

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Cosi, Inc., on behalf of itself and affiliated debtors and debtors-in-possession (collectively, the "Debtors"), pursuant to 11 U.S.C. §§ 361, 362, 363 and 507(b), Federal Rules of Bankruptcy Procedure 2002, 4001, and 9014, and MLBR 4001-2, hereby requests that this Court enter an Order on an interim basis (the "Interim Order") and on a final basis (the "Final Order"), in the form submitted herewith, (i) authorizing the Debtor's use of cash collateral of its pre-petition lenders and other secured parties (the "Cash Collateral"), (ii) granting adequate protection to such secured creditors in the form of replacement liens and other protections described below, and (iii) scheduling a final hearing on this Motion. **Those parties that may have an interest in the Cash Collateral are described starting on page 5 of this Motion and include Milfam II LP, AB**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the federal tax identification number for each of the Debtors, are Cosi, Inc. (3745) ("Cosi") and its subsidiaries, Xando Cosi of Maryland, Inc. (2196) ("Xando"), Cosi Sandwich Bar, Inc. (0910) ("CSB"), Hearthstone Associates, LLC (6267) ("HALLC"), and Hearthstone Partners, LLC (9433) ("HPLLC"; collectively with Xando, CSB, and HALLC, the "Subsidiaries"). The Debtors' corporate offices are located at 294 Washington Street, Suite 510, Boston, MA 02108.

Client Matter/27288/1/A3473229.DOC

**Opportunity Fund LLC, and AB Value Partners, L.P.**[2] As set forth in detail herein, the Debtors seek authority to use cash collateral and receipts in the ordinary course of business to satisfy ongoing expenses, such as payroll and employee benefits, rent, utilities, and other post-petition expenses. The Debtors seek to use Cash Collateral through the week ending December 30, 2016, when they expect to close on a sale of substantially all of their assets. As adequate protection, the Debtors propose to provide post-petition liens to the identified secured creditors on all of the Debtors' assets (excluding avoidance actions). The pre-petition lenders of the Debtors who have outstanding claims against the Debtors have consented to the relief requested herein. Accordingly, the Debtors submit that those secured creditors' interests are adequately protected. Absent authority to use cash collateral, the Debtors will be unable to operate their business, which will immediately and irreparably harm the value of their assets as a going concern.

**As set forth and highlighted herein, the Debtors request terms and conditions in this Motion that vary from MLBR 4001-2(c), including (i) acknowledgement of the amount due to prepetition lenders, though the Debtors reserve their rights with respect to the liens securing those claims, (ii) the right to relief from the automatic stay in the event of a default by the Debtors; and (iii) carveouts for certain estate professionals. Further, prior to filing these bankruptcy cases, the Debtors provided the lenders with a $250,000 deposit in connection with the post-petition financing by such lenders.**

In support of this Motion, the Debtors rely upon and fully incorporate herein by reference the *Declaration of Patrick Bennett, Interim CEO and President of the Debtors, in Support of Chapter 11 Petition and First Day Pleadings* (the "Bennett Declaration") and the *Declaration of Edward Schatz, The O'Connor Group, Inc., Acting Chief Financial Officer of the Debtors, in*

---

[2] First Franchise Capital Corporation, Santander Bank, and American Express Bank also filed UCC financing statements, but the obligations of the Debtors to each of those entities have been fully satisfied.

2

*Support of Chapter 11 Petition and First Day Pleadings* (the "Schatz Declaration"; together with the Bennett Declaration, the "Declarations") filed with the Court concurrently herewith.

In further support of this Motion, the Debtors submit the following:

### Jurisdiction and Venue

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory predicates for the relief requested herein are sections to 11 U.S.C. §§ 361, 362, 363 and 507(b) of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), Federal Rules of Bankruptcy Procedure 2002, 4001, and 9014, and MLBR 4001-2.

### Background

2. On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code.

3. The Debtors continue to operate their business and to manage their property as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4. No trustee or examiner has been requested or appointed in these cases and no creditors' committee has been established in this case.

5. Each of the Debtors has filed a Motion for Order Authorizing Joint Administration of Chapter 11 Cases Pursuant to Federal Rule of Bankruptcy Procedure 1015 and MLBR 1015-1 for procedural purposes only under the case of Debtor Cosi, Inc.

6. Debtor Cosi, Inc. ("COSI") is an international fast casual restaurant company specializing in a variety of made-to-order hot and cold sandwiches, salads, bowls, breakfast wraps, "Squagels" (square bagels), melts, soups, flatbread pizzas, S'mores, snacks, desserts, and a large offering of handcrafted, coffee-based, and specialty beverages. Prior to the Petition Date, the

3

Debtors had 72 debtor-owned locations and 35 franchised locations in the United States, the United Arab Emirates, and Costa Rica. Also prior to the Petition Date, the Debtors employed approximately 1,555 people, 82% of whom worked on a part-time basis. As of the end of the Company's fiscal second quarter of 2016 (i.e., as of June 27, 2016), the Debtors had consolidated net sales of $22.3 million, with net losses of approximately $3.1 million and cash on hand of approximately $3 million. Since the close of the Company's fiscal second quarter of 2016, sales have deteriorated further, losses have increased, and cash on hand has decreased to approximately $950,000 in the operating account as of the Petition Date.[3] The Debtors' corporate headquarters are located in Boston.

7. The events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are set forth in the Declarations filed contemporaneously herewith and incorporated herein by reference.

8. To attempt to preserve the core business enterprise and provide the best opportunity to deliver a return to creditors and preserve a significant number of jobs, immediately prior to the Petition Date, the Debtors identified the store locations with the most significant losses (the "Exit Stores"), closed those store locations, and reduced their workforce accordingly. As a result, between approximately September 26, 2016 and the Petition Date, the Debtors closed approximately 29 locations and laid off approximately 450 full and part-time employees (the "Exit Store Layoffs").

9. The Debtors have preserved the remaining viable locations (the "Core Stores") and jobs for the remaining approximately 1,100 full and part-time employees with the hopes of identifying a buyer to accomplish a turnaround of the core business.

---

[3] The Debtors also have multiple depository accounts which are maintained at locations in proximity to the Debtors' restaurants and which have varying balances depending on day-to-day operations and restricted cash accounts, all of which are not included in the operating account balance above.

Client Matter/27288/1/A3473229.DOC

## The Debtors' Secured Creditors

10. In April of 2014, the Debtors entered into a series of financing transactions with three senior lenders, Milfam II LP ("Milfam"), AB Opportunity Fund LLC ("AB Opportunity") and AB Value Partners, L.P. ("AB Value"; collectively with Milfam and AB Opportunity, the "Senior Secured Lenders"). The financing by the Senior Secured Lender is referred to herein as the "2014 Financing."

11. In connection with the 2014 Financing with the Senior Secured Lenders, COSI executed promissory notes (the "Senior Secured Notes") in favor of the Senior Secured Lenders[4] which have current principal balances as follows:

| | |
|---|---|
| Milfam | $5,000,000 |
| AB Opportunity | $2,000,000 |
| AB Value | $ 500,000 |
| Total | $7,500,000 |

12. Also in connection with the 2014 Financing, two of the Subsidiaries, Xando and CSB, are obligated to the Senior Secured Lenders on certain guaranties (the "Guaranties") pursuant to which Xando and CSB have guaranteed COSI's obligations to the Senior Secured Lenders.

13. Each of the Senior Secured Notes and the Guaranties related to the 2014 Financing contains a grant of an interest in each respective Debtor's collateral which (substantially) reads as follows:

> The [Company or Guarantor] hereby grants to Lender, [subject to certain permitted liens], a continuing first priority security interest in all assets of

---

[4] The Debtors reserve all rights for themselves and their successors to challenge the validity and/or enforceability of the Senior Secured Notes, the 2014 Financing and any and all documents related thereto or executed prior or subsequent to.

the [Company or Guarantor] whether now owned or hereafter acquired, including all proceeds therefrom...

14. Also in connection with the 2014 Financing, COSI provided the Senior Secured Lenders with a Pledge Agreement by which COSI pledged its ownership interest in one of the Subsidiaries, HALLC, to the Senior Secured Lenders. HALLC is the 100% owner of the operating subsidiary HPLLC. The Senior Secured Lenders have no direct collateral interest in HPLLC.

15. Very recently, in September of 2016, the Senior Secured Lenders requested that the Debtors confirm their collateral obligations by executing a Collateral Agreement. As a result of the Senior Secured Lenders' requests, on September 9, 2016, all of the Debtors, except HPLLC, entered into a Collateral Agreement prepared by the Senior Secured Lenders (the "2016 Collateral Agreement").

16. The 2016 Collateral Agreement provided a more detailed description of all of the assets in which certain of the Debtors granted security interests to the Senior Secured Lenders. COSI, Xando, CSB and HALLC are parties to the 2016 Collateral Agreement.

17. Since executing the 2016 Collateral Agreement, the Debtors have determined that the original collateral description in the Senior Secured Notes was an insufficient grant of an interest in the Debtors' collateral pursuant to the Uniform Commercial Code, Article 9, Section 108, which governs the sufficiency of collateral descriptions in a security agreement and renders ineffective "supergeneric" collateral descriptions. As a result, the 2016 Collateral Agreement provided each of the Senior Secured Lenders with a significant enhancement of its collateral position which the Debtors may be able to challenge under certain provisions of the Bankruptcy Code including, among others, preference avoidance and recovery provisions.

6

18. The Senior Secured Lenders have informed the Debtors that they believe they have defenses to any actions the Debtors may take to avoid the Senior Secured Lenders' interests. As discussed briefly below and in detail in the pleadings filed by the Debtors, the Debtors and the Senior Secured Lenders have agreed to address the disputes related to the 2014 Financing and the 2016 Collateral Agreement, in summary, as follows: (i) the Senior Secured Lenders (or their nominee) will fund the Debtors' operations during this Chapter 11; (ii) the Senior Secured Lenders (or their nominee) will be the stalking horse bidder for the purchase of the Debtors out of Chapter 11; (iii) the Senior Secured Lenders will be restricted regarding their ability to "credit bid" in the sale process; and (iv) all issues related to the potential to challenges to the 2014 Financing and the 2016 Collateral Agreement will be preserved for a later determination in these bankruptcy cases.

19. More specifically, the Senior Secured Lenders have agreed to make post-petition loans of up to $4.1 million to the Debtors to fund operations during the Chapter 11 cases (the "DIP Loan") pursuant to, and on the terms set forth in, the Debtors' financing motion filed contemporaneously herewith (the "DIP Financing Motion"). The Senior Secured Lenders will receive liens on substantially all of the Debtors' assets (other than avoidance actions) to secure the DIP Loan. As part of the Senior Secured Lenders' agreement to fund the Debtors' operations during this Chapter 11, the Senior Secured Lenders have agreed to the Debtors' use of Cash Collateral as set forth herein.

20. In addition to financing statements filed by the Senior Secured Lenders, there are also UCC financing statements filed on behalf of First Franchise Capital Corporation, Santander Bank and American Express Bank. The obligations of the Debtors to each of those entities have been fully satisfied.

Client Matter/27288/1/A3473229.DOC

## Relief Requested

21. As set forth in the Schatz Declaration, the Debtors request the authority to use Cash Collateral to fund operational and administrative expenses until the Debtors can accomplish a sale of substantially all of their assets to the Senior Secured Creditors or to another high bidder.

### A. The Budget.

22. The Debtors have prepared a budget that details the Debtors' proposed use of Cash Collateral (the "Budget"). A copy of the Budget is attached as **Exhibit A**. The Budget spans the duration of the Debtor's expected operations from the Petition Date through the week beginning December 26, 2016 (the "Budget Period"). The Debtors anticipate closing the sale transaction during the week of November 28, 2016.

23. Among other things, the Budget identifies the Debtors' estimated receipts and expenses for the Budget Period. It also incorporates the funds from the DIP Loan. The Debtors believe that the Budget reflects a reasonable projection of its operations for the Budget Period.

24. The purchase price offered by the Senior Secured Lenders for the Debtors' business is $6,800,000. The Debtors believe that the sale will produce a return for unsecured creditors, particularly if the liens of the Senior Secured Lenders are avoided or compromised. The Debtors estimate that, after payment of the DIP Loan and cure costs, as much as $1.2 million may be available to the estate.

25. In light of the Senior Secured Lenders' consent to the Debtors' use of the Cash Collateral and the replacement liens that will be granted to them, their interests are adequately protected. Further, despite the fact that the Debtors will rely on the DIP Loan to fund their operational shortfall prior to the sale, the value of the company as a going concern remains sufficient to repay the DIP Loan and provide a dividend for unsecured creditors. Thus, the

Debtors' use of Cash Collateral will serve to benefit the estate and the Debtors' creditors, by increasing the Debtors' total assets and value of the Debtors' business.

26. The expenses set forth on the Budget are the ordinary course business expenses necessary to maintain the Debtors' operations and, therefore, to preserve the value of the Debtors' assets.

### B. Use of Cash Collateral.

27. Approval of the use of the Cash Collateral on the terms identified in this Motion is in the best interest of the Debtors, their estates, and their creditors. The use of the Cash Collateral will enable the Debtors to pay post-petition obligations and maintain the continuity of their operations while they close on a sale to the Senior Secured Lenders, or to some other high bidder, at maximum value.

28. Absent the use of the Cash Collateral, the Debtors would be required to cease operations. The cessation of the Debtors' business operations would likely result in a significant devaluation of assets to the detriment of the Debtors and their creditors.

29. Pursuant to Bankruptcy Code § 363(c)(2), a debtor may not use "cash collateral" unless (i) each entity that has an interest in such collateral consents; or (ii) the court, after notice and a hearing, authorizes such use ... in accordance with the provisions of [§ 363]. 11 U.S.C. § 363(c)(2).

30. Bankruptcy Code § 363(e) provides that a party with an interest in property proposed to be used, sold or leased by the debtor may receive adequate protection of such interest before the debtor may use, sell or lease such property.

31. Although the Bankruptcy Code does not define "adequate protection", Bankruptcy Code § 361 contains a non-exhaustive list of acceptable forms of adequate protection, including a cash payment or periodic cash payments, additional liens, replacement liens, and the "indubitable

equivalent of such entity's interest in such property." 11 U.S.C. § 361. What constitutes adequate protection varies with the facts and circumstances of each particular case.

32. "The purpose of adequate protection is to provide a secured creditor the benefit of its bargain while enabling a debtor to use secured property." In re Ne. Chick Servs., Inc., 43 B.R. 326, 332 (Bankr. D. Mass. 1984). Adequate protection requires only that the value of the creditor's interest in the cash collateral be protected from diminution while the debtor is using the cash collateral. See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365 (1988); In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) ("'[T]he whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.'" (quoting In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987))).

33. Notably, the proposed purchase price of $6.8 million represents the value of the Debtors' business as a going concern. As discussed above, the secured creditors with interests in the Cash Collateral (i.e., the Senior Secured Lenders) have consented to the Debtors' use of such Cash Collateral.

34. The Debtors will also provide adequate protection to the Senior Secured Lenders, on account of the secured portion of their claims, in the form of post-petition liens on all of the Debtors' assets, excluding avoidance actions (the "Replacement Liens"), all of which are junior to the post-petition secured claims and liens of the Senior Secured Lenders as more fully set forth in the DIP Financing Motion. Bankruptcy Code § 361 provides that when adequate protection is required under § 363, such adequate protection may be provided by, *inter alia*, "providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property."

Client Matter/27288/1/A3473229.DOC

35. If the Debtors are unable to continue to operate their business as a going concern, the sale value of their business assets will be substantially devalued. The use of the Cash Collateral will therefore provide adequate protection to the secured creditors on account of their secured claims.

### Additional Information Required By MLBR 4001-2

36. In further compliance with MLBR 4001-2(a), the Debtors submit the following:

   a. **Budget/Use of Funds.** The Budget includes detailed information regarding specific uses of funds post-petition and total dollar amount of the funds to be utilized post-petition.

   b. **Administrative Solvency**. The Budget includes provisions to allow the Debtor to pay post-petition expenses, including professional fees and expected fees to the U.S. Trustee's Office, in the ordinary course.

   c. **Acknowledgement of Amounts Due.** The Debtors have acknowledged the principal amounts due to the Senior Secured Lenders. The Debtors have reserved their rights with respect to the liens securing those claims.

   d. **Relief from Stay.** In the DIP Financing Motion, the Debtors have agreed that in the event of a default by the Debtors, the lenders shall be entitled to enforce their rights in their collateral within three business days absent an order enjoining such remedies.

   e. **Carveouts for Professionals.** In the DIP Financing Motion, the lenders have agreed to a limited "carveout" for estate professionals.

### Request for Interim Approval

37. Pursuant to Bankruptcy Rule 4001(b)(2), a minimum of fourteen (14) days' notice is required before a final hearing on this Motion may commence. Upon request, however, the Court may conduct a preliminary expedited hearing on the Motion to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing. Fed. R. Bankr. P. 4001(b)(2). In accordance with Bankruptcy Rule 4001(b), the Debtors request that the Court conduct an expedited preliminary hearing on the Motion and authorize the Debtors' use of Cash Collateral on an interim basis, pending entry of a final order. The Debtors submit that such relief

is vital in order to maintain and finance the Debtors' ongoing operations, preserve the going concern value of the Debtors' business and assets pending the conclusion of the proposed sale process, and, therefore, to prevent immediate and irreparable harm to the Debtors' estates. The Debtors further request that the Court schedule a hearing to consider entry of a Final Order.

38. The Debtors further submit that because the relief requested in this Motion is necessary to avoid immediate and irreparable harm, Bankruptcy Rule 6003 has been satisfied. Furthermore, to successfully implement the foregoing, the Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay under Bankruptcy Rule 6004(h).

## Notice and Hearings

39. Pursuant to MLBR 4001-2(b), the Debtors will serve this motion on (a) all known secured creditors, (b) any taxing authority that has a claim against the estate, (c) the 20 largest unsecured creditors, (d) the Office of the United States Trustee, (e) each known guarantor of the Debtor's obligations, and (f) all parties who have filed a notice of appearance in this case (the "Notice Parties"). The Debtors believe that such service provides sufficient notice in light of the nature of the relief requested and request that the Court approve such notice.

40. The Debtors further request that this Court schedule a final hearing (the "Final Hearing") on this Motion. Pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure, the Debtor requests that it be authorized to provide notice of the Final Hearing by serving any interim order entered by the Court, upon the Notice Parties and any statutory committee of unsecured creditors (or, if retained, its attorneys) in one of the following ways: (a) by this Court's CM/ECF System or (b) by first class mail. The cost of mailing notice to all creditors in this Chapter 11 case would be extremely expensive, and would not confer any substantial benefit on the Debtors, their estate or creditors. Moreover, notice to all creditors of a motion for authority to

obtain the use of cash collateral is not required under Rule 4001(c) of the Federal Rules of Bankruptcy Procedure or MLBR 4001-2.

WHEREFORE, the Debtor respectfully requests that this Court enter an order:

A. Granting the within Motion; and

B. Entering an Order, substantially in the form filed herewith, granting the relief requested herein.

Respectfully submitted,

**COSI, INC., XANDO COSI OF MARYLAND, INC., COSI SANDWICH BAR, INC., HEARTHSTONE ASSOCIATES, LLC, AND HEARTHSTONE PARTNERS, LLC**

By their proposed counsel,

/s/ Paul W. Carey
Joseph H. Baldiga, BBO # 549963
Paul W. Carey, BBO #566865
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Drive, Suite 400
Westborough, MA 01581-3926
Phone: (508) 898-1501
Fax:    (508) 898-1502
Email: bankrupt@mirickoconnell.com
Email: pcarey@mirickoconnell.com

Dated: September 28, 2016

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

| | |
|---|---|
| In re:<br><br>COSI, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br>Case No. 16-13704-MSH<br><br>(Joint Administration Requested) |

### ORDER (I) AUTHORIZING USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION, AND (III) SCHEDULING A HEARING ON FURTHER USE OF CASH COLLATERAL

Upon the Motion for Entry of an Order (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Hearing on Further Use of Cash Collateral, and (IV) Granting Related Relief (the "Cash Collateral Motion") filed by Cosi, Inc. on behalf of itself and affiliated debtors and debtors-in-possession (the "Debtors") on September 28, 2016; and notice of the Cash Collateral Motion being good and sufficient notice; the Court finding that the Cash Collateral Motion is in the best interest of the Debtors' estate; and no objection to the Cash Collateral Motion having been filed or any such objection having been withdrawn or overruled; the Court finds as follows:

1. On September 28, 2016 (the "Petition Date"), the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the federal tax identification number for each of the Debtors, are Cosi, Inc. (3745) ("Cosi") and its subsidiaries, Xando Cosi of Maryland, Inc. (2196) ("Xando"), Cosi Sandwich Bar, Inc. (0910) ("CSB"), Hearthstone Associates, LLC (6267) ("HALLC"), and Hearthstone Partners, LLC (9433) ("HPLLC"; collectively with Xando, CSB, and HALLC, the "Subsidiaries"). The Debtors' corporate offices are located at 294 Washington Street, Suite 510, Boston, MA 02108.

2. Since the Petition Date, the Debtors have continued in the management of their business and to manage their property as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108. No official committee of unsecured creditors, trustee, or examiner has been appointed herein.

3. The Debtors require the use of cash collateral in order to preserve their operations and the value of their assets. The relief granted in this Order is in the best interests of the Debtors, their estate, and their creditors.

4. The following creditors may have liens against the Debtor's personal property, including its cash and accounts receivable: (a) Milfam II LP, (b) AB Opportunity Fund LLC, and (c) AB Value Partners, L.P. (collectively, the "Senior Secured Lenders"). In addition, UCC financing statement have been filed on behalf of First Franchise Capital Corporation, Santander Bank, and American Express Bank, although the Debtors represent that their obligations to these entities have been discharged.

5. This Court has not been asked to find, and it does not find, that any security interest asserted by the Senior Secured Lenders is valid or perfected.

6. Pending a final hearing on the Cash Collateral Motion, the replacement liens and the equity in the Debtor's property, as set forth below, will adequately protect the interests of the Senior Secured Lenders for the purposes of Bankruptcy Code §§ 361 and 363(e).

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

A. The Cash Collateral Motion is allowed on an interim basis.

B. The Debtor is authorized to use Cash Collateral in the ordinary course of its business substantially in accordance with the budget attached hereto as **Exhibit A**.

2

C. For the purposes of Bankruptcy Code §§ 361 and 363(e) and as adequate protection for the Debtor's use of Cash Collateral, the Senior Secured Lenders are hereby granted replacement liens (the "Replacement Liens") in and to all property of the kind presently securing the prepetition obligations of the Senior Secured Lenders, including any property purchased or acquired with the Cash Collateral and any proceeds thereof, but excluding any causes of action under Chapter 5 of the Bankruptcy Code or the proceeds of any claims under or actions commenced pursuant to such powers. The Replacement Liens shall only attach to and be enforceable against the same types of property, to the same extent, and in the same order of priority as existed immediately prior to the Petition Date. The Replacement Liens shall be recognized only to the extent of any post-petition diminution in value of the Secured Creditors' prepetition collateral resulting from the Debtors' use of Cash Collateral during this bankruptcy case.

D. Nothing in this Order shall constitute a waiver by the Debtors or restrict the Debtors' right to seek the further use of Cash Collateral.

E. This Order, and the Debtors' use of Cash Collateral as authorized in this Order, shall become effective immediately upon entry of this Order.

F. A final hearing on the Cash Collateral Motion shall be held on _____, 2016 at _____ a.m. / p.m.

Dated:                                                                 _____
                                                                        Honorable Melvin S. Hofffman
                                                                        United States Bankruptcy Judge

3