UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

| | |
|---|---|
| **In re:** | |
| **COSI, INC.,** *et al.*,[1] | **Chapter 11**<br>**Case No. 16-13704-MSH** |
| **Debtors.** | **(Joint Administration Requested)** |

**DEBTORS' MOTION FOR AN ORDER APPROVING**
**KEY EMPLOYEE RETENTION PROGRAM**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Cosi, Inc., on behalf of itself and affiliated debtors and debtors-in-possession (collectively, the "Debtors" or the "Company"), hereby submits this motion (the "Motion") for an order ("Order") approving the Debtors' key employee retention program for certain non-insider employees (the "KERP") and authorizing the payments contemplated thereunder. In support of the Motion, the Debtors submit the *Declaration of Patrick Bennett in Support of First Day Motions* (the "Bennett Declaration") and the *Declaration of Edward Schatz in Support of First Day Motions* (the "Schatz Declaration; together with the Bennett Declaration, the "Declarations") and respectfully represent as follows:

**Jurisdiction and Venue**

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory predicates for the relief requested herein are

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of the federal tax identification number for each of the Debtors, are Cosi, Inc. (3745) ("Cosi") and its subsidiaries, Xando Cosi of Maryland, Inc. (2196) ("Xando"), Cosi Sandwich Bar, Inc. (0910) ("CSB"), Hearthstone Associates, LLC (6267) ("HALLC"), and Hearthstone Partners, LLC (9433) ("HPLLC"; collectively with Xando, CSB, and HALLC, the "Subsidiaries"). The Debtors' corporate offices are located at 294 Washington Street, Suite 510, Boston, MA 02108.

sections 105(a), 363(b) and 503(b) of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code").

## Background

**A.    Bankruptcy Case Background.**

2.    On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code.

3.    The Debtors continue to operate their business and to manage their property as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.    No trustee or examiner has been requested or appointed in these cases and no creditors' committee has been established in this case.

5.    Each of the Debtors has filed a Motion for Order Authorizing Joint Administration of Chapter 11 Cases Pursuant to Federal Rule of Bankruptcy Procedure 1015 and MLBR 1015-1 for procedural purposes only under the case of Debtor Cosi, Inc.

**B.    The Debtors.**

6.    Debtor Cosi, Inc. ("COSI") is an international fast casual restaurant company specializing in a variety of made-to-order hot and cold sandwiches, salads, bowls, breakfast wraps, "Squagels®" (square bagels), melts, soups, flatbread pizzas, S'mores, snacks, desserts, and a large offering of handcrafted, coffee-based, and specialty beverages. Prior to the Petition Date, the Debtors had 72 debtor-owned locations and 35 franchised locations in the United States, the United Arab Emirates, and Costa Rica.  Also prior to the Petition Date, the Debtors employed approximately 1,555 people, 82% of whom worked on a part-time basis.  As of the end of the Company's fiscal second quarter of 2016 (i.e., as of June 27, 2016), the Debtors had consolidated net sales of $22.3 million, with net losses of approximately $3.1 million and cash on hand of approximately $3 million.  Since the close of the Company's fiscal second quarter of 2016, sales

have deteriorated further, losses have increased, and cash on hand has decreased to approximately

$950,000 in the operating account as of the Petition Date.[2] The Debtors' corporate headquarters

are located in Boston.

7.      Most members of the Debtors' management and administration are located at the

Debtors' support center in Boston, Massachusetts including senior management, human resources,

accounting/finance, operations support, license administration, and other administrative functions

associated with the Company.  The Debtors also employ restaurant managers, area directors,

regional managers, and food service employees.

8.      The events leading up to the Petition Date and the facts and circumstances

supporting the relief requested herein are set forth in the Declarations filed contemporaneously

herewith and incorporated herein by reference.

9.      To attempt to preserve the core business enterprise and provide the best

opportunity to deliver a return to creditors and preserve a significant number of jobs, immediately

prior to the Petition Date, the Debtors identified the store locations with the most significant losses

(the "Exit Stores"), closed those store locations, and reduced their workforce accordingly.  As a

result, between approximately September 26, 2016 and the Petition Date, the Debtors closed

approximately 29 locations and laid off approximately 450 full and part-time employees (the "Exit

Store Layoffs").  Most of the employees impacted by the Exit Store Layoffs were lower wage,

hourly workers.  In addition, many worked part-time.  In connection with the Exit Store Layoffs,

the Debtors paid no bonuses and no severance.  The Debtors provided each employee a final

check for all services provided to the Debtors through the last date of service, inclusive of earned

but unused paid time off (i.e., PTO).

---

[2]     The Debtors also have multiple depository accounts which are maintained at locations in proximity to the
Debtors' restaurants and which have varying balances depending on day-to-day operations and restricted cash
accounts, all of which are not included in the operating account balance above.

Client Matter/27288/1/A3472846.DOC

10. The Debtors have preserved the remaining viable locations (the "Core Stores") and jobs for the remaining approximately 1,100 full and part-time employees with the hopes of identifying a buyer to accomplish a turnaround of the core business.

## C. The Debtors' Financing Structure.

11. In April of 2014, the Debtors entered into a series of financing transactions (the "2014 Financing") with three senior lenders, Milfam II LP ("Milfam"), AB Opportunity Fund LLC ("AB Opportunity") and AB Value Partners, L.P. ("AB Value"; collectively with Milfam and AB Opportunity, the "Senior Secured Lenders") through which (a) COSI executed promissory notes (the "Senior Secured Notes") in favor of the Senior Secured Lenders with a collective principal balance of $7,500,000, (b) Xando and CSB guaranteed COSI's obligations to the Senior Secured Lenders, and (c) COSI pledged its ownership interest in HALLC to the Senior Secured Lenders. The 2014 Financing is discussed in more detail in the Schatz Declaration.

12. On September 9, 2016, at the Senior Secured Lenders' request, all of the Debtors, except HPLLC, entered into a Collateral Agreement prepared by the Senior Secured Lenders (the "2016 Collateral Agreement") pursuant to which the Debtors confirmed their collateral obligations. Since executing the 2016 Collateral Agreement, however, the Debtors have determined that the Senior Secured Lenders' security interests may be avoidable because the original collateral description in the Senior Secured Notes was an insufficient grant of an interest in the Debtors' collateral.

13. The Senior Secured Lenders have informed the Debtors that they believe they have defenses to any actions the Debtors may take to avoid the Senior Secured Lenders' interests. As discussed in more detail in the pleadings filed by the Debtors, the Debtors and the Senior Secured Lenders have agreed to address the disputes related to the 2014 Financing and the 2016 Collateral Agreement, in summary, as follows: (i) the Senior Secured Lenders (or their nominee) will fund

4

the Debtors' operations during this Chapter 11; (ii) the Senior Secured Lenders (or their nominee) will be the stalking horse bidder for the purchase of the Debtors out of Chapter 11; (iii) the Senior Secured Lenders will be restricted regarding their ability to "credit bid" in the sale process; and (iv) all issues related to the potential challenges to the 2014 Financing and the 2016 Collateral Agreement will be preserved for later determination in these bankruptcy cases.

14.     As part of the Senior Secured Lenders' agreement to fund the Debtors' operations during this Chapter 11, the Senior Secured Lenders have agreed to fund the KERP. The Debtors and the Senior Secured Lenders believe that the KERP is necessary to preserve the Debtors' value as a going concern.

## Approval of the KERP

15.     As a multi-unit fast-casual restaurant chain, the retention of trained employees is critical to maintaining the value of the Debtors' enterprise. The remaining approximately 1,081 employees are necessary and vital to ensuring that operations continue uninterrupted during the Chapter 11 period. In order to reduce the potential for employee losses and the damage that such losses would do to company value, the Debtors request approval of the KERP.

16.     The KERP is designed to provide certain employees with financial incentives to remain with the Company (the "Retention Benefits"). Specifically, the participants in the proposed KERP identified to date are approximately 125 valuable, hard-to-replace employees (the "Participants"), most of whom are non-insiders at the corporate manager or store manager level and all of whose institutional knowledge and skill are essential to maximizing the value of the Company during the sale process.[3] The Participants and the proposed payments are identified on **Exhibit A** attached hereto, which has been redacted to protect employee privacy. The Participants

---

[3]     Of the Participants, three employees are arguably insiders: Vicki Baue (general counsel), William Nicolini (assistant secretary and vice president of operations), and Tania DiSciullo (controller and assistant secretary). Their retention bonuses are capped at $8,000.

include employees from various functions, including, but not limited to, store management, accounting, finance, human resources, information technology, legal, operations and sourcing/planning. The KERP is intended to incentivize the Participants to remain with the Company as the Company transitions under a buyer, as well as to help manage the Company's ongoing operations and the administration of the Company during the Chapter 11 Cases.

17.    Under the proposed KERP, Participants will have the ability to receive three cash "bonus pool" payments, payable as follows: (a) a 30- day pay-out equal to 30% of the designated bonus pool; (b) a 60-day pay-out equal to 30% of the designated bonus pool; and (c) a 90-day pay-out equal to 40% of the designated bonus pool. The proposed designated bonus amounts for each Participant range from $710 to $8,000. The total proposed amount anticipated to be paid under the KERP is approximately $258,000.

18.    The Debtors assert that the KERP is both necessary and appropriate and, as such, the Debtors seek approval of the KERP and the Retention Benefits as part of their First Day Motions.

19.    Notably, the Debtors have already suffered significant losses of key employees. Specifically, the Debtors have lost three multi-unit managers within the approximately one month prior to the Petition Date. The Debtors are also aware of other restaurant managers, area directors, regional managers and other employees that have either recently left or have contemplated leaving. Competitors and recruiters are targeting the Debtors' field operations and support center employees at all levels, citing the Debtors' financial condition as leverage to convince employees to consider other opportunities. The Debtors' recent lack of growth, lack of bonuses and uncertain future have all contributed to an unstable workforce. Without the Retention Benefits under the proposed KERP, the Participants are likely to seek alternative employment, which would harm the

value of the estates and affect the efficiency of the Debtors' sale efforts. In fact, certain employees

that would have been included in the KERP have already left the Debtors for other employment.

20.     Accordingly, the Debtors believe that the KERP is necessary to incentivize key

employees to remain with the Company through the Debtors' Chapter 11 process and/or the

closing of the Debtors' proposed sale.

21.     In addition to maintaining most of their normal responsibilities related to the

Debtors' operations and retail activity, the Participants already have, and will continue to, assume

significantly greater responsibilities as a result of these Chapter 11 cases. The Debtors submit that

payments made under the KERP are necessary to ensure that key employees focus their efforts on

the successful completion of the sale process, maximizing the going concern value of the Debtors,

minimizing operational expenses and ensuring that the employees do not lose focus during this

critical time. Without the incentives provided for in the KERP, the Debtors likely would lose the

non-executive personnel most essential to their sale efforts.

22.     In concert with their experienced turnaround consultants,[4] the Debtors designed the

KERP to achieve the goals of maximizing the value of their assets for the benefit of all interested

parties and ensuring effective and stable management throughout the sale of the business.  The

Debtors, with their consultants, designed the KERP as a reasonable, cost-effective way to ensure

the commitment of and to retain certain key personnel that are essential to the Debtors' sale as a

going concern.

---

[4]     As described in the *Application by Debtors for Order Approving Retention of Edward Schatz and the O'Connor Group as Financial Consultants to the Debtors, Effective Nunc Pro Tunc to the Effective Date*, the Debtors enlisted the services of The O'Connor Group ("TOG"), a leading consulting firm specializing in turnaround and liquidation management for companies experiencing financial difficulty. The Debtors selected TOG because, in addition to the experience and skill TOG brings to the financial advisory services it is providing to the Debtors, TOG has experience in designing employee incentive, retention and severance plans for companies in Chapter 11.

23.     The Debtors also provided the Senior Secured Lenders with an opportunity to review and comment on the KERP.  As part of their DIP Financing commitment, the Senior Secured Lenders have agreed to fund the KERP and, accordingly, the Debtors file this Motion with their support.

24.     The Debtors seek approval of the KERP in order to efficiently sell their business operations as a going concern. The Debtors' needs cannot be met without the support of the Participants. Every one of the Participants confronts the loss of employment in the near future if the Debtors' sale efforts are not successful.  It is crucial that the Debtors maintain the loyalty of these key employees and incentivize their executives to deliver their best performance throughout the sale process.  Indeed, the loss of any of the Participants will likely reduce the value of the Debtors' assets and could disrupt the sale process.  The Participants are highly skilled, and their skill and institutional knowledge are critical to the Debtors' sale efforts. Without the implementation of the KERP, the Participants are likely to pursue other employment before the liquidation is complete.  The Debtors must be afforded the chance to implement the KERP to offer incentives and protections that will maximize creditor recoveries and prevent the Participants' departure for new employment during this critical period.

### The KERP Applies Only to Non-Insiders and Is Not Prohibited By Section 503(c)(1) or (2)

25.     The KERP provides Retention Benefits to non-insider employees and, therefore, the requirements of Bankruptcy Code § 503(c)(1) or (2), which apply only to insiders, do not apply here.

26.     Section 101(31)(B) of the Bankruptcy Code defines an insider as any director, officer, person in control of the debtor, partnership where the debtor is a general partner, general partner of the debtor, or relative of a general partner, director, officer, or person in control of the

debtor. See 11 U.S.C. § 101(31)(B). Courts have held that any person holding an officer's title is presumptively an officer and thus an insider. See, e.g. In re Foothills Texas, Inc., 408 B.R. 573 (Bankr. D. Del. 2009). In that case the Court held that "a party seeking to rebut that presumption must present evidence sufficient to establish that the person holds the title of an officer in name only and, in fact, does not meet the substantive definition of the same, i.e., he or she is not taking part in the management of the debtor." Id., at 574-75.

27.     Three of the Participants have titles that suggest insider status: (a) Vicki Baue, Vice President & General Counsel, and Assistant Secretary; (b) William Nicolini, Vice President of Operations; and (c) Tania DiSciullo, Controller and Assistant Secretary. While these three Participants have titles that suggest officer status, and although these Participants are important to the Debtors' business and are particularly vital during these Chapter 11 cases, they report to and take direction from the Chief Executive Officer. Notably, their Retention Benefits are capped at $8,000 and should be allowed given the relatively small amount compared to their importance to the Debtors' operations and sale efforts.

28.     The vast majority of the Participants are officers or managers in name only. They report to intermediate managers or officers and the scope of their authority is quite limited. They do not take part in the overall management of the Debtors, do not direct or implement company policy and do not report to the Board of Directors. Therefore, they are not "insiders." See In re Global Aviation Holdings Inc., 478 B.R. 142, 148 (Bankr. E.D.N.Y. 2012) (finding that director-level employees were not "officers" because none of them were members of board, participated in corporate governance, attended board meetings or reported to board). Many of the Participants' duties are limited to sales or support functions. Courts have declined to find insider status where the scope of authority is quite limited. See In re Borders Grp., Inc., 453 B.R. 459, 469 (Bankr. S.D.N.Y. 2011) (employees in KERP plan were not insiders because none of them had authority

9

to implement company policy, did not report to board of directors and were subordinate to actual

officers). The titles these Participants have been given reflect the employees' individual functions

and roles, but do not reflect an officer's status. See In re NMI Sys., Inc., 179 B.R. 357, 370

(Bankr. D.D.C. 1995) (finding that vice president was not insider because he was conferred title

"for purposes of marketing" only and was not "in the inner circle making the company's critical

financial decisions.").

29.    The KERP has been designed by the Debtors and TOG to incentivize performance

and ensure continued employment within the parameters of sections 363(b) and 503(c) of the

Bankruptcy Code. The prohibitions and restrictions in section 503(c)(1) and (2) do not apply here,

as those provisions restrict the ability of "insiders" to receive payments as part of retention or

severance plans.

30.    Courts have approved similar incentive plans that contemplate retention payments

to non-insiders. See In re Furniture Brands Int'l, Inc., Case No. 13-12329 (CSS) (Bankr. D. Del.

Oct. 11, 2013) (approving a retention plan for non-insider employees); In re Circuit City Stores,

Inc., Case No. 08-35653 (KR) (Bankr. E.D. Va. Mar. 25, 2009) (approving a retention plan for

non-insiders during a winddown); In re KB Toys, Inc., Case No. 08-13269 (KJ) (Bankr. D. Del.

Jan. 6, 2009) (approving a retention plan for non-insider employees); In re Mervyn's Holdings,

LLC, Case No. 08-11586 (KG) (Bankr. D. Del. Oct. 30, 2009) (approving a retention plan for

non-insiders); see also In re Linens Holding Co., Case No. 08-10832 (CSS) (Bankr. D. Del. Oct.

21, 2008) (approving a retention plan for non-insiders during a winddown). Accordingly, the

Debtors submit that the KERP should be approved.

### The KERP Should Be Approved As A Reasonable Exercise
### of the Debtors' Business Judgment

31.     Because the KERP is not prohibited by Bankruptcy Code §§ 503(c)(1) or (2) of the

Bankruptcy Code, this Court should issue an order authorizing the Debtors to implement the

KERP under Bankruptcy Code §§ 363(b)(1) and 503(c)(3).

32.     The standard for approving payments under Bankruptcy Code § 503(c)(3) is

essentially the same "business judgment" standard for approving similar transactions under BR

Code § 363(b)(1). See, e.g., In re Nellson Nutraceutical, Inc., 369 B.R. 787, 804 (Bankr. D. Del.

2007) (business judgment standard was to be used to assess plan); In re Global Home Prods.,

LLC, 369 B.R. at 787 (same). But see GT Advanced Technologies Inc., Case No. 15-CV-LM,

2015 WL 4459502 (D. NH July 21, 2015)(applying heightened scrutiny to employee retention

plan).

33.     Section 363(b)(1) of the Bankruptcy Code allows a debtor in possession to use

property of the estate "other than in the ordinary course of business" after notice and a hearing, in

the exercise of the Debtors' business judgment. 11 U.S.C. § 363(b)(1); see also, e.g., In re Martin,

91 F.3d 389, 395 (3d. Cir. 1996) (stating that under normal circumstances, courts will defer to

debtor's judgment in using property under section 363(b) if there is legitimate business

justification). Therefore, the estate's property may be used other than in the ordinary course of

business if the debtor can show a "sound business purpose" for such use. See In re Lionel Corp.,

722 F.2d 1063, 1071 (2d Cir. 1983) ("[t]he rule we adopt requires that a judge determining a

§ 363(b) application expressly find from the evidence presented before him [supports a] good

business reason to grant the application."); In re Del. Hudson Ry. Co., 124 B.R. 169, 179 (Bankr.

D. Del. 1991). If a debtor shows a valid business purpose, the court applies the "business

judgment rule," a presumption "that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985).

34.     Applying the business judgment rule in chapter 11 cases, courts have routinely permitted employee payments that are outside the normal course of business. See, e.g., Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153-55 (D. Del. 1999) (affirming bankruptcy court's authorization of key employee compensation program, holding "[i]n determining whether to authorize the use, sale, or lease of property of the estate under [section 363(b)], courts require the debtors to show that a sound business purpose justifies such actions"); In re Global Home Prods., 369 B.R. at 784 ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment."); see also In re Martin, 91 F.3d at 395 (citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991)).

35.     The KERP represents a sound business purpose and satisfies the business judgment rule. The KERP facilitates the Debtors' sale process by incentivizing, retaining and protecting crucial employees to ensure that the sale process is effective and that asset value is maximized. These goals cannot be met if skilled key employees depart prematurely.

36.     The KERP provides non-insider employees with security and a reward for remaining loyal to the Debtors during this critical period.

## CONCLUSION

37.     Accordingly, for the reasons stated herein the Debtors request the approval of the KERP as such approval is in the best interest of the Debtors' estates, their creditors and all parties-in-interest.

Respectfully submitted,

**COSI, INC., XANDO COSI OF MARYLAND, INC., COSI SANDWICH BAR, INC., HEARTHSTONE ASSOCIATES, LLC, AND HEARTHSTONE PARTNERS, LLC**

By their proposed counsel,

/s/ Paul W. Carey
Joseph H. Baldiga, BBO # 549963
Paul W. Carey, BBO #566865
Christine E. Devine, BBO #566990
Kate P. Foley, BBO #682548
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Drive, Suite 400
Westborough, MA 01581-3926
Phone: (508) 898-1501
Fax:    (508) 898-1502
Email: bankrupt@mirickoconnell.com
Email: pcarey@mirickoconnell.com

Dated: September 28, 2016

Client Matter/27288/1/A3472846.DOC

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

| | |
|---|---|
| **In re:** | |
| | **Chapter 11** |
| **COSI, INC.,** *et al.,*[1] | **Case No. 16-13704-MSH** |
| | |
| **Debtors.** | **(Joint Administration Requested)** |

### ORDER APPROVING KEY EMPLOYEE RETENTION PROGRAM

Upon consideration of the *Debtors' Motion for an Order Approving Key Employee Retention Program* (the "Motion"); the Court having reviewed the Motion; the Court finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (c) venue of these chapter 11 cases in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and (d) notice of the Motion was sufficient under the circumstances; the Court determining that the legal and factual bases set forth in the Motion establish just cause for the relief granted by this Order; and it appearing that the relief requested is in the best interest of the Debtors' estates, their creditors and other parties in interest;

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED in its entirety.

2.      The Debtors' key employee retention program for certain non-insider employees (the "KERP") is APPROVED.

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of the federal tax identification number for each of the Debtors, are Cosi, Inc. (3745) ("Cosi") and its subsidiaries, Xando Cosi of Maryland, Inc. (2196) ("Xando"), Cosi Sandwich Bar, Inc. (0910) ("CSB"), Hearthstone Associates, LLC (6267) ("HALLC"), and Hearthstone Partners, LLC (9433) ("HPLLC"; collectively with Xando, CSB, and HALLC, the Subsidiaries"). The Debtors' corporate offices are located at 294 Washington Street, Suite 510, Boston, MA 02108.

3.    The Debtors are authorized to make the payments as set forth in the Motion.

4.    The Debtors are authorized to continue, renew, modify, terminate or replace, in their discretion, their KERP without further order of the Court.

_____

Honorable Melvin S. Hoffman
United States Bankruptcy Judge

Dated: _____, 2016

Client Matter/27288/1/A3472846.DOC

# EXHIBIT A

**Key Employee Retention Program Model**

**Retention Bonus Target (% of Base Salary)**

Tier 1: Most Vital

Tier 2: Vital

Tier 3: Necessary

SLT Capped at $8000

| TIER 1 | Layoff | Elegible | Tier | Bonus % | Salary | Bonus Pool | Payout | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 30 Day Payout 30% | 60 Day Payout 30% | 90 Day Payout 40% |
| Legal | No | Yes | SLT | n/a | $205,000 | $8,000 | $2,400 | $2,400 | $3,200 |
| VP Ops | No | Yes | SLT | n/a | $165,000 | $8,000 | $2,400 | $2,400 | $3,200 |
| Finance/Acctg | No | Yes | SLT | n/a | $160,000 | $8,000 | $2,400 | $2,400 | $3,200 |
| Facilities | No | Yes | 2 | 3% | $160,000 | $4,800 | $1,440 | $1,440 | $1,920 |
| Finance/Acctg | No | Yes | 2 | 3% | $135,000 | $4,050 | $1,215 | $1,215 | $1,620 |
| RD | No | Yes | 1 | 5% | $115,000 | $5,750 | $1,725 | $1,725 | $2,300 |
| HR | No | Yes | 3 | 0% | $112,500 | $0 | $0 | $0 | $0 |
| Finance/Acctg | No | Yes | 3 | 0% | $100,000 | $0 | $0 | $0 | $0 |
| RD | No | Yes | 1 | 5% | $93,000 | $4,650 | $1,395 | $1,395 | $1,860 |
| Marketing | No | Yes | 2 | 3% | $90,000 | $2,700 | $810 | $810 | $1,080 |
| AD | No | Yes | 2 | 3% | $90,000 | $2,700 | $810 | $810 | $1,080 |
| Training | No | Yes | 2 | 3% | $88,000 | $2,640 | $792 | $792 | $1,056 |
| Catering | No | Yes | 2 | 3% | $85,000 | $2,550 | $765 | $765 | $1,020 |
| Legal | No | Yes | 3 | 0% | $85,000 | $0 | $0 | $0 | $0 |
| Systems | No | Yes | 2 | 3% | $82,500 | $2,475 | $743 | $743 | $990 |
| General Manager | No | Yes | 1 | 5% | $78,617 | $3,931 | $1,179 | $1,179 | $1,572 |
| AD | No | Yes | 2 | 3% | $77,000 | $2,310 | $693 | $693 | $924 |
| Franchise | No | Yes | 3 | 0% | $75,000 | $0 | $0 | $0 | $0 |
| General Manager | No | Yes | 1 | 5% | $70,000 | $3,500 | $1,050 | $1,050 | $1,400 |
| Finance/Acctg | No | Yes | 2 | 3% | $70,000 | $2,100 | $630 | $630 | $840 |
| Finance/Acctg | No | Yes | 2 | 3% | $70,000 | $2,100 | $630 | $630 | $840 |
| General Manager | No | Yes | 1 | 5% | $69,325 | $3,466 | $1,040 | $1,040 | $1,387 |
| General Manager | No | Yes | 1 | 5% | $68,000 | $3,400 | $1,020 | $1,020 | $1,360 |
| General Manager | No | Yes | 1 | 5% | $67,000 | $3,350 | $1,005 | $1,005 | $1,340 |
| General Manager | No | Yes | 1 | 5% | $65,780 | $3,289 | $987 | $987 | $1,316 |
| AD | No | Yes | 2 | 3% | $65,000 | $1,950 | $585 | $585 | $780 |

| Position | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| AD | No | Yes | 2 | 3% | $65,000 | $1,950 | $585 | $585 | $780 |
| HR | No | Yes | 2 | 3% | $65,000 | $1,950 | $585 | $585 | $780 |
| Training General Manager | No | Yes | 1 | 5% | $64,361 | $3,218 | $965 | $965 | $1,287 |
| General Manager | No | Yes | 1 | 5% | $64,000 | $3,200 | $960 | $960 | $1,280 |
| General Manager | No | Yes | 1 | 5% | $63,673 | $3,184 | $955 | $955 | $1,273 |
| General Manager | No | Yes | 1 | 5% | $63,120 | $3,156 | $947 | $947 | $1,262 |
| General Manager | No | Yes | 1 | 5% | $62,600 | $3,130 | $939 | $939 | $1,252 |
| Training General Manager | No | Yes | 1 | 5% | $62,600 | $3,130 | $939 | $939 | $1,252 |
| Training General Manager | No | Yes | 1 | 5% | $62,000 | $3,100 | $930 | $930 | $1,240 |
| General Manager | No | Yes | 1 | 5% | $61,831 | $3,092 | $927 | $927 | $1,237 |
| Finance/Acctg | No | Yes | 3 | 5% | $60,600 | $3,030 | $909 | $909 | $1,212 |
| Finance/Acctg | No | Yes | 3 | 0% | $60,000 | $0 | $0 | $0 | $0 |
| General Manager | No | Yes | 1 | 5% | $60,000 | $3,000 | $900 | $900 | $1,200 |
| General Manager | No | Yes | 1 | 5% | $60,000 | $3,000 | $900 | $900 | $1,200 |
| General Manager | No | Yes | 1 | 5% | $59,000 | $2,950 | $885 | $885 | $1,180 |
| General Manager | No | Yes | 1 | 5% | $58,927 | $2,946 | $884 | $884 | $1,179 |
| General Manager | No | Yes | 1 | 5% | $58,000 | $2,900 | $870 | $870 | $1,160 |
| Assistant Manager | No | Yes | 2 | 5% | $57,794 | $2,890 | $867 | $867 | $1,156 |
| General Manager | No | Yes | 1 | 3% | $55,000 | $1,650 | $495 | $495 | $660 |
| General Manager | No | Yes | 1 | 5% | $54,000 | $2,700 | $810 | $810 | $1,080 |
| General Manager | No | Yes | 1 | 5% | $54,000 | $2,700 | $810 | $810 | $1,080 |
| General Manager | No | Yes | 1 | 5% | $53,000 | $2,650 | $795 | $795 | $1,060 |
| General Manager | No | Yes | 1 | 5% | $52,806 | $2,640 | $792 | $792 | $1,056 |
| General Manager | No | Yes | 1 | 5% | $51,700 | $2,585 | $776 | $776 | $1,034 |
| General Manager | No | Yes | 1 | 5% | $51,500 | $2,575 | $773 | $773 | $1,030 |
| General Manager | No | Yes | 1 | 5% | $51,000 | $2,550 | $765 | $765 | $1,020 |
| General Manager | No | Yes | 1 | 5% | $51,000 | $2,550 | $765 | $765 | $1,020 |
| General Manager | No | Yes | 1 | 5% | $50,470 | $2,524 | $757 | $757 | $1,009 |
| General Manager | No | Yes | 1 | 5% | $50,000 | $2,500 | $750 | $750 | $1,000 |
| Assistant Manager | No | Yes | 2 | 3% | $50,000 | $1,500 | $450 | $450 | $600 |
| General Manager | No | Yes | 1 | 5% | $50,000 | $2,500 | $750 | $750 | $1,000 |
| General Manager | No | Yes | 1 | 5% | $50,000 | $2,500 | $750 | $750 | $1,000 |
| General Manager | No | Yes | 1 | 5% | $50,000 | $2,500 | $750 | $750 | $1,000 |
| **General Manager** | No | Yes | 1 | 5% | $49,000 | $2,450 | $735 | $735 | $980 |
| Catering | No | Yes | 2 | 3% | $48,500 | $1,455 | $437 | $437 | $582 |

| Title | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Assistant Manager | No | Yes | 2 | 3% | $48,000 | $1,440 | $432 | $432 | $576 |
| Marketing | No | Yes | 3 | 0% | $48,000 | $0 | $0 | $0 | $0 |
| Assistant Manager | No | Yes | 2 | 3% | $47,281 | $1,418 | $426 | $426 | $567 |
| Assistant Manager | No | Yes | 2 | 3% | $47,000 | $1,410 | $423 | $423 | $564 |
| Assistant Manager | No | Yes | 2 | 3% | $46,860 | $1,406 | $422 | $422 | $562 |
| Assistant Manager | No | Yes | 2 | 3% | $46,595 | $1,398 | $419 | $419 | $559 |
| Assistant Manager | No | Yes | 2 | 3% | $46,500 | $1,395 | $419 | $419 | $558 |
| Catering | No | Yes | 2 | 3% | $46,350 | $1,391 | $417 | $417 | $556 |
| General Manager | No | Yes | 1 | 5% | $46,000 | $1,380 | $414 | $414 | $552 |
| General Manager | No | Yes | 1 | 5% | $46,000 | $2,300 | $690 | $690 | $920 |
| Assistant Manager | No | Yes | 2 | 5% | $45,900 | $2,295 | $689 | $689 | $918 |
| General Manager | No | Yes | 1 | 5% | $45,000 | $1,350 | $405 | $405 | $540 |
| Assistant Manager | No | Yes | 2 | 3% | $45,000 | $2,250 | $675 | $675 | $900 |
| Assistant Manager | No | Yes | 2 | 3% | $45,000 | $1,350 | $405 | $405 | $540 |
| General Manager | No | Yes | 1 | 5% | $45,000 | $1,350 | $405 | $405 | $540 |
| Finance/Acctg | No | Yes | 3 | 0% | $45,000 | $2,250 | $675 | $675 | $900 |
| Catering | No | Yes | 2 | 3% | $45,000 | $0 | $0 | $0 | $0 |
| Assistant Manager | No | Yes | 2 | 3% | $45,000 | $1,350 | $405 | $405 | $540 |
| Assistant Manager | No | Yes | 2 | 3% | $43,260 | $1,298 | $389 | $389 | $519 |
| Assistant Manager | No | Yes | 2 | 3% | $43,000 | $1,290 | $387 | $387 | $516 |
| Assistant Manager | No | Yes | 2 | 3% | $43,000 | $1,290 | $387 | $387 | $516 |
| Assistant Manager | No | Yes | 2 | 3% | $43,000 | $1,290 | $387 | $387 | $516 |
| Assistant Manager | No | Yes | 2 | 3% | $42,345 | $1,270 | $381 | $381 | $508 |
| Catering | No | Yes | 2 | 3% | $42,000 | $1,260 | $378 | $378 | $504 |
| General Manager | No | Yes | 1 | 5% | $42,000 | $2,100 | $630 | $630 | $840 |
| Assistant Manager | No | Yes | 2 | 3% | $42,000 | $1,260 | $378 | $378 | $504 |
| Assistant Manager | No | Yes | 2 | 3% | $41,500 | $1,245 | $374 | $374 | $498 |
| Assistant Manager | No | Yes | 2 | 3% | $41,137 | $1,234 | $370 | $370 | $494 |
| Assistant Manager | No | Yes | 2 | 3% | $41,000 | $1,230 | $369 | $369 | $492 |
| Assistant Manager | No | Yes | 2 | 3% | $41,000 | $1,230 | $369 | $369 | $492 |
| Assistant Manager | No | Yes | 2 | 3% | $41,000 | $1,230 | $369 | $369 | $492 |
| Assistant Manager | No | Yes | 2 | 3% | $40,100 | $1,203 | $361 | $361 | $481 |
| Assistant Manager | No | Yes | 2 | 3% | $40,000 | $1,200 | $360 | $360 | $480 |
| Assistant Manager | No | Yes | 2 | 3% | $40,000 | $1,200 | $360 | $360 | $480 |
| Assistant Manager | No | Yes | 2 | 3% | $40,000 | $1,200 | $360 | $360 | $480 |
| Assistant Manager | No | Yes | 2 | 3% | $40,000 | $1,200 | $360 | $360 | $480 |
| Assistant Manager | No | Yes | 2 | 3% | $40,000 | $1,200 | $360 | $360 | $480 |
| Assistant Manager | No | Yes | 2 | 3% | $40,000 | $1,200 | $360 | $360 | $480 |

| Position | | | | | Salary | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Assistant Manager | No | Yes | 2 | 3% | $40,000 | $1,200 | $360 | $360 | $480 |
| Assistant Manager | No | Yes | 2 | 3% | $40,000 | $1,200 | $360 | $360 | $480 |
| Assistant Manager | No | Yes | 2 | 3% | $40,000 | $1,200 | $360 | $360 | $480 |
| Manager In Training | No | Yes | 2 | 3% | $39,000 | $1,170 | $351 | $351 | $468 |
| Assistant Manager | No | Yes | 2 | 3% | $38,397 | $1,152 | $346 | $346 | $461 |
| Assistant Manager | No | Yes | 2 | 3% | $38,002 | $1,140 | $342 | $342 | $456 |
| Assistant Manager | No | Yes | 2 | 3% | $38,000 | $1,140 | $342 | $342 | $456 |
| Assistant Manager | No | Yes | 2 | 3% | $38,000 | $1,140 | $342 | $342 | $456 |
| Assistant Manager | No | Yes | 2 | 3% | $37,740 | $1,132 | $340 | $340 | $453 |
| Systems | No | Yes | 3 | 0% | $37,500 | $0 | $0 | $0 | $0 |
| Assistant Manager | No | Yes | 2 | 3% | $37,080 | $1,112 | $334 | $334 | $445 |
| Assistant Manager | No | Yes | 2 | 3% | $37,000 | $1,110 | $333 | $333 | $444 |
| Assistant Manager | No | Yes | 2 | 3% | $37,000 | $1,110 | $333 | $333 | $444 |
| Assistant Manager | No | Yes | 2 | 3% | $37,000 | $1,110 | $333 | $333 | $444 |
| Assistant Manager | No | Yes | 2 | 3% | $37,000 | $1,110 | $333 | $333 | $444 |
| Assistant Manager | No | Yes | 2 | 3% | $37,000 | $1,110 | $333 | $333 | $444 |
| Assistant Manager | No | Yes | 2 | 3% | $36,000 | $1,080 | $324 | $324 | $432 |
| Assistant Manager | No | Yes | 2 | 3% | $36,000 | $1,080 | $324 | $324 | $432 |
| Manager In Training | No | Yes | 2 | 3% | $32,000 | $960 | $288 | $288 | $384 |
| Assistant Manager | No | Yes | 2 | 3% | $23,670 | $710 | $213 | $213 | $284 |
| General Manager | Yes | No | n/a | n/a | $64,807 | $0 | $0 | $0 | $0 |
| Assistant Manager | Yes | No | n/a | n/a | $36,000 | $0 | $0 | $0 | $0 |
| Marketing | Yes | No | n/a | n/a | $39,000 | $0 | $0 | $0 | $0 |
| General Manager | Yes | No | n/a | n/a | $48,000 | $0 | $0 | $0 | $0 |
| General Manager | Yes | No | n/a | n/a | $60,900 | $0 | $0 | $0 | $0 |
| General Manager | Yes | No | n/a | n/a | $60,000 | $0 | $0 | $0 | $0 |
| Assistant Manager | Yes | No | n/a | n/a | $50,000 | $0 | $0 | $0 | $0 |
| Assistant Manager | Yes | No | n/a | n/a | $38,192 | $0 | $0 | $0 | $0 |
| Assistant Manager | Yes | No | n/a | n/a | $47,044 | $0 | $0 | $0 | $0 |
| General Manager | Yes | No | n/a | n/a | $53,284 | $0 | $0 | $0 | $0 |
| General Manager | Yes | No | n/a | n/a | $38,000 | $0 | $0 | $0 | $0 |
| General Manager | Yes | No | n/a | n/a | $48,000 | $0 | $0 | $0 | $0 |
| Assistant Manager | Yes | No | n/a | n/a | $62,751 | $0 | $0 | $0 | $0 |
| General Manager | Yes | No | n/a | n/a | $56,000 | $0 | $0 | $0 | $0 |
| General Manager | Yes | No | n/a | n/a | $40,000 | $0 | $0 | $0 | $0 |
| Assistant Manager | Yes | No | n/a | n/a | $60,000 | $0 | $0 | $0 | $0 |
| General Manager | Yes | No | n/a | n/a | $140,200 | $0 | $0 | $0 | $0 |
| Finance/Acctg | Yes | No | n/a | n/a | $45,000 | $0 | $0 | $0 | $0 |
| **General Manager** | Yes | No | n/a | n/a | | $0 | $0 | $0 | $0 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Assistant Manager | Yes | No | n/a | n/a | $50,000 | $0 | $0 | $0 |
| AD | Yes | No | n/a | n/a | $86,000 | $0 | $0 | $0 |
| Assistant Manager | Yes | No | n/a | n/a | $43,860 | $0 | $0 | $0 |
| General Manager | Yes | No | n/a | n/a | $42,000 | $0 | $0 | $0 |
| AD | Yes | No | n/a | n/a | $103,000 | $0 | $0 | $0 |
| Catering | Yes | No | n/a | n/a | $45,000 | $0 | $0 | $0 |
| Assistant Manager | Yes | No | n/a | n/a | $41,000 | $0 | $0 | $0 |
| General Manager | Yes | No | n/a | n/a | $44,000 | $0 | $0 | $0 |
| AD | Yes | No | n/a | n/a | $70,000 | $0 | $0 | $0 |
| General Manager | Yes | No | n/a | n/a | $45,000 | $0 | $0 | $0 |
| General Manager | Yes | No | n/a | n/a | $44,000 | $0 | $0 | $0 |

**Grand Total** $258,325  $77,497  $77,497

Total Terminated 29

Discrepancies with Joanne's 9/: 13