**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**(EASTERN DIVISION)**

In re:

COSI, INC., *et al.*,[1]

      **Debtors.**

**Chapter 11**
**Case No. 16-13704-MSH**

**(Jointly Administered)**

**INTERIM ORDER UNDER 11 U.S.C. §§ 105(a), 361, 362(c)(2), 363(e) AND 364 AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) (A) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING AND (B) UTILIZE CASH COLLATERAL, AND (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES**

Upon the motion, dated September 28, 2016 [Docket No. 7] (the "Motion"), of Cosi, Inc. ("COSI"), Hearthstone Partners LLC ("Hearthstone Partners"), Hearthstone Associates LLC ("Hearthstone Associates"), Xando Cosi Maryland, Inc. ("Xando"), and Cosi Sandwich Bar, Inc, ("Cosi Sandwich Bar") and affiliated debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors") for an interim order authorizing them to incur postpetition secured indebtedness, grant security interests and superpriority claims, and grant adequate protection, pursuant to sections 105(a), 361, 362, 363, and 364(c), (d) and (e) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the federal tax identification number for each of the Debtors, are Cosi, Inc. (3745) ("Cosi") and its subsidiaries, Xando Cosi of Maryland, Inc. (2196) ("Xando"), Cosi Sandwich Bar, Inc. (0910) ("CSB"), Hearthstone Associates, LLC (6267) ("HALLC"), and Hearthstone Partners, LLC (9433) ("HPLLC"; collectively with Xando, CSB, and HALLC, the "Subsidiaries"). The Debtors' corporate offices are located at 294 Washington Street, Suite 510, Boston, MA 02108.

"Bankruptcy Rules"), and having sought the following relief:

(a)      the Court's authorization, pursuant to sections 105(a), 362, 363, and 364(c), and 364(d) of the Bankruptcy Code, and Bankruptcy Rules 2002, 4001, and 9014, for COSI, as parent borrower, and the other Debtors as subsidiary borrowers on a joint and several basis (the "Borrowers"), to enter into a debtor-in-possession, senior secured Credit Agreement, or, in connection with this Interim Order, prior to the execution of such Credit Agreement,  one or more "Secured Debtor-in-Possession Promissory Note" in an aggregate principal amount of $[1,800,000] (the "Interim Amount") (such agreement or note(s), the "DIP Loan Agreement") based substantially on the terms set forth in the Cosi, Inc.  Debtor-In-Possession (DIP) Financing Term Sheet (the "DIP Term Sheet"), a copy of which DIP Term Sheet was attached to the Motion as Exhibit B, with AB Opportunity Fund LLC ("AB Opportunity"), AB Value Partners, L.P. ("AB Value") and one or more entities affiliated with MILFAM II L.P. ("Milfam" and together with AB Opportunity and AB Value, or any other lender entity designated by AB opportunity, AB Value or Milfam to be a lender under the DIP Loan Agreement (collectively, the "DIP Lenders"), to obtain extensions of credit on a superpriority, priming secured basis, in an aggregate principal amount not to exceed $4,100,000 at any time outstanding (with an aggregate interim amount of $1,800,000) (the loans under such facility, the "DIP Loans") on the terms set forth in the DIP Loan Agreement and the DIP Term Sheet (together with any and all other related documents, term sheets, notes, instruments, credit agreements, security documents, loan documents, deeds of trust, filings, amendments, agreements and instruments delivered pursuant thereto or executed or filed in connection therewith, including the Budget (as defined below), and including this Interim Order, collectively, the "DIP Loan Documents"), to fund cash operating expenses of the Debtors in accordance with the Budget toward the consummation of a sale of all or substantially all of the

Debtors' assets pursuant to Section 363 of the Bankruptcy Code in accordance with the DIP Loan

Documents and the Budget;

(b)     the Court's ordering, pursuant to sections 364(c)(1), (c)(2) and 364(c)(3) of the

Bankruptcy Code, that all of the obligations of the Debtors under the DIP Loan Documents or this

Interim Order, whether for principal, interest, fees, expenses, indemnities, charges, costs or

otherwise (collectively, the "DIP Obligations") are:

i.     granted superpriority administrative expense claim status pursuant to

section 363(c)(1) of the Bankruptcy Code against the Debtors, having priority over any and all

administrative expenses of the kinds specified in or arising or ordered under any section of the

Bankruptcy Code including, without limitation, sections 105(a), 326, 328, 330, 331, 365, 503(b),

506(c), 506(d), 507, 546(c), 726, 1113, and 1114 of the Bankruptcy Code, subject to the Carve-

Out Expenses (as defined in paragraph 13 hereof); and

ii.     secured under section 364(c)(2) by a valid and fully perfected, first priority

lien on and security interest in all assets and properties of the Debtors (except for Avoidance

Actions (as defined below)), and their estates, as more fully described in paragraph 8(a) hereof, to

the extent such property is not otherwise subject to a valid and perfected lien and security interest,

with such lien and security interest subject to the Carve-Out Expenses; and

iii.     secured under section 364(c)(3) of the Bankruptcy Code by a valid and

fully perfected, first priority junior lien on and security interest in all properties and assets of the

Debtors (except for Avoidance Actions), and their estates, that is currently subject to a valid and

perfected lien and security interest, which shall be a junior priority lien with respect to such valid

and perfected lien and security interest, subject to the Carve-Out Expenses; and

3

(c)    the Court ordering that, in accordance with sections 361, 363(e) and 364(c) of the Bankruptcy Code, to the extent of any diminution resulting from (x) the use, sale, lease, disposition, decline in market value, consumption (or other decline in value) of the Noteholder Prepetition Collateral (as defined below), (y) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, and (z) the granting for the benefit of the DIP Lenders of the claims, liens and security interests hereunder, AB Opportunity, AB Value and Milfam (including any assignees, the "Existing Lenders"), in their capacity as holder(s) of certain "Senior Secured Promissory Notes (the "Existing Notes") dated as of April 14, 2014 and May 20, 2014 in an aggregate principal amount of $7,500,000 (as amended), with such adequate protection being subject to the extent that the estates successfully avoid any of the liens and security interests in favor of the Existing Lenders is:

i.    granted a superpriority administrative claim against the Debtors as provided for in section 507(b) of the Bankruptcy Code, subject to the Carve-Out Expenses and subject to the limitation as to $400,000 in sale proceeds set forth on Page 9 of the Term Sheet (the "Contingent Carve-Out") ; and

ii.    granted valid, perfected, additional and replacement liens existing from and after the Petition Date (as defined below) on, and security interests in, all of the Noteholder Prepetition Collateral, including the Cash Collateral (each as defined below), all Unencumbered Collateral (as defined below), and all other assets and properties of the Debtors (except for Avoidance Actions), and their estates, subject to the Carve-Out Expenses and Contingent Carve-Out;

(d)    the Court's scheduling an interim hearing on September 30, 2016 (the "Interim Hearing") pursuant to Bankruptcy Rule 4001(c)(2) to consider the entry of this Interim Order

4

which, among other things, on an interim basis, (i) approves the postpetition financing to be made

pursuant to the DIP Loan Documents and this Interim Order, (ii) authorizes the Borrower to obtain

DIP Loans on an interim term basis in accordance with the DIP Loan Documents in an aggregate

principal amount of up to $1,800,000 (the "Interim Amount") secured in accordance herewith,

(iii) grants adequate protection to Existing Lenders, as provided in this Interim Order, and (iv)

grants the other relief set forth herein and contemplated by the DIP Loan Documents;

(e)      the Court's finding, pursuant to Bankruptcy Rule 4001(c)(3), that notice of the

Interim Hearing was sufficient having been given to (i) the United States Trustee, (ii) counsel to

the DIP Lenders, (iii) counsel to the Existing Lenders, (iv) counsel to the Debtors' top 20 secured

and unsecured creditors as listed in their chapter 11 petitions, (v) all parties having filed a notice

of appearance in the above-captioned cases, and (vi) all parties required to be served pursuant to

Bankruptcy Rule 2002 (collectively, the "Notice Parties"); and such notice being sufficient and

adequate, and no other or further notice being required; and

(f)      The Interim Hearing having been held on September 30, 2016, and based upon all

of the pleadings filed with the Court, the evidence presented at the Interim Hearing and the entire

record herein; and the Court having heard and resolved or overruled all objections to the interim

relief requested in the Motion; and the Court having noted the appearances of all parties in

interest; and it appearing that the relief requested in the Motion is in the best interests of the

Debtors, their estates, and creditors; and after due deliberation and consideration, and sufficient

cause appearing therefor:

**IT IS HEREBY FOUND AND DETERMINED, that:**[2]

      A.     Petition Date.  On September 28, 2016 (the "Petition Date"), the Debtors commenced their chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under the Bankruptcy Code.  The Debtors are operating their businesses and managing their affairs as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in any of the Chapter 11 Cases.

      B.     Jurisdiction; Venue.  This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157.  Venue for these Chapter 11 Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory bases for the relief requested herein are sections 105, 361, 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014 [and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court  for the District of Massachusetts (the "Local Bankruptcy Rules")].

      C.     Prepetition Obligations.  The Existing Notes were issued to the Existing Lenders pursuant to certain Senior Secured Promissory Notes and certain Senior Secured Note Purchase Agreements (the "Note Agreements").  The original aggregate principal amount of the Existing Notes was $7,500,000 (consisting of $2,000,000 to AB Opportunity, $500,000 to AB Value, and $5,000,000 to Milfam) and the outstanding aggregate principal amount of Existing Notes as of the Petition Date is $7,500,000.  To secure the obligations under the Existing Notes and the Note Agreements, prior to the Petition Date, the Debtors pledged collateral, consisting of all or substantially all of their assets (except the assets of Hearthstone Partners), to the Existing

---

[2]     Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.  Paragraphs A through J shall have the same force and effect as if set forth below as decretal paragraphs.

Lenders pursuant to (a) the Existing Notes, (b) certain Guarantees executed by each of

Hearthstone Associates, Xando, and Cosi Sandwich Bar, (c) a collateral agreement executed on or

about September 9, 2016 and (d) certain other filings and instruments executed and delivered from

time to time, including filings made by the Debtors with the United States Patent & Trademark

Office (collectively, together with related collateral agreements and filings, the "Existing

Collateral Documents," and together with the Existing Notes and the related Note Agreements,

and other "Note Documents" referenced therein, the "Existing Note Documents").  Pursuant to the

Existing Note Documents, the collateral (including cash collateral (as defined in section 363(a) of

the Bankruptcy Code) ("Cash Collateral") securing the Existing Notes (hereinafter, the

"Noteholder Prepetition Collateral") includes all present and future accounts, chattel paper,

deposit accounts, documents, general intangibles, goods (including all inventory and equipment),

instruments, investment property, letter of credit rights, pledged securities, supporting obligations,

books and records pertaining to the collateral, and products and proceeds of the foregoing.

       D.      Purpose and Necessity of Financing.  The principal assets of the Debtors

consist of cash, accounts receivable, equipment, inventory, general intangibles, intellectual

property and leasehold interests.  As a result of, among other things, sales declines in Debtors'

owned stores and other adverse business conditions, the Debtors do not have sufficient liquidity to

meet their obligations and do not believe that any sources of capital will be forthcoming in the

near or medium term to meet their past and present obligations.  The Debtors have substantial

payables outstanding to landlords, vendors, and other creditors, and have substantial continuing

obligations to landlords and to employees which require immediate infusions of cash from outside

sources.  After extensive discussions among the Debtors and the Existing Lenders, the Debtors

determined that a process of the sale of all or substantially all of their assets as soon as possible

was the best option for preserving the going concern value of their businesses and maximizing the

recovery to their creditors.  The Debtors require the financing described in the Motion in order to

fund the cash operating expenses of the Debtors during such sale process.  In light of the fact that

all or substantially all of the Debtors' properties are subject to asserted liens, including the liens of

the Existing Lenders, and the fact that the DIP Lenders are knowledgeable about the Debtors'

businesses as a result of, among other things, the Existing Notes, the obtaining of the DIP

Financing from the DIP Lenders is the only source of capital available to the Debtors to fund such

sale process, in which the DIP Lenders have expressed interest in serving as a stalking horse

bidder.  If the Debtors do not obtain authorization to borrow under the DIP Loan Documents and

the DIP Loans are not approved, the Debtors will suffer immediate and irreparable harm, and the

failure to obtain authorization would almost certainly cause material disruption to the sale process,

which will ultimately cause irreparable harm to the Debtors and their estates, and creditors.  The

Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense

under section 503 of the Bankruptcy Code, or other financing under sections 364(c) of the

Bankruptcy Code, on equal or more favorable terms than those set forth in the DIP Loan

Documents.  A loan facility in the amount provided by the DIP Loan Documents is not available

to the Debtors without granting the DIP Lenders the superpriority claims, liens, and security

interests, pursuant to sections 364(c)(1), (2), and (3)  of the Bankruptcy Code, as provided in this

Interim Order and the DIP Loan Documents.  After considering all alternatives, the Debtors have

concluded, in the exercise of their prudent business judgment, that the loan facility provided under

the DIP Loan Documents represents the best working capital financing available to them at this

time and provides a path forward to a possible sale of all or substantially all of their assets to

either entities affiliated with the DIP Lenders or other entities.

E.      Good Cause.  The ability of the Debtors to obtain sufficient working capital under the DIP Loan Documents is vital to the Debtors' estates and creditors.  The liquidity to be provided under the DIP Loan Documents will enable the Debtors to continue to operate their businesses in the ordinary course and preserve the value of the Debtors' businesses while engaging in a sale process for all or substantially all of their assets.  The Debtors' estates will be immediately and irreparably harmed if this Interim Order is not entered, which will ultimately cause irreparable harm to the Debtors and their estates, creditors and equity holders.  Good cause has, therefore, been shown for the relief sought in the Motion.

F.      Good Faith.  The terms and conditions of the DIP Loan Documents are fair, reasonable, and the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  DIP Loan Documents have been negotiated in good faith and at arm's length by and among the Debtors and the DIP Lenders.  Any DIP Loans and/or other financial accommodations made to the Debtors by the DIP Lenders pursuant to this Order and/or the DIP Loan Documents shall be deemed to have been extended by the DIP Lenders in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and the DIP Lenders shall be entitled to all protections afforded thereunder, including, without limitation, the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision thereof is vacated, reversed or modified, on appeal or otherwise.

G.      Consideration.  The Debtors will receive and have received fair and reasonable consideration in exchange for access to the DIP Loans, and all other financial accommodations provided under the DIP Loan Documents, and this Interim Order and the entry and execution thereof.

9

H.    <u>Immediate Entry of Interim Order</u>.  The Debtors have requested immediate

entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2).  The permission

granted herein to enter into the DIP Loan Documents and to obtain funds thereunder is necessary

to avoid immediate and irreparable harm to the Debtors.  This Court concludes that entry of this

Interim Order is in the best interests of the Debtors' respective estates and creditors as its

implementation will, among other things, allow for the funding of cash operating expenses, which

is necessary to sustain the operation of the Debtors' existing businesses during the pendency of a

sale process, and thereby further enhance the Debtors' prospects for providing a meaningful

recovery for their creditors.

I.    <u>Liens Held by JPMorgan Chase Bank, N.A.</u>  JPMorgan Chase Bank, N.A.

("JPM") has a perfected, senior security interest in cash held two separate collateral accounts of

Cosi Sandwich Bar, Inc. (x2449; x7628) (the "CSB Collateral Accounts") and in the Debtors'

primary operating account (x8539).  The CSB Collateral accounts collectively hold approximately

$100,000.  JPM's security interest secures all liabilities due from the Debtors to JPM.  Such

liabilities include, but are not limited to, outstanding letters of credit issued by JPM, in an amount

of approximately $288,000, plus potential ACH transactions and amounts in relation to Debtor's

corporate credit card program through JPM.  As adequate protection for the security interest of

JPM, JPM has been permitted to maintain an administrative hold on (i) $658,476 of cash held in

Debtors' operating account, less any amounts JPM may release from administrative hold in

connection with the Debtors' termination of the ACH transaction program or otherwise (the

"Operating Account Administrative Hold") , and (ii) on all amounts held in the CSB Collateral

Accounts (collectively, in such amounts, the "<u>JPM Cash Collateral</u>").

J.      <u>Debtors' Stipulations and Agreements</u>.  In connection with the relief

provided for herein, the Debtors permanently, immediately and irrevocably acknowledge,

represent, stipulate, and agree that:

(i)      the DIP Lenders and the Debtors negotiated the DIP Loan Documents on an

arm's length basis and in good faith within the meaning of Section 364(e) of the Bankruptcy

Code;

(ii)     the DIP Lenders are not in control of or insiders of the Debtors by virtue of

any of the negotiations or discussions related to the DIP Loan Documents, or any actions taken

with respect to, in connection with, related to, or arising from the DIP Loan Documents;

(iii)    as of the date hereof, there exist no Claims (as defined in the Bankruptcy

Code) or causes of action against the DIP Lenders (in their capacity as such) with respect to, in

connection with, related to, or arising from the Debtors or the DIP Loan Documents that may be

asserted by the Debtors or their estates;

(iv)     the Existing Lenders have valid, binding, and enforceable claims against the

Debtors pursuant to the Existing Notes, and the principal amount of such Existing Notes is

$7,500,000 plus accrued and unpaid interest, and expenses, fees and other amounts due and owing

under the Existing Notes and the related Existing Note Documents. The obligations of the Debtors

under the Existing Notes and the other Existing Note Documents whether for principal, interest,

fees, indemnities, or other amounts shall be referred to hereafter as the "<u>Existing Note</u>

<u>Obligations</u>".  The Existing Note Obligations are enforceable and allowed and are not and shall

not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination

(whether equitable, contractual or otherwise), impairment, counterclaims, cross-claims, defenses

or any other challenges under the Bankruptcy Code or other applicable law or regulation by any

11

person or entity.  The Debtors agree that they will not take any steps to investigate or challenge or assist any person in investigating or challenging the allowance and enforceability of the Existing Note Obligations.

> K.      Certain Limited Reservations of Rights.  The Existing Lenders assert that, pursuant to the Existing Notes, the Existing Note Documents and other filings (including documents filed with the United States Patent and Trademark Office), they have valid, binding, enforceable and perfected liens in the Noteholder Prepetition Collateral, constituting all of the personal property assets of the Debtors COSI., Hearthstone Partners, Xando Cosi and Cosi Sandwich Bar, including, without limitation, liens on all intellectual property of such Debtors and that such liens in the Prepetition Noteholder Collateral are not subject to avoidance.  The Debtors have asserted that some or all of the liens on the Prepetition Noteholder Collateral securing the Existing Notes are subject to avoidance.  Without limiting the binding stipulations and agreements set forth in decretal paragraph J above as it related to the claims under the Existing Note Obligations, the Debtors, the estates and the Existing Lenders fully reserve and preserve all rights with respect to the enforceability and avoidability (or lack thereof) of the liens in favor of the Existing Lenders in the Prepetition Noteholder Collateral.

**NOW THEREFORE**, based upon the foregoing findings, acknowledgements, stipulations, and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefore:

**IT IS HEREBY FOUND AND DETERMINED, ORDERED AND ADJUDGED:**

> 1.      Disposition.  The Motion is granted on the terms set forth herein.  Any objections to the Motion that have not previously been withdrawn or resolved are hereby overruled on their merits.  This Interim Order shall be valid, binding on all parties-in-interest, and fully effective immediately upon entry notwithstanding the possible application of Bankruptcy Rules 6004(h),

7062, and 9014.  The terms and provisions of the DIP Loan Documents are approved on an interim basis.

2.      Term of DIP Loans.  The DIP Loan Documents authorized hereunder shall expire, and the DIP Loans made pursuant to the DIP Loan Documents and this Interim Order, together with all interest thereon and other DIP Obligations, shall mature and become due and payable (unless such DIP Loans and other DIP Obligation become due and payable earlier pursuant to the terms of the DIP Loan Documents and/or this Interim Order) on the earlier of (the "DIP Loan Termination Date"): (i) October 20, 2016 ("Interim Maturity Date") in the event that a final order (the "Final Order") in respect of the Motion is not entered on or before such date, (ii) December 31, 2016 ("Final Maturity Date") and (ii) the date on which the DIP Loans shall become due and payable in accordance with the terms of this Interim Order and/or the DIP Loan Documents, including but not limited to, upon the occurrence of an Event of Default (as defined below).

3.      Borrowing.  The Debtors are hereby authorized to immediately obtain the DIP Loans, pursuant to the terms of this Interim Order and subject to the terms of the DIP Loan Documents, in an aggregate principal amount of up to $1,800,000 solely for uses specified and permitted under the Budget (as defined below).

4.      Budget and Use of Proceeds of Borrowing and Assets.  The Debtors shall use advances of credit under the DIP Loan Documents only for the purposes set forth in this Interim Order and, for purposes of this Interim Order, in compliance with a thirteen week budget with respect to revenues and expenses mutually agreed upon among the Debtors and the DIP Lenders (the "Budget" attached as Exhibit A hereto).  To the extent that the Final Maturity Date is extended by the DIP Lenders in their sole discretion past the period covered in the Budget, an updated Budget for each successive four week period (or longer time agreed among the DIP

13

Lenders and the Debtors) shall be provided to the DIP Lenders not less than two weeks prior to

the end of the time period covered by the then effective Budget and shall be effective upon

agreement by the DIP Lenders and the Debtors.  The Budget and any modifications to, or

amendment or update of, the Budget shall be in form and substance acceptable to and approved by

the DIP Lenders in their sole discretion.  The Budget may be amended or modified in writing from

time to time with the written consent of the DIP Lenders in their sole discretion and may be

amended or modified without the need for further approval by this Court only with the written

consent of the DIP Lenders in their sole discretion.

       5.     <u>Authority to Execute and Deliver Necessary Documents</u>.

      (a)     Each of the Debtors is authorized and directed to negotiate, prepare, enter into, and

deliver the DIP Loan Documents (including the DIP Credit Agreement).  Each of the Debtors is

further authorized and directed to negotiate, prepare, enter into and deliver any UCC financing

statements, pledge and security agreements, account control agreements, leasehold mortgages,

mortgages or deeds of trust and other instruments encumbering all of the DIP Collateral necessary

to perfect the DIP Liens (as defined below) and securing all of the Debtors' obligations under the

DIP Loan Documents, including repayment of all DIP Obligations in cash, that are requested by

the DIP Lenders in their sole discretion.

      (b)     Each of the Debtors is hereby further authorized and directed to (i) perform all of

its obligations under the DIP Loan Documents, and such other agreements as may be required by

the DIP Loan Documents to give effect to the terms of the financing provided for therein and in

this Interim Order, and (ii) perform all acts required under the DIP Loan Documents and this

Interim Order, including, without limitation, the payment of fees, and the reimbursement of

present and future costs and expenses (including without limitation, reasonable attorneys' fees and

legal expenses, as described more fully in this Interim Order and the DIP Loan Documents), paid or incurred by the DIP Lenders as provided for in this Interim Order and the DIP Loan Documents.  All such unpaid fees, costs, and other expenses shall be included and constitute part of the amount of the DIP Obligations and be secured by the DIP Liens (as defined below).

(c)     All obligations under the DIP Loan Documents shall constitute valid and binding obligations of each of the Debtors enforceable against each of them, and each of their successors and assigns, in accordance with their terms and the terms of this Interim Order.  No obligation, payment, transfer or grant of a security under the DIP Loan Documents or this Interim Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code) or subject to any defense, challenge, dispute, reduction, setoff, recoupment or counterclaim.

6.     Amendments, Consents, Waivers, and Modifications.  The Debtors are hereby authorized to execute, deliver and perform one or more amendments to the DIP Term Sheet and the DIP Loan Documents, in each case with the express written consent of the DIP Lenders, it being understood that no prior approval of the Court shall be required for amendments to the DIP Loan Documents that do not (i) change the maturity of the extensions of credit thereunder past 30 days after the initial Final Maturity Date of December 31, 2016, or (ii) increase the principal amount advanced; *provided that* the DIP Lenders shall be entitled to request approval of the Court with respect to any amendment.

7.     DIP Lenders' Superpriority Claims.  The DIP Lenders are hereby granted an (i) allowed superpriority administrative expense claim against each of the Debtors (the "Superpriority DIP Claim"), pursuant to section 364(c)(1) of the Bankruptcy Code, in the amount of all DIP Obligations, having priority over any and all other administrative expenses and unsecured claims

15

against the Debtors or their estates in these Chapter 11 Cases or any successor cases under any

chapter of the Bankruptcy Code, now existing or hereafter arising, of any kind or nature

whatsoever, including, without limitation, all administrative expenses of the kinds specified in or

arising or ordered under sections 105(a), 326, 328, 330, 331, 365, 503(b), 506(c), 507, 546(c),

546(d), 726, 1113, and 1114 of the Bankruptcy Code, and any other provisions of the Bankruptcy

Code, whether or not such expenses or claims may become secured by a judgment lien or other

non-consensual lien, levy or attachment, which Superpriority DIP Claim shall be payable from

and have recourse to all prepetition and postpetition property of the DIP Financing Lenders and

their respective estates and all proceeds thereof.  The Superpriority DIP Claim is enforceable and

allowed and is not and shall not be subject to any avoidance, reductions, setoff, offset,

recharacterization, subordination (whether equitable, contractual or otherwise), impairment,

counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or other

applicable law or regulation by any person or entity.  The Superpriority DIP Claim shall be a joint

and several obligation of each of the Debtors.

   8.    <u>DIP Lenders' Lien Priority</u>.

   (a)    To secure the DIP Obligations, the DIP Lenders are hereby granted:

   i.    pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding,

continuing, enforceable, non-avoidable, and automatically and properly fully perfected first

priority postpetition security interest in, and lien on, any and all presently owned and hereafter

acquired personal property, real property (including leasehold interests) and other assets and

properties of the Debtors, and their respective estates, regardless of where located, including,

without limitation, the following: all presently owned and hereafter acquired assets of the Debtors

and their estates, and any proceeds, products, profits and rents in respect thereof, including

without limitation, accounts deposit accounts, cash, chattel paper, investment property, letter-of-credit rights, securities accounts, commercial tort claims, investments, instruments, documents, inventory, contract rights, franchise agreements, general intangibles, intellectual property, real property, leasehold interests, fixtures, goods, inventory, equipment and other assets and proceeds, products, profits and rents in respect thereof, including as collateral any rights, actions or recoveries from any proceedings brought by or on behalf of the Debtors' estates under sections 549 of the Bankruptcy Code,)  (collectively, "Debtors Property"), to the extent such Debtors Property is not otherwise subject to a valid, enforceable, and perfected lien and security interest (to such extent, the "Unencumbered Collateral") (such lien and security interest, the "Unencumbered Property Lien"), but specifically excluding from the Unencumbered Property Lien any lien in favor of the DIP Lenders on any rights, actions or recoveries from any proceedings brought by or on behalf of the Debtors' estates under sections 544, 547 and 548 of the Bankruptcy Code ("Avoidance Actions"); and

(b)      pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, non-avoidable, and automatically and properly fully perfected postpetition junior senior security interest in, and lien on, all Debtors Property to the extent such property is currently subject to an existing valid, enforceable, and perfected lien and security interest, to the extent such liens are not avoided (such existing liens and security interests. "Existing Liens")  (to such extent, the "Junior DIP Collateral", and together with the Unencumbered Collateral, the "DIP Collateral") (such lien and security interest in favor of the DIP Lenders, the "Junior DIP Lien", and together with the Unencumbered Property Lien, the "DIP Liens").  The DIP Liens are intended to cover and hereby cover all of the Debtors Property as security for the DIP Obligations.

17

(c)    The DIP Liens shall not at any time be (i) made subject or subordinated to, or made

*pari passu* with any other lien, security interest or claim existing as of or following the Petition

Date, or created under sections 363 or 364(d) of the Bankruptcy Code or otherwise except as

otherwise expressly provided in this Interim Order, or (ii) subject to any lien or security interest

that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the

Bankruptcy Code.  In the event and to the extent that the Existing Liens as to any Debtor's

Property is avoided by the estates, the DIP Liens in respect of such Debtors Property shall be

considered part of the Unencumbered Property Lien.

(d)    The DIP Liens shall be junior to the following liens only: (i) Existing Liens; (ii) the

liens of JPM in the JPM Cash Collateral; and (iii) the Carve-Out Expenses (as defined in

paragraph 13).  For the avoidance of doubt, the DIP Liens shall be a senior secured first priority

interest in all cash in the Debtors' primary operating account (x8539) to the extent the amount of

such cash exceeds the Operating Account Administrative Hold.  The Debtors shall immediately

inform the DIP Lenders of any reductions in the amount of the Operating Account Administrative

Hold, and the DIP Lenders are permitted but shall not be required to advance funds to the Debtors

to the extent that the amount of the Operating Account Administrative Hold results in a reduction

in available cash to the Debtors below the amount contemplated by the Budget.

(e)    The DIP Liens shall be and hereby are fully perfected liens and security interests,

effective and perfected upon the date of this Interim Order without the necessity of execution by

the Debtors of mortgages, deeds of trust, security agreements, pledge agreements, financing

agreements, financing statements and other agreements or instruments, such that no additional

steps need be taken by the DIP Lenders to perfect such interests.

(f)     The DIP Liens, Superpriority DIP Claims, and other rights and remedies granted under this Interim Order to the DIP Lenders shall continue in this and in any superseding case or cases under the Bankruptcy Code and shall survive dismissal or conversion of one or more of the Chapter 11 Cases, and such liens and security interests shall maintain their priority as provided in this Interim Order until all the DIP Obligations have been indefeasibly paid in full in cash and completely satisfied and the DIP Lenders' commitment has been terminated in accordance with the DIP Loan Documents.

(g)     Upon reasonable notice, at reasonable times during normal business hours, the Debtors (and/or their legal or financial advisors) shall deliver to the DIP Lenders, and to Vinson & Elkins LLP and Brown Rudnick LLP, counsel to the DIP Lenders and the Existing Lenders, all financial reports, budgets, forecasts, and all other documentation, pleadings, and/or filings (collectively, the "Documentation"), as is reasonably available, that is either (i) required to be provided to the DIP Lenders or the Existing Lenders pursuant to the DIP Loan Documents or Existing Note Documents, or (ii) relates to the sale process contemplated by the DIP Loan Documents, or (iii) are reasonably requested by the DIP Lenders or Existing Lenders or their advisors.

9.     Adequate Protection for Existing Lenders.  The provisions of this paragraph 9 shall be subject to the reservations set forth in decretal paragraph K above.

(a)     The Debtors have requested that the Existing Lenders consent to, among other things, the incurrence of the DIP Loans under the DIP Loan Documents and the Debtors' granting of liens and superpriority claims in connection therewith, and the Existing Lenders have consented thereto, subject to the provisions of this Interim Order.  For the avoidance of doubt, the Existing Lenders do not consent to any postpetition financing other than financing provided

19

by the DIP Lenders (as identified on the date hereof) pursuant to the DIP Loan Documents and

this Interim Order. The Debtors acknowledge and stipulate that to the extent the liens of the

Existing Lenders are not avoided, the Existing Lenders are entitled, pursuant to sections 361 and

363(e) of the Bankruptcy Code, to adequate protection of their interests in the Noteholder

Prepetition Collateral, including the Cash Collateral, to the extent of any aggregate diminution in

value of the Noteholder Prepetition Collateral, including, without limitation, any such diminution

resulting from the sale, lease or use by the Debtors (or other decline in value) of Cash Collateral

of the Existing Lenders and any other Noteholder Prepetition Collateral, the imposition of the

automatic stay pursuant to section 362 of the Bankruptcy Code and the imposition of

superpriority claims and priming liens pursuant hereto and the DIP Loan Documents (any such

diminution in value, the "Collateral Value Diminution"). As adequate protection for the

Collateral Value Diminution, but subject to the reservations of rights of the estates and the

Existing Lenders set forth in decretal paragraph K above, the Existing Lenders are hereby

granted the following ((b) through (d) below shall be referred to collectively as the "Adequate

Protection Obligations"):

(b) <u>Adequate Protection Liens</u>. The Existing Lenders shall be and hereby are

granted replacement liens on all assets and properties of the Debtors (including all

Unencumbered Collateral and Priming Collateral) (but, for the avoidance of doubt, excluding

Avoidance Actions and subject to the Contingent Carve-Out) to the extent of diminution in value

arising from the DIP Obligations, this Interim Order and the DIP Loan Documents (all such

replacement liens, "Replacement Liens"). The Replacement Liens shall not at any time be

(i) made subject or subordinated to, or made *pari passu* with any other lien, security interest or

claim existing as of the Petition Date, or created under sections 363 or 364(d) of the Bankruptcy

20

Code or otherwise (except that the Replacement Liens shall be subordinated and subject to (1) the DIP Liens, (2) the Carve-Out Expenses, (3) the Contingent Carve-Out, and (4) any valid and enforceable liens on specific assets and properties of the Debtors to the extent that any such liens, as the case may be, were senior to the liens of the Existing Lenders in the respective asset and property constituting Noteholder Prepetition Collateral), or (ii) subject to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under sections 551 of the Bankruptcy Code.

(c)      Section 507(b) Claim.  To the extent of the Collateral Value Diminution, if any, the Existing Lenders are also hereby granted an allowed superpriority administrative claims against the Debtors, as provided for in section 507(b) of the Bankruptcy Code (the "Adequate Protection Claim"), having priority over any and all other claims against the Debtors including claims made pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, except that the Adequate Protection Claim shall be junior in priority to the Superpriority DIP Claims.

10.      Existing Lenders Further Adequate Protection.  Nothing in this Interim Order waives any right of the Existing Lenders to request at any time that the Court provide additional or further protection of their interests in the Noteholder Prepetition Collateral (including their Cash Collateral), or to seek further or additional adequate protection in the event the adequate protection provided herein proves to be inadequate, or the right of the Debtors to contest any such request.

11.      Perfection of DIP Liens and Replacement Liens.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and the Replacement Liens without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the

law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Replacement Liens, or to entitle the DIP Lenders and the Existing Lenders to the priorities granted herein. Notwithstanding the foregoing, each of the DIP Lenders and the Existing Lenders are authorized to file, as it deems necessary or advisable in their sole discretion, at the expense of the Debtors, such financing statements, mortgages, deeds of trust, notices and other instruments or documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the applicable DIP Liens and/or Replacement Liens, and all such financing statements, mortgages, deeds of trust, notices and other instruments or documents shall be deemed to have been filed as of the date of this Interim Order; provided however that no such filing or recordation shall be necessary or required in order to create, evidence or perfect the DIP Liens and/or the Replacement Liens.  The Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Lenders and the Existing Lenders all such financing statements, mortgages, deeds of trust, notices and other instruments or documents as may be reasonably requested.  The DIP Lenders and the Existing Lenders may each, in their sole discretion, file a photocopy of this Interim Order as a financing statement or other notice with any filing or recording office or with any registry of deeds of similar office, in addition to or in lieu of such financing statements, mortgages, notices of lien instrument or similar document.

12.    DIP Lender Expenses.  The Debtors shall pay directly or reimburse the DIP Lenders for all fees, expenses and charges incurred in connection with the formulation, negotiation, execution, delivery, administration and enforcement of the DIP Loan Documents and this Interim Order (including, without limitation, the payment of reasonable fees and

expenses of counsel and any financial consultant), whether incurred before or after the Petition

Date.  Such amounts shall be due and payable on the DIP Loan Termination Date.  The fees,

expenses and charges of the DIP Lenders shall constitute part of the DIP Obligations.

13.     Carve-Out Expenses.  The Super-Priority DIP Claim, the Adequate Protection

Claim, the DIP Liens and the Replacement Liens shall be subject to and subordinate to the

Carve-Out Expenses.  For purposes of this Interim Order, the "Carve-Out Expenses" shall mean

(i) allowed, accrued, but unpaid professional fees of the Debtors and one official committee of

creditors (the "Committee") consistent with and not in excess of the amounts included in the

Budget for the relevant time periods which have been incurred prior to the occurrence and

declaration of an Event of Default, (ii) allowed, accrued but unpaid professional fees and

expenses incurred by the Debtors and the Committee consistent with the Budget for the relevant

time period which are incurred after the declaration of an Event of Default (that is not cured or

waived) in an aggregate amount not to exceed $75,000, and (iii) fees payable to the U.S. trustee

pursuant to 28 U.S.C. §1930 and to the clerk of the Bankruptcy Court; *provided, however*, that

the Carve-Out Expenses shall not include (a) any other claims that are or may be senior to or *pari*

*passu* with any of the Carve-Out Expenses, (b) any fees or expenses of a Chapter 7 trustee, (c)

any fees or disbursements arising after the conversion of any of the Chapter 11 Cases to a

Chapter 7 Case (d) any fees or disbursements related to the investigation of, preparation for, or

commencement or prosecution of investigation of any litigation, proceeding or adverse action

against, or challenge to the rights, validity and/or the first-priority status of liens and prepetition

secured claims of the DIP Lenders or the Existing Lenders, *provided that* the Carve-Out

Expenses will allow the payment of $10,000 to the Committee for the purposes of reviewing the

liens and claims of the Existing Notes, or (e) any fees or disbursements related to any challenge

or objection to the debt or collateral position of the DIP Lenders, the Existing Lenders, or the

terms of the DIP Facility or hindering or delaying the DIP Lenders' enforcement or realization

upon the Collateral once an Event of Default has occurred and is continuing.  For the avoidance

of doubt, the Carve-Out Expenses and the provisions of this paragraph 13 or any other provision

of this Interim Order or any other agreement or instrument does not constitute a guarantee of

payment by the DIP Lenders or the Existing Lenders, but is a subordination by the DIP Lenders

and the Existing Lien Lenders of the DIP Liens, Replacement Liens, Super-Priority DIP Claim

and Adequate Protection Claim to the beneficiaries of the Carve-Out Expenses to the extent of

the allowed claims of those beneficiaries that constitute Carve-Out Expenses.  Nothing in this

order shall be deemed a waiver of the right of the DIP Lenders or any other Person to object to

the allowance of any amounts that would constitute Carve-Out Expenses except that the DIP

Lenders and the Existing Lenders agree that the Carve-Out Expenses shall have the priority

contemplated in this Interim Order to the extent allowed.  For the avoidance of doubt, the Carve-

Out Expenses shall be junior to the liens of JPM in the JPM Cash Collateral.

14.    Corporate Credit Card Program.  With JPM's consent, the Debtors are authorized,

but not required, to continue their corporate credit card program with JPM pursuant to the same

terms and conditions as existed prior to the Petition Date.

15.    Indemnification. Subject to entry of the Final Order, the Debtors shall indemnify the

DIP Lenders and their respective affiliates, successors, and assigns, and the officers, directors,

employees, agents, advisors, controlling persons and members of each of the foregoing (each, in their

capacity as such, an "Indemnified Person") and hold each of them harmless from and against all

costs, expenses (including reasonable fees, disbursements and other charges of counsel) and

liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other

proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of

whether such matter is initiated by a third party or by the Debtors or any of their affiliates or shareholders) that relates to the DIP Loan Documents or this Interim Order, including the financial accommodations to the Debtors contemplated hereby, the Debtors' chapter 11 cases, or any transactions in connection there with; *provided*, *however*, that no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such Indemnified Person's gross negligence or willful misconduct. Nothing herein is meant to limit the scope of any indemnity provided for the benefit of the DIP Lenders in the DIP Loan Documents. For the avoidance of doubt, this paragraph 15 does not apply or otherwise affect any indemnification rights or obligations in respect of the Existing Lenders under the Existing Note Documents.

16.     Access to Information.  Upon reasonable notice, at reasonable times during normal business hours and subject to the provisions of existing confidentiality agreements, the Debtors shall permit representatives, agents, and/or employees of the DIP Lenders and Existing Lenders to have access in the ordinary course to visit and inspect their properties, to examine their books and records, and to discuss their affairs, finances and condition with their officers and financial advisors and shall cooperate, consult with, and provide to such persons all such information requested in connection with the contemplated sale process or as otherwise required or allowed under the DIP Loan Documents or the provisions of this Interim Order.

17.     Specified Covenants.  The Debtors shall comply with the covenants ("Specified Covenants") set forth in clauses [(e), (f), (g), (h), (i), (j) and (k)] of the DIP Term Sheet.

18.     Lenders Not Responsible Persons.  In (a) deciding to make the DIP Loans; (b) administering the DIP Loans; and (c) extending other financial accommodations to the Debtors under the DIP Loan Documents, the DIP Lenders shall not be considered to be exercising control over any operations of the Debtors or acting in any way as a responsible

person, as an owner or operator under any applicable law, including without limitation, any environmental law (including, but not limited to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601, *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. 6901, *et seq.*, as either may be amended from time to time, or any similar federal or state).

19.     <u>Successors and Assigns</u>.  The DIP Loan Documents and the provisions of this Interim Order shall be binding upon the Debtors, the DIP Lenders, and Existing Lenders, and each of their respective successors and assigns, and shall inure to the benefit of the Debtors, Existing Lenders, and each of their respective successors and assigns including, without limitation, any trustee, responsible officer, estate administrator or representative, or similar person appointed in a case for any Debtor under any chapter of the Bankruptcy Code.  The provisions of this Interim Order shall also be binding on all of the Debtors' creditors, equity holders, and all other parties in interest.

20.     <u>No Obligation to Extend Credit</u>.  None of the entities constituting the DIP Lenders shall have any obligation to make any loan or advance under the DIP Loan Documents, unless all of the conditions precedent to the making of such extension of credit under the applicable DIP Loan Documents (including all conditions set forth on the DIP Term Sheet under the caption "Conditions Precedent for effectiveness of DIP Facility and each funding") and this Interim Order have been satisfied in full or waived in writing.

21.     <u>Binding Nature of Agreement</u>.  Each of the DIP Loan Documents to which any of the Debtors are or will become a party shall constitute legal, valid, and binding obligations of the Debtors party thereto, enforceable in accordance with their terms.  The DIP Loan Documents have been or will be properly executed and delivered to the DIP Lenders by the Debtors.  The

rights, remedies, powers, privileges, liens, and priorities of Existing Lenders provided for in this

Interim Order and the DIP Loan Documents shall not be modified, altered or impaired in any

manner by any subsequent order (including a confirmation order), or by any plan of

reorganization or liquidation in these cases or in any subsequent case under the Bankruptcy Code

unless and until the DIP Obligations have first been indefeasibly paid in full in cash and

completely satisfied and the commitments terminated in accordance with the DIP Loan

Documents.

22.     <u>Effect of Certain Stipulations; Challenge Period for Non-Debtors</u>.   The

stipulations and agreements set forth in the decretal paragraph J(i)-(iii) above relating to the DIP

Loans, the DIP Loan Documents and the DIP Lenders shall be binding on the Debtors and their

estates upon entry of this Order.  The stipulations and agreements set forth in decretal paragraph

J(iv) shall be binding on the Debtors upon entry of this order.  Parties-in-interest (other than the

Debtor) that are or have been granted standing shall have until the Challenge Deadline (as

defined below) to file a complaint pursuant to Bankruptcy Rule 7001 asserting a claim or cause

of action against the Existing Lenders arising out of the Existing Note Documents, or otherwise

challenging the extent, validity, amount, or allowability of the Existing Note Obligations.  Such

complaint, if filed, shall be diligently pursued by such party-in-interest or the Committee, as

applicable.  For the avoidance of doubt, the Carve-Out Expenses shall not include any fees and

expenses incurred by or on behalf of any such party-in-interest or Committee in connection with

any such complaint or action seeking standing to assert a complaint.  The term "Challenge

Deadline" shall mean the date that is 150 days following the Petition Date, unless extended by

the Existing Lenders in their sole and absolute discretion.

23.    <u>Subsequent Reversal or Modification</u>.  This Interim Order is entered pursuant to

section 364 of the Bankruptcy Code, and Bankruptcy Rules 400l(b) and (c), granting the DIP

Lenders all protections afforded by section 364(e) of the Bankruptcy Code.  If any or all of the

provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, that action

will not affect (i) the validity of any obligation, indebtedness or liability incurred hereunder by

any of the Debtors to the DIP Lenders and Existing Lenders prior to the date of receipt by the

DIP Lenders or Existing Lenders, as applicable, of written notice of the effective date of such

action, or (ii) the validity and enforceability of any lien or priority authorized or created under

this Interim Order or pursuant to the DIP Loan Documents.  Notwithstanding any such reversal,

stay, modification or vacatur, any postpetition indebtedness, obligation or liability incurred by

any of the Debtors to the DIP Lenders and Existing Lenders prior to written notice to the DIP

Lenders or Existing Lenders, as applicable, of the effective date of such action, shall be governed

in all respects by the original provisions of this Interim Order, and the DIP Lenders and Existing

Lenders shall be entitled to all the rights, remedies, privileges, and benefits granted herein and in

the DIP Loan Documents with respect to all such indebtedness, obligations or liability.

24.    <u>Restriction on Use of DIP Lender's Funds</u>.  Notwithstanding anything herein to

the contrary, no DIP Collateral, proceeds thereof, Cash Collateral, Noteholder Prepetition

Collateral, or proceeds thereof, may be used by any of the Debtors, any committee appointed in

these Chapter 11 Cases, any trustee appointed in these Chapter 11 Cases, or any other person,

party or entity to (a) request authorization to obtain postpetition loans or other financial

accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code, or otherwise, other

than from the DIP Lenders on the terms provided herein; and (b) assert, join, commence, support

or prosecute any action for any claim, counter-claim, action, proceeding, application, motion,

objection, defense, or other contested matter seeking any order, judgment, determination or

similar relief against, or adverse to the interests of, in any capacity, the DIP Lenders and Existing

Lenders, or any of their respective officers, directors, employees, agents, members, partners,

attorneys, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission,

or action, including, without limitation, (i) any actions arising under chapter 5 of the Bankruptcy

Code, (ii) any so-called "lender liability" claims and causes of action, (iii) any action with

respect to the validity and extent of the DIP Obligations or the obligations to Existing Lenders,

or the validity, extent, and priority of the DIP Liens, the liens on the Noteholder Prepetition

Collateral or the Replacement Liens, (iv) any action seeking to invalidate, set aside, avoid or

subordinate, in whole or in part, the DIP Liens, the liens on the Noteholder Prepetition Collateral

or the Replacement Liens, or (v) any action that has the effect of preventing, hindering or

delaying (whether directly or indirectly) the DIP Lenders and Existing Lenders in respect of their

liens and security interests in the DIP Collateral or the Noteholder Prepetition Collateral.

　　　　25.　　<u>Event of Default</u>.  Unless otherwise agreed to in writing between the DIP Lenders

and the Debtors, the Debtors' ability to obtain DIP Loans under the DIP Loan Documents and

this Interim Order (and the DIP Lenders' obligation to provide any funding) shall terminate on

the earlier to occur of (i) the Interim Maturity Date, (ii) the Final Maturity Date, and (iii) the date

upon which any of the following events occur and are continuing beyond any applicable grace

period set forth below (each an, "<u>Event of Default</u>"):

　　　　(a)　　　the Debtors fail to make a payment to the DIP Lenders as and when required by

the DIP Loan Documents or this Interim Order, or otherwise fail to comply in any material

respect with any of the terms or conditions of the DIP Loan Documents and/or this Interim Order

other than relating to payments, including, without limitation, the Debtors failure to provide

Access to Information as required in paragraph 16 of this Interim Order; provided, however, that any failure by the Debtors to comply with any material terms or conditions of the DIP Loan Documents and/or this Interim Order (other than a failure to make payment) is subject to two (2) business days' notice by the DIP Lenders to the Debtors and an opportunity to cure unless the DIP Lenders in good faith determines that such notice and opportunity to cure will cause a material adverse effect on their rights, remedies and benefits in the DIP Collateral or under the DIP Loan Document and/or this Interim Order;

(b)      two business days after any of the DIP Lenders notifies the Debtors of the occurrence of an "Event of Default" under the DIP Loan Agreement other than an event described elsewhere in this paragraph 26;

(c)      two business days after any of the DIP Lenders notifies the Debtors of the breach of any Specified Covenants;

(d)      the Debtors seek any modification or extension of this Interim Order, without the prior consent of Existing Lenders and the DIP Lenders, or an order is entered by a court of competent jurisdiction reversing, amending, supplementing, staying for a period in excess of three (3) days, vacating or otherwise modifying this Interim Order in a manner that is adverse to Existing Lenders and/or the DIP Lenders without their prior written consent;

(e)      any representation or warranty made by the Debtors under this Interim Order or the DIP Loan Documents proves to have been false, materially inaccurate or materially misleading;

(f)      the Debtors shall use proceeds of DIP Loans or any other asset of the Debtors for any purpose other than as provided in the Budget (or pursuant to an amended, modified or

updated Budget that has been amended, modified or updated in accordance with paragraph 4 of

this Interim Order) or for any purpose prohibited by paragraph 4 of this Interim Order;

(g)      with respect to the Budget, if (i) total disbursements for any rolling time period of

the Budget shall have exceeded the total disbursements allowed in the Budget by more than 15%,

(ii) total disbursements for any line item in the Budget for any weekly time period shall be

exceed by more than the greater of 30% or $100,000, or for any trailing three week period

greater than 15%, (iii) total rent expenses for any month shall exceed $1,000,000; and (iv) for

any weekly period, sales in stores that are not subject to a rejection motion shall fall below the

budgeted sales in such stores by greater than 10%; and (v) total payments in respect of

prepetition claims to critical vendors pursuant to a critical vendor order (if court authority is

sought and obtained) exceeds $100,000**;**

(h)      the Debtors shall incur any capital expenditures other than ordinary maintenance

and repair;

(i)      except for an agreement with respect to a transaction ("Acceptable Transaction")

that provides for (1) the payment in full in cash on closing of all of the DIP Obligations and (2)

which is scheduled to close on or prior to the DIP Loan Termination Date, the Debtors shall

consummate any asset sale, or any order shall be entered by the Bankruptcy Court under section

363 of the Bankruptcy Court, for the sale, lease or transfer of any DIP Collateral, except for an

Acceptable Transaction and sales of inventory in the ordinary course of business; provided that

irrespective of whether a transaction constitutes an Event of Default, nothing in this Interim

Order will be deemed a waiver of the right of the DIP Lenders or Existing Lenders to object to

any transaction or the terms thereof, or to credit bid their claims in any such transaction

(provided that the Debtors reserve the right to object to any credit bid by the Existing Lenders);

(j)       without the prior written consent of Existing Lenders and the DIP Lenders, the

Debtors shall file a motion seeking to grant a third party, pursuant to section 364 or otherwise, a

security interest or lien upon all or part of any of the Noteholder Prepetition Collateral, including

the Cash Collateral, or the DIP Collateral that has a priority which is senior to, or *pari passu*

with, the DIP Liens, the Replacement Liens or the Liens of the Existing Lenders in the

Noteholder Prepetition Collateral;

(k)       an application (other than the application for financing provided by a third party

which seeks authority to pay indefeasibly in full the obligations under the First Lien Loan

Documents and DIP Obligations upon entry of an order approving such financing) is filed by any

of the Debtors for the approval of (or an order is entered by the Court approving) any claim

arising under section 507(b) of the Bankruptcy Code or any lien in any of the Chapter 11 Cases

which is *pari passu* with or senior to the Superpriority DIP Claim, the Replacement Liens or the

DIP Liens, excluding, in all cases, any financing agreement made with the prior written consent

of Existing Lenders and the DIP Lenders (which shall be in their sole discretion);

(l)       the commencement of any action by any of the Debtors against the Existing

Lenders or the DIP Lenders, or their respective agents and affiliates, to subordinate or avoid any

liens or object to or seek the subordination of any portion of any claim made in connection with

the DIP Loan Documents and Existing Loan Documents;

(m)       any order with respect to any of the Debtors shall be entered by the Bankruptcy

Court in the Chapter 11 Cases that is not stayed granting relief from the automatic stay to one or

more creditors of any of the Debtors to permit foreclosure (or the granting of a deed in lieu of

foreclosure or similar instrument), possession, or any similar remedy with respect to any Debtors

Property;

32

(n)      except for matters subject to the automatic stay or with respect to which enforcement has otherwise been effectively stayed, or that are fully covered by insurance (i) one or more judgments arising after the Petition Date for the payment of money in an aggregate amount in excess of $100,000 shall be rendered against any of the Debtors or any of their respective subsidiaries or any combination thereof and the same shall remain undischarged for a period of 30 consecutive days, or (ii) one or more judgments arising after the Petition Date that is not for the payment of money shall be rendered against any of the Debtors or any of their subsidiaries or any combination thereof and the same shall result in a Material Adverse Effect (as defined in the DIP Loan Documents);

(o)      any of the Chapter 11 Cases shall be dismissed (without providing for the termination of all commitments and payment in full in cash of all DIP Obligations under the DIP Loan Documents and this Interim Order) or converted to a case under chapter 7 of the Bankruptcy Code, or an order of the Bankruptcy Court shall be entered in any of the Chapter 11 Cases appointing a trustee under chapter 11 of the Bankruptcy Code, or an examiner with enlarged powers relating to the operation of the businesses of the Debtors (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106 of the Bankruptcy Code;

(p)      any material contract of the Debtors shall be terminated or rejected pursuant to order of the Court without the consent of the DIP Lenders;

(q)      the failure to achieve any Sale Milestones (as defined on Exhibit B);

(r)      three business days after either (i) termination of the Stalking Horse Agreement (as defined in the DIP Term Sheet), (ii) the entering into by the Debtors of a definitive agreement for the sale of a substantial part of their assets to a purchaser other than the Stalking Horse

Bidder (as defined in the DIP Term Sheet), or (iii) the Debtors shall withdraw the sale motion

contemplated by the DIP Term Sheet or otherwise materially alter the 363 Sale Process

contemplated by the DIP Term Sheet;

(s)     the occurrence of any event following the Petition Date that causes or could

reasonably be expected to have a material adverse effect on the business, operations, financial

condition, assets, properties, liabilities, cash flows, or prospects of the Loan parties or the

success of the 363 Sale Process (as defined in the DIP Term Sheet); or

(t)     the Debtors shall assert in any pleading filed in any court that any material

provision of this Interim Order is not valid and binding for any reason, or any material provision

of this Interim Order shall for any reason, or any other order of the Bankruptcy Court approving

the use of Cash Collateral, without the prior written consent of Existing Lenders and DIP Lender,

cease to be valid and binding.

The Debtors shall promptly provide notice to the Existing Lenders and DIP Lenders of the

occurrence of any Event of Default.

26.     Rights and Remedies Upon Event of Default; Termination Event.  Upon the

occurrence of an Event of Default, (i)  the DIP Lenders shall be under no obligation to make any

further advances to the Debtors and (ii) the DIP Lenders shall have the right to declare a

"Termination Event".  Upon the declaration of a Termination Event, (i) the DIP Loans made

pursuant to the DIP Loan Documents and this Interim Order shall mature, and together with all

interest thereon and other DIP Obligations, become due and payable, and (ii) the DIP Lenders

may, upon three (3) business days' written notice to the Debtors setoff amounts in any account of

the Debtors maintained with the DIP Lenders, and (iii) the DIP Lenders may, upon three (3)

business days' written notice to the Debtors, without need for further relief from the stay or other

relief from this or any other court, exercise the rights and remedies available under this Interim

Order and/or applicable law (including the Uniform Commercial Code as in effect in any

jurisdiction), including foreclosing upon and selling all or any portion of the DIP Collateral. The

actions described in clauses (i), (ii), and (iii) above may be taken without further order or

application to the Bankruptcy Court as the DIP Lenders shall, in their discretion, elect, and the

automatic stay is hereby modified and vacated to the extent necessary to permit such actions, so

long as no order prohibiting such action is entered by the Bankruptcy Court during the above-

referenced three (3) business day period. The sole issue that may be raised by any party during

such three (3) business day period shall be limited to whether an Event of Default has occurred.

The DIP Lenders shall be entitled to apply the payments or proceeds of the DIP Collateral to the

DIP Obligations in any order whatsoever in their sole and absolute discretion. Notwithstanding

the occurrence of an Event of Default or anything herein, all of the rights, remedies, benefits and

protections provided to the DIP Lenders and Existing Lenders under this Interim Order shall

survive any Event of Default or Termination Event.

27.    Collateral Rights.  In the event that any party who holds a lien or security interest

in DIP Collateral or Noteholder Prepetition Collateral that is junior and/or subordinate to the DIP

Liens, the Replacement Liens or the liens of the Existing Lenders in such DIP Collateral or

Noteholder Prepetition Collateral receives or is paid the proceeds of such DIP Collateral or

Noteholder Prepetition Collateral, prior to indefeasible payment in full in cash and the complete

satisfaction of all DIP Obligations under the DIP Loan Documents and all obligations under the

Existing Note Loan Documents, and termination of the commitments in accordance with the DIP

Loan Documents and the Existing Note Loan Documents, such junior or subordinate lienholder

shall be deemed to have received, and shall hold, the proceeds of any such DIP Collateral or

Noteholder Prepetition Collateral in trust for the DIP Lenders and Existing Lenders and shall immediately turnover such proceeds for application (a) to the DIP Obligations under the DIP Loan Documents and (b) to the Existing Note Obligations.

28.    No Waiver.  This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Lenders and Existing Lenders may have under the Bankruptcy Code or applicable law, or any prior order of this Court, or to bring or be heard on any matter brought before this Court.

29.    No Marshalling.  The DIP Lenders and Existing Lenders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Noteholder Prepetition Collateral.

30.    Sale of Collateral; Treatment of Proceeds; Right to Credit Bid.  The DIP Lenders and Existing Lenders expressly reserve their right to object to any sale of any DIP Collateral or Noteholder Prepetition Collateral or any of the terms of any proposed transaction.  In connection with any proposed sale or other transfer of any DIP Collateral or Noteholder Prepetition Collateral, the DIP Lenders shall be entitled to bid at such sale and shall be entitled to offset the DIP Obligations against the purchase price of such property.  The Existing Lenders will not credit bid the Existing Notes in connection with a 363 sale.

31.    Conversion/Dismissal.  No motion shall be filed by any of the Debtors seeking to dismiss the Chapter 11 Cases or convert to a case under chapter 7 of the Bankruptcy Code, or to seek entry of an order in any of the Chapter 11 Cases appointing a trustee under chapter 11 of the Bankruptcy Code, or a responsible officer or an examiner with enlarged powers relating to the operation of the businesses of the Debtors (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106 of the Bankruptcy Code unless and until

(i) the DIP Obligations are indefeasibly paid in full in cash and completely satisfied and the commitments under the DIP Loan Documents are terminated in accordance therewith, or (ii) the DIP Lenders expressly consents in writing.

(a)     Limits on Lenders' Liability.  Nothing in this Interim Order or in any of the First Lien Loan Documents or DIP Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon Existing Lenders or the DIP Lenders of any liability for any claims arising from any and all activities by the Debtors or any of their subsidiaries or affiliates in the operation of their businesses or in connection with their restructuring efforts either before or following the Petition Date.

32.     Incorporation by Reference of DIP Term Sheet and DIP Loan Documents.  All terms and conditions of the DIP Term Sheet and DIP Loan Documents are incorporated by reference and shall be binding and enforceable to the same extent as if set forth herein in the first instance.

33.     Priority of Terms.  To the extent of any conflict between or among (a) the express terms or provisions of any of the First Lien Loan Documents, the DIP Loan Documents, the Motion, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" or "as more fully described in" the DIP Loan Documents or similar reference, the terms and provisions of this Interim Order shall govern.

34.     No Third Party Beneficiary.  Except as explicitly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

35.    <u>Survival</u>.  Except as otherwise provided herein, unless and until all DIP

Obligations and Existing Note Obligations are indefeasibly paid in full in cash and completely

satisfied and the commitments under the DIP Loan Documents and the First Lien Loan

Documents are terminated in accordance therewith, (a) the protections afforded to the DIP

Lenders and Existing Lenders under this Interim Order, and any actions taken pursuant thereto,

shall survive the entry of an order (i) confirming a plan of reorganization, (ii) dismissing any of

these cases or (iii) converting any of these cases into a case pursuant to chapter 7 of the

Bankruptcy Code, and (b) the DIP Liens, the Replacement Liens, the Superpriority DIP Claims,

and the Adequate Protection Claim shall continue in the Chapter 11 Cases, in any such successor

case or after any such dismissal.  Except as otherwise provided herein, the DIP Liens and the

Replacement Liens shall maintain their validity and priority as provided by this Interim Order,

and not be modified, altered or impaired in any way by any other financing, extension of credit,

incurrence of indebtedness, except with respect to any additional financing to be provided by the

DIP Lenders in accordance with this Interim Order, or any conversion of any of these Chapter 11

Cases into a case pursuant to chapter 7 of the Bankruptcy Code or dismissal of any of these

Chapter 11 Cases, by any act or omission until the all DIP Obligations and Existing Note

Obligations are indefeasibly paid in full in cash and completely satisfied, and the commitments

thereunder are terminated in accordance with the DIP Loan Documents, the Prepetition

Noteholder Loan Documents and this Interim Order.

36.    <u>Limitation on Charging Expenses Against DIP Collateral and Noteholder</u>

<u>Prepetition Collateral</u>.  In consideration of the financial accommodations provided by the DIP

Lenders hereunder and Existing Lenders consent to the DIP Loans, no expenses of

administration of the Chapter 11 Cases or any future proceeding that may result therefrom,

including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be

charged against or recovered from the DIP Collateral or the Noteholder Prepetition Collateral

under section 506(c) of the Bankruptcy Code or any similar principle of law, or otherwise,

without the prior written consent of Existing Lenders and DIP Lenders, and no such consent shall

be implied from any action, inaction, acquiescence or otherwise..

37.    <u>Final Hearing Date</u>.  The Final Hearing to consider the entry of the Final Order

approving the relief sought in the Motion shall be held on **<u>October 20, 2016</u>** (as the same may be

adjourned or continued by the Court) **<u>at 2:00 p.m.</u>** before the Honorable Melvin S. Hoffman, at

the United States Bankruptcy Court for the District of Massachusetts, 5 Post Office Square

#1150, Boston, Massachusetts 02109, Courtroom 2.

38.    <u>Adequate Notice/Objections</u>.  The notice given by the Debtors of the Interim

Hearing and the relief set forth herein was given in accordance with Bankruptcy Rules 2002 and

4001(b)(3) and (c)(3), and the Local Bankruptcy Rules, and was adequate and sufficient, and no

other or further notice shall be required.  Under the circumstances, no further notice of the

request of the Interim Hearing and the relief set forth herein is required.  The Debtors shall

promptly mail copies of this Interim Order to the Notice Parties, any known party effected by the

terms of the Interim Order, and any other party requesting notice after the entry of this Interim

Order.  The Debtors shall not be required to mail copies of the DIP Loan Documents to such

persons or entities but shall provide instructions on how to obtain a copy of the DIP Loan

Documents from the Court's docket or how to request a paper copy of the DIP Loan Documents

from counsel to the Debtors.  Service may be made electronically or by fax if made on other than

a weekday. Any objection to the relief sought at the Final Hearing shall be made in writing

setting forth with particularity the grounds thereof, and filed with the Court and served so as to

be actually received no later than **4:00 p.m. ET on October 17, 2016** by the following parties:

(i) counsel to the Debtors: (a) Mirick, O'Connell, DeMallie & Lougee, LLP, 100 Front Street,

Worchester Mass 01608, Attention:  Paul Carey, Esq.; (ii) counsel to the DIP Lenders, (a)

Vinson & Elkins LLP, 666 Fifth Avenue, New York, NY 10103, Attn: Steven M. Abramowitz,

Esq., and (b) Brown Rudnick LLP, One Financial Center Boston, MA 02111Attn: William

Baldiga, Esq.  Service may be made electronically or by fax if made on other than a weekday.

     39.    <u>Entry of Order; Effect</u>.  This Interim Order shall take effect immediately upon

execution hereof, notwithstanding the possible application of Bankruptcy Rules 6004(g), 7062,

9014, or otherwise, and the Clerk of the Court is hereby directed to enter this Interim Order on

the Court's docket in these cases.

     40.    <u>Binding Effect of Order</u>.  The terms of this Interim Order shall be binding on any

trustee appointed under chapter 7 or chapter 11 of the Bankruptcy Code.

Dated:  October 5, 2016

 

_____
HONORABLE MELVIN S. HOFFMAN
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

**Cosi, Inc.**
**13 WEEK CASH FLOW - FORECAST - 28 Store Closu...**

| Week Ended: | 10/3/2016 | 10/10/2016 | 10/17/2016 | 10/24/2016 | 10/31/2016 | 11/7/2016 | 11/14/2016 | 11/21/2016 | 11/28/2016 | Forecast | 12/5/2016 | 12/12/2016 | 12/19/2016 | 12/26/2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | | | | | | | | | |
| Store Revenue | 874,647 | 1,062,763 | 1,119,144 | 1,121,194 | 1,103,759 | 1,148,820 | 1,114,526 | 1,150,921 | 745,502 | 9,441,275 | 1,148,477 | 1,149,098 | 1,085,876 | 615,039 |
| Franchise Royalty Revenue | 35,182 | 36,098 | 36,450 | 37,348 | 36,867 | 37,199 | 35,579 | 37,037 | 27,982 | 319,743 | 35,902 | 37,659 | 36,479 | 24,507 |
| **Total Revenue** | 909,829 | 1,098,861 | 1,155,593 | 1,158,542 | 1,140,626 | 1,186,019 | 1,150,106 | 1,187,958 | 773,484 | 9,761,018 | 1,184,379 | 1,186,757 | 1,122,355 | 639,545 |
| **Cash Receipts:** | | | | | | | | | | | | | | |
| Store Receipts | 928,831 | 1,114,989 | 1,174,192 | 1,176,345 | 1,158,038 | 1,202,199 | 1,166,958 | 1,205,215 | 779,525 | 9,906,292 | 1,192,339 | 1,195,767 | 1,129,384 | 635,024 |
| Franchise Receipts | 35,182 | 36,098 | 36,450 | 37,348 | 36,867 | 37,199 | 35,579 | 37,037 | 27,982 | 319,743 | 35,902 | 37,659 | 36,479 | 24,507 |
| **Total Receipts** | 964,013 | 1,151,087 | 1,210,642 | 1,213,692 | 1,194,905 | 1,239,398 | 1,202,538 | 1,242,252 | 807,507 | 10,226,035 | 1,228,242 | 1,233,426 | 1,165,863 | 659,531 |
| **Cash Disbursements:** | | | | | | | | | | | | | | |
| **Operating Disbursements:** | | | | | | | | | | | | | | |
| Store Labor and Taxes | - | 821,232 | - | 804,472 | - | 804,472 | - | 803,466 | 756,204 | 3,989,846 | - | - | 803,466 | - |
| G&A Labor and Taxes | - | 121,565 | - | 113,325 | - | 113,325 | - | 107,491 | 107,491 | 563,197 | - | - | 107,491 | - |
| Benefits | 25,400 | 20,000 | 42,400 | 20,000 | 52,400 | 20,000 | 42,400 | 20,000 | 187,200 | 429,800 | | | | |
| **Total Labor, Taxes and Benefits** | 25,400 | 962,797 | 42,400 | 937,797 | 52,400 | 937,797 | 42,400 | 930,957 | 1,050,895 | 4,982,843 | - | - | 910,957 | - |
| COGS | 287,404 | 351,177 | 370,291 | 370,986 | 365,075 | 380,352 | 368,726 | 381,064 | 298,297 | 3,173,372 | 380,235 | 380,446 | 359,013 | 263,181 |
| Sales Tax | 17,000 | 17,000 | 400,000 | 17,000 | 15,000 | 15,000 | 15,000 | 278,827 | 408,534 | 1,183,361 | | | | |
| Rents | 891,661 | - | | - | | 891,661 | | | | 1,783,322 | 891,661 | | | |
| Repairs and Maintenance | 46,852 | 46,852 | 46,852 | 46,852 | 46,852 | 46,852 | 46,852 | 46,852 | 46,852 | 421,667 | 46,852 | 46,852 | 46,852 | 46,852 |
| Utilities | 35,550 | 35,550 | 53,674 | 35,550 | 35,550 | 35,550 | 35,550 | 35,550 | 35,550 | 356,202 | 35,550 | 35,550 | 53,674 | 35,550 |
| General & Administrative | 77,020 | 64,320 | 98,179 | 256,580 | 288,320 | 195,695 | 68,420 | 160,679 | 88,320 | 1,297,533 | 112,968 | 461,643 | 116,679 | 184,552 |
| **Total Operating Disbursements** | 1,380,887 | 1,477,696 | 1,011,396 | 1,664,766 | 803,198 | 2,502,907 | 595,072 | 1,833,930 | 1,928,448 | 13,198,300 | 1,467,267 | 924,491 | 1,487,175 | 530,135 |
| **Net Operating Cash** | (416,873) | (326,609) | 199,245 | (451,073) | 391,707 | (1,263,509) | 607,466 | (591,678) | (1,120,941) | (2,972,265) | (239,025) | 308,935 | (321,312) | 129,396 |
| **Non-operating Disbursements** | | | | | | | | | | | | | | |
| DIP Interest and Fees | - | - | - | - | - | - | - | - | | | | | | |
| Key Employee Incentive Plan (KEIP) | | | | 77,400 | | | | 77,400 | | 154,800 | | | 103,200 | |
| Critical Vendor Payments/Deposits | 275,000 | | | | | | | | | 275,000 | | | | |
| Unsecured Creditor Committee Legal Fees | - | | | 25,000 | | | | 25,000 | | 50,000 | | | | 25,000 |
| DIP Lender Legal Fees | - | | | 5,000 | | | | | | 5,000 | | | | |
| Company Legal Fees | - | | | 100,000 | | | | 100,000 | | 200,000 | | | | 100,000 |
| TOG Professional Fees | - | | | 52,000 | | | | 52,000 | 13,000 | 117,000 | 13,000 | 13,000 | 13,000 | 13,000 |
| DIP CRO Professional Fees | - | 13,800 | 13,800 | 19,800 | 13,800 | 13,800 | 13,800 | 19,800 | 13,800 | 122,400 | 13,800 | 13,800 | 13,800 | 266,800 |
| US Trustee Fees | | | | | | | | | 20,000 | 20,000 | | | | |
| Other Restructuring Costs | 56,000 | | | | | | | | | 56,000 | | | | |
| Lease Assumption Cures | | | | | | | | | | - | | | | |
| Executory Contract Cures | | | | | | | | | | | | | | |
| **Total Non-operating Disbursements** | 331,000 | 13,800 | 13,800 | 279,200 | 13,800 | 13,800 | 13,800 | 274,200 | 46,800 | 1,000,200 | 26,800 | 26,800 | 130,000 | 404,800 |
| **Total Disbursements** | 1,711,887 | 1,491,496 | 1,025,196 | 1,943,966 | 816,998 | 2,516,707 | 608,872 | 2,108,130 | 1,975,248 | 14,198,500 | 1,494,067 | 951,291 | 1,617,175 | 934,935 |
| **Cash Receipts less total expenditures** | (747,873) | (340,409) | 185,445 | (730,273) | 377,907 | (1,277,309) | 593,666 | (865,878) | (1,167,741) | (3,972,465) | (265,825) | 282,135 | (451,312) | (275,404) |
| **Beginning Cash Balances** | 950,000 | 1,000,000 | 1,000,000 | 1,185,445 | 1,000,000 | 1,377,907 | 1,000,000 | 1,593,666 | 1,000,000 | 950,000 | 1,000,000 | 1,000,000 | 1,282,135 | 1,000,000 |
| **Net Weekly Cash Activity (from above)** | (747,873) | (340,409) | 185,445 | (730,273) | 377,907 | (1,277,309) | 593,666 | (865,878) | (1,167,741) | (3,972,465) | (265,825) | 282,135 | (451,312) | (275,404) |
| **Advance from DIP Facility** | 797,873 | 340,409 | | 544,828 | | 899,402 | - | 272,212 | 1,167,741 | 4,022,465 | 265,825 | | 169,177 | 275,404 |
| **Ending Cash Balances** | 1,000,000 | 1,000,000 | 1,185,445 | 1,000,000 | 1,377,907 | 1,000,000 | 1,593,666 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,282,135 | 1,000,000 | 1,000,000 |
| **Total I Cumulative Change in Cash** | 50,000 | 50,000 | 235,445 | 50,000 | 427,907 | 50,000 | 643,666 | 50,000 | 50,000 | 50,000 | 50,000 | 332,135 | 50,000 | 50,000 |
| **DIP Facility, Beginning Balance** | | 797,873 | 1,138,283 | 1,138,283 | 1,683,111 | 1,683,111 | 2,582,512 | 2,582,512 | 2,854,724 | - | 4,022,465 | 4,288,290 | 4,288,290 | 4,457,467 |
| Advance | 797,873 | 340,409 | | 544,828 | | 899,402 | - | 272,212 | 1,167,741 | 4,022,465 | 265,825 | | 169,177 | 275,404 |
| **DIP Facility, Ending Balance** | 797,873 | 1,138,283 | 1,138,283 | 1,683,111 | 1,683,111 | 2,582,512 | 2,582,512 | 2,854,724 | 4,022,465 | 4,022,465 | 4,288,290 | 4,288,290 | 4,457,467 | 4,732,872 |
| **Restricted Cash from the Sale of Gift Cards** | - | 1,096 | 1,099 | 1,099 | 1,099 | 5,064 | 4,296 | 4,322 | 4,322 | 22,398 | 17,660 | 14,884 | 14,884 | 14,865 |

Cost, Inc.

13 WEEK CASH FLOW - FORECAST - 28 Store Closures - Assumptions    Case 16-13704    Doc 82    Filed 10/05/16    Entered 10/05/16 08:45:37    Desc Main
Document    Page 43 of 45

| | | |
|---|---|---|
| GENERAL | | This plan assumes the closing of 29 stores just before the petition date. It does not assume the payments for curing executory contracts or leases which amount to an estimated $1.2m (see U and V below). It does contemplate a deposit of $250K paid to the DIP lender pre-bankruptcy (amount is reflected in the opening cash balance). Please note there are three possible events that could give up side to this plan. The first is a lease breakup payment from MIT in the amount of $900k. The second is an initial franchise fee from Purdue for $35k, The third is a premium reimbursement from Hays Insurance for $37k. None of these have been included in the plan. The plan assumes that the bankruptcy will end on the 28th of November. If that date moves, adjustments to the plan would be necessary to be sure that all payroll, trust fund taxes and other fiduciary obligations incurred in the bankruptcy are paid in full. |
| A | Store Revenue | Based 2015 store sales for the same weeks reduced by a factor of 30% and then further reduced by a blended comp base -8% for week 1, -10% for weeks 2 - 5 and trending back to -8% over the next 4 weeks. The 29% represents the average sales from the exiting stores over the last month in comparison to the total store sales. An additional adjustment was made to reduce sales of gift cards by an additional 30% assuming purchases of gift cards will be hurt be the publicity of the bankruptcy |
| B | Franchisee Royalty Revenue | Calculated as 5% of franchisee revenue. Franchisee revenue based year over year same week franchisee store revenue reduced by -5% store comps The -5% store comp is a bit more conservative then the recent trend of -3%. No one-time development fees or initial franchise fees have been included (see general note above). |
| C | Store Receipts | Store receipts = store sales grossed up for sales tax (7%) less cc fees (2%). The net effect of segregating gift card sales has been considered as well. A separate line tracks the restricted cash from gift card sales (see Z below) |
| D | Franchisee Receipts | Franchise receipts = franchisee royalty fees. Note that the marketing funding fees (1% of franchisee sales) have been removed from this model as the company anticipates franchisee push back in the absence of quantifiable ongoing marketing initiatives (spending). |
| E | Store Labor and Taxes | Based on recent historical labor by store for ongoing stores. Assumes a vast majority of exiting store employees are laid off prior to filing. Employees from exiting stores that remain for a period of time are there to assist in the store closing or have transferred to other stores.. |
| F | G&A Labor and Taxes | Includes all of corporate salaries and operation management salaries (no store managers). Reductions to head count made on an employee by employee basis. Per the operations manager, the is operating throughout this period with one less area manager than is optimal. |
| G | Benefits | Includes all benefits (medical, vision, dental, life, etc.). The Company is self insured for medical. A motion will be filed to allow prepetition claims to be covered. Therefore in the course of this budget, medical claim reimburse is not expected to go down. As the employees from the exiting stores represent less than 10% of the total employees on the company medical plan, the future savings is expected to be approximately $2k per week. |
| H | COGS | Includes COGS and Paper. Based on average actual cash paid for COGs from P4 - P9 2016 reduced by 29% for store closures (29% based on Sales reduction excluding -8 comp base). This was further reduced by a factor of 2.25% to account for lost volume discounts, etc. |
| I | Sales Tax | Trust Fund Tax. The first month represents payments of sales tax for September for all 72 stores. The following months represents sales tax on the 44 remaining stores. Note that the company follows a 4-4-5 month in the time period to which the sales tax being paid relates. |
| J | Rents . | Assumes paying all rents on time for 44 locations. It does not contemplate curing the arrearage on these stores (see U below). |
| K | Repairs and Maintenance | This line reflects payments for our standard R&M contracts for pests, oven cleanings, maintenance, as well as payments to vendors for general R&M. It was based an average weekly cash outlay from P4-P9 2016 reduced by 30% for store closures. This amounts to approximately $40k per week. We have also included approximately $8k in what we would traditionally be called capex using the same theory (recent historical outlay less 30%). |
| L | Utilities | Utilities were based on average weekly cash outlay from P3-P6 2016 for seasonal reasons reduced by 30% store closures. |
| M | General & Administrative | Used specific identification. Includes costs for IT systems (wk. 13 $45k due for Ultipro), accounting fees (wk. 5 $75k), legal, SEC costs (wk. 5 $100k legal SEC / wk. 6 $65k Nasdaq), and insurance (WK 4 $65k / WK 11 renewal down payment $300k) |
| N | DIP Interest and Fees | DIP Lender to provide cash requirements of the financing arrangement. |
| O | Key Employee Retention Plan (KERP) | General estimate of payout under key employee retention plan. The plan assumes the payout of 30% in 30 days, 30% in 60 days and 40% in 90 days and amounts to $258k in total which was agreed to by the DIP lender. |
| P | Critical Vendor Payments/Deposits | General estimate of possible key vendor and utility deposits/prepayments. |
| Q | Unsecured Creditor Committee Legal Fees | Estimate of legal fees for the unsecured creditors committee |
| R | Company Legal Fees | Legal fees for the company's bankruptcy counsel - Mirick O'Connell |
| S | DIP Lender Legal Fees | Legal Fees incurred by the DIP lender related to the DIP financing |
| T | Professional Fees | Professional fees for the company's interim CFO - The O'Connor Group |
| U | DIP CRO Professional Fees | DIP Lenders Professional Fees include $13.8k per week in fees. $6k per month per diem in October and November and $3k in December. A maximum of $250k in success fees paid in December. |
| V | US Trustee Fees | Monthly reporting fees for payable to the US Trustee's office. It is based on fee structure that is outlined in the Operating Guidelines which is based off of total disbursements |
| W | Other Restructuring Costs | These costs relate to the cost of the store closing estimated at $2k per store. |
| X | Lease Assumption Cures | Estimated at $900k based on the expected outstanding rent on the petition date for all stores leases that will be assumed. Subject to discussion and negotiation with DIP Lender |
| Y | Executory Contract Cures | Estimated at $470k based on the estimated outstanding balance on the petition date of all other executory contracts that are expected to be assumed. Subject to discussion and negotiation with DIP Lender |
| Z | Restricted Cash from Gift Card Sales | The net cash from gift card sales has been segregated from operating cash. Sales were based off last year sales for the same months, reduced by the same negative year over year sales comps as regular stores' sales and then further reduced by 30% to reflect consumers reluctance to buy gift cards when a company is in bankruptcy. Redemptions are calculated by taking 70% of each weeks sales with a six week lag in use. |

# EXHIBIT B

<u>Exhibit B – Sale Milestones</u>

1.    filing with the Bankruptcy Court no later than October 6, 2016 of a sale motion
      seeking approval of the 363 Sale Process and bidding protections for the Stalking
      Horse Purchaser.

2.    execution of a Stalking Horse Agreement with the DIP Lenders as the Stalking
      Horse Purchaser no later than October 7, 2016, as such date may be extended by the
      Stalking Horse Purchaser in its sole and absolute discretion..

3.    entry of order relating to bidding procedures contemplated by the DIP Term Sheet
      (as such procedures may be modified by the Stalking Horse Purchaser prior to entry
      of such order in its sole and absolute discretion) no later than October 20, 2016.

4.    Debtors to provide notice of the proposed sale of all or substantially all of their
      assets (the "363 Sale") in compliance with Bankruptcy Rule 2002 and 6004 and
      Local Rules 2002-5 and 6004-1, 6006-1, no later than October 24, 2016.

5.    receipt of competing bids (if any) for the 363 Sale no later than November 14, 2016.

6.    conduct auction among all qualified bidders no later than November 18, 2016

7.    entry of order(s) approving transactions relating to 363 Sale no later than November
      22, 2016.

8.    Closing of transactions relating to the 363 Sale no later than November 28, 2016