UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

In re:

COSI, INC., *et al.*,[1]

      Debtors.

Chapter 11
Case No. 16-13704-MSH

(Jointly Administered)

### ORDER (I) AUTHORIZING USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION, AND (III) SCHEDULING A HEARING ON FURTHER USE OF CASH COLLATERAL

Upon the Motion for Entry of an Order (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Hearing on Further Use of Cash Collateral, and (IV) Granting Related Relief (the "Cash Collateral Motion") filed by Cosi, Inc. on behalf of itself and affiliated debtors and debtors-in-possession (the "Debtors") on September 28, 2016; and notice of the Cash Collateral Motion being good and sufficient notice; the Court finding that the Cash Collateral Motion is in the best interest of the Debtors' estate; and no objection to the Cash Collateral Motion having been filed or any such objection having been withdrawn or overruled; the Court finds as follows:

1.      On September 28, 2016 (the "Petition Date"), the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the federal tax identification number for each of the Debtors, are Cosi, Inc. (3745) ("Cosi") and its subsidiaries, Xando Cosi of Maryland, Inc. (2196) ("Xando"), Cosi Sandwich Bar, Inc. (0910) ("CSB"), Hearthstone Associates, LLC (6267) ("HALLC"), and Hearthstone Partners, LLC (9433) ("HPLLC"; collectively with Xando, CSB, and HALLC, the "Subsidiaries"). The Debtors' corporate offices are located at 294 Washington Street, Suite 510, Boston, MA 02108.

1

2. Since the Petition Date, the Debtors have continued in the management of their business and to manage their property as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108. No official committee of unsecured creditors, trustee, or examiner has been appointed herein.

3. The Debtors require the use of cash collateral in order to preserve their operations and the value of their assets. The relief granted in this Order is in the best interests of the Debtors, their estate, and their creditors.

4. The following creditors may have liens against the Debtor's personal property, including its cash and accounts receivable: (a) Milfam II LP, (b) AB Opportunity Fund LLC, and (c) AB Value Partners, L.P. (collectively, the "Senior Secured Lenders"). In addition, UCC financing statement have been filed on behalf of First Franchise Capital Corporation, Santander Bank, and American Express Bank, although the Debtors represent that their obligations to these entities have been discharged. JPMorgan Chase Bank, N.A. ("JPM") has a perfected, senior security interest in cash held in two separate collateral accounts of Cosi Sandwich Bar, Inc. (x2449; x7628) (the "CSB Collateral Accounts") and in the Debtors' primary operating account (x8539). The CSB Collateral accounts collectively hold approximately $100,000. JPM's security interest secures all liabilities due from the Debtors to JPM. Such liabilities include, but are not limited to, outstanding letters of credit issued by JPM, in an amount of approximately $288,000, plus exposure to ACH transactions and amounts in relation to Debtors' corporate credit card program through JPM.

5. This Court has not been asked to find, and it does not find, that any security interest asserted by the Senior Secured Lenders is valid or perfected.

6. Pending a final hearing on the Cash Collateral Motion, the replacement liens and the equity in the Debtor's property, as set forth below, will adequately protect the

interests of the Senior Secured Lenders for the purposes of Bankruptcy Code §§ 361 and 363(e).

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

    A.    The Cash Collateral Motion is allowed on an interim basis.

    B.    The Debtor is authorized to use Cash Collateral in the ordinary course of its business substantially in accordance with the budget attached hereto as **Exhibit A**.

    C.    For the purposes of Bankruptcy Code §§ 361 and 363(e) and as adequate protection for the Debtor's use of Cash Collateral, the Senior Secured Lenders are hereby granted replacement liens (the "Replacement Liens") in and to all property of the kind presently securing the prepetition obligations of the Senior Secured Lenders, including any property purchased or acquired with the Cash Collateral and any proceeds thereof, but excluding any causes of action under Chapter 5 of the Bankruptcy Code or the proceeds of any claims under or actions commenced pursuant to such powers. The Replacement Liens shall only attach to and be enforceable against the same types of property, to the same extent, and in the same order of priority as existed immediately prior to the Petition Date. The Replacement Liens shall be recognized only to the extent of any post-petition diminution in value of the Secured Creditors' prepetition collateral resulting from the Debtors' use of Cash Collateral during this bankruptcy case. The adequate protection provided in this Order shall be in addition to, but without duplication of the adequate protection provided to the Secured Creditors in the "INTERIM ORDER UNDER 11 U.S.C. §§ 105(a), 361, 362(c)(2), 363(e) AND 364 AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) (A) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING AND (B) UTILIZE CASH COLLATERAL, AND (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES"

3

      D.      Notwithstanding anything to the contrary herein, as adequate protection for the security interest of JPM, JPM shall be entitled to maintain an administrative hold on $658,476 of cash held in Debtors' operating account, less any amounts JPM may release from administrative hold, and on all amounts held in the CSB Collateral Accounts (collectively the "JPM Cash Collateral"). The Debtors are not authorized to use the JPM Cash Collateral pursuant to this order.

      E.      Nothing in this Order shall constitute a waiver by the Debtors or restrict the Debtors' right to seek the further use of Cash Collateral, or the right of the Senior Secured Lenders to challenge any such use of Cash Collateral or seek modification of this Order

      F.      This Order, and the Debtors' use of Cash Collateral as authorized in this Order, shall become effective immediately upon entry of this Order.

      G.      A final hearing on the Cash Collateral Motion shall be held on **October 20, 2016 at 2:00 p.m.**

Dated: October 5, 2016

                                      Honorable Melvin S. Hoffman
                                      United States Bankruptcy Judge

# EXHIBIT A

**Cosi, Inc.**
**13 WEEK CASH FLOW - FORECAST - 28 Store Closure**

| Week Ended: | 6 Day Week 10/3/2016 | 10/10/2016 | 10/17/2016 | 10/24/2016 | 10/31/2016 | 11/7/2016 | 11/14/2016 | 11/21/2016 | 11/28/2016 | 9 Week Sub Forecast | 10 12/5/2016 | 11 12/12/2016 | 12 12/19/2016 | 13 12/26/2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | | | | | | | | | |
| Store Revenue | 874,647 | 1,062,763 | 1,119,144 | 1,121,194 | 1,103,759 | 1,148,820 | 1,114,526 | 1,150,921 | 745,502 | 9,441,275 | 1,148,477 | 1,149,098 | 1,085,876 | 615,039 |
| Franchisee Royalty Revenue | 35,182 | 36,098 | 36,450 | 37,348 | 36,867 | 37,199 | 35,579 | 37,037 | 27,982 | 319,743 | 35,902 | 37,659 | 36,479 | 24,507 |
| **Total Revenue** | 909,829 | 1,098,861 | 1,155,593 | 1,158,542 | 1,140,626 | 1,186,019 | 1,150,106 | 1,187,958 | 773,484 | 9,761,018 | 1,184,379 | 1,186,757 | 1,122,355 | 639,545 |
| **Cash Receipts:** | | | | | | | | | | | | | | |
| Store Receipts | 928,831 | 1,114,989 | 1,174,192 | 1,176,345 | 1,158,038 | 1,202,199 | 1,166,958 | 1,205,215 | 779,525 | 9,906,292 | 1,192,339 | 1,195,767 | 1,129,384 | 635,024 |
| Franchisee Receipts | 35,182 | 36,098 | 36,450 | 37,348 | 36,867 | 37,199 | 35,579 | 37,037 | 27,982 | 319,743 | 35,902 | 37,659 | 36,479 | 24,507 |
| **Total Receipts** | 964,013 | 1,151,087 | 1,210,642 | 1,213,692 | 1,194,905 | 1,239,398 | 1,202,538 | 1,242,252 | 807,507 | 10,226,035 | 1,228,242 | 1,233,426 | 1,165,863 | 659,531 |
| **Cash Disbursements:** | | | | | | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Store Labor and Taxes | - | 821,232 | - | 804,472 | - | 804,472 | - | 803,466 | 756,204 | 3,989,846 | | | 803,466 | - |
| G&A Labor and Taxes | - | 121,565 | - | 113,325 | - | 113,325 | - | 107,491 | 107,491 | 563,197 | - | - | 107,491 | - |
| Benefits | 25,400 | 20,000 | 42,400 | 20,000 | 52,400 | 20,000 | 42,400 | 20,000 | 187,200 | 429,800 | | | | |
| **Total Labor, Taxes and Benefits** | 25,400 | 962,797 | 42,400 | 937,797 | 52,400 | 937,797 | 42,400 | 930,957 | 1,050,895 | 4,982,843 | - | - | 910,957 | - |
| COGS | 287,404 | 351,177 | 370,291 | 370,986 | 365,075 | 380,352 | 368,726 | 381,064 | 298,297 | 3,173,372 | 380,235 | 380,446 | 359,013 | 263,181 |
| Sales Tax | 17,000 | 17,000 | 400,000 | 17,000 | 15,000 | 15,000 | 15,000 | 278,827 | 408,534 | 1,183,361 | | | | |
| Rents | 891,661 | - | - | - | - | 891,661 | - | - | - | 1,783,322 | 891,661 | | - | - |
| Repairs and Maintenance | 46,852 | 46,852 | 46,852 | 46,852 | 46,852 | 46,852 | 46,852 | 46,852 | 46,852 | 421,667 | 46,852 | 46,852 | 46,852 | 46,852 |
| Utilities | 35,550 | 35,550 | 53,674 | 35,550 | 35,550 | 35,550 | 53,674 | 35,550 | 35,550 | 356,202 | 35,550 | 35,550 | 53,674 | 35,550 |
| General & Administrative | 77,020 | 64,320 | 98,179 | 256,580 | 288,320 | 195,695 | 68,420 | 160,679 | 88,320 | 1,297,533 | 112,968 | 461,643 | 116,679 | 184,552 |
| **Total Operating Disbursements** | 1,380,887 | 1,477,696 | 1,011,396 | 1,664,766 | 803,198 | 2,502,907 | 595,072 | 1,833,930 | 1,928,448 | 13,198,300 | 1,467,267 | 924,491 | 1,487,175 | 530,135 |
| **Net Operating Cash** | (416,873) | (326,609) | 199,245 | (451,073) | 391,707 | (1,263,509) | 607,466 | (591,678) | (1,120,941) | (2,972,265) | (239,025) | 308,935 | (321,312) | 129,396 |
| **Non-operating Disbursements** | | | | | | | | | | | | | | |
| DIP Interest and Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Key Employee Incentive Plan (KEIP) | | | | 77,400 | | | | 77,400 | | 154,800 | | | 103,200 | - |
| Critical Vendor Payments/Deposits | 275,000 | - | - | - | - | - | - | - | - | 275,000 | - | - | - | - |
| Unsecured Creditor Committee Legal Fees | - | - | - | 25,000 | - | - | - | 25,000 | - | 50,000 | - | - | - | 25,000 |
| DIP Lender Legal Fees | - | - | - | 5,000 | - | - | - | - | - | 5,000 | - | - | - | - |
| Company Legal Fees | - | - | - | 100,000 | - | - | - | 100,000 | - | 200,000 | - | - | - | 100,000 |
| TOG Professional Fees | - | - | - | 52,000 | - | - | - | 52,000 | 13,000 | 117,000 | 13,000 | 13,000 | 13,000 | 13,000 |
| DIP CRO Professional Fees | - | 13,800 | 13,800 | 19,800 | 13,800 | 13,800 | 13,800 | 19,800 | 13,800 | 122,400 | 13,800 | 13,800 | 13,800 | 266,800 |
| US Trustee Fees | | | | | | | | | 20,000 | 20,000 | | | | |
| Other Restructuring Costs | 56,000 | | | | | | | | | 56,000 | | | | |
| Lease Assumption Cures | | | | | | | | | | - | | | | |
| Executory Contract Cures | | | | | | | | | | | | | | |
| **Total Non-operating Disbursements** | 331,000 | 13,800 | 13,800 | 279,200 | 13,800 | 13,800 | 13,800 | 274,200 | 46,800 | 1,000,200 | 26,800 | 26,800 | 130,000 | 404,800 |
| **Total Disbursements** | 1,711,887 | 1,491,496 | 1,025,196 | 1,943,966 | 816,998 | 2,516,707 | 608,872 | 2,108,130 | 1,975,248 | 14,198,500 | 1,494,067 | 951,291 | 1,617,175 | 934,935 |
| **Cash Receipts less total expenditures** | (747,873) | (340,409) | 185,445 | (730,273) | 377,907 | (1,277,309) | 593,666 | (865,878) | (1,167,741) | (3,972,465) | (265,825) | 282,135 | (451,312) | (275,404) |
| **Beginning Cash Balances** | 950,000 | 1,000,000 | 1,000,000 | 1,185,445 | 1,000,000 | 1,377,907 | 1,000,000 | 1,593,666 | 1,000,000 | 950,000 | 1,000,000 | 1,000,000 | 1,282,135 | 1,000,000 |
| **Net Weekly Cash Activity (from above)** | (747,873) | (340,409) | 185,445 | (730,273) | 377,907 | (1,277,309) | 593,666 | (865,878) | (1,167,741) | (3,972,465) | (265,825) | 282,135 | (451,312) | (275,404) |
| **Advance from DIP Facility** | 797,873 | 340,409 | - | 544,828 | - | 899,402 | - | 272,212 | 1,167,741 | 4,022,465 | 265,825 | - | 169,177 | 275,404 |
| **Ending Cash Balances** | 1,000,000 | 1,000,000 | 1,185,445 | 1,000,000 | 1,377,907 | 1,000,000 | 1,593,666 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,282,135 | 1,000,000 | 1,000,000 |
| **Total / Cumulative Change in Cash** | 50,000 | 50,000 | 235,445 | 50,000 | 427,907 | 50,000 | 643,666 | 50,000 | 50,000 | 50,000 | 50,000 | 332,135 | 50,000 | 50,000 |
| DIP Facility, Beginning Balance | | 797,873 | 1,138,283 | 1,138,283 | 1,683,111 | 1,683,111 | 2,582,512 | 2,582,512 | 2,854,724 | - | 4,022,465 | 4,288,290 | 4,288,290 | 4,457,467 |
| Advance | 797,873 | 340,409 | - | 544,828 | - | 899,402 | - | 272,212 | 1,167,741 | 4,022,465 | 265,825 | - | 169,177 | 275,404 |
| DIP Facility, Ending Balance | 797,873 | 1,138,283 | 1,138,283 | 1,683,111 | 1,683,111 | 2,582,512 | 2,582,512 | 2,854,724 | 4,022,465 | 4,022,465 | 4,288,290 | 4,288,290 | 4,457,467 | 4,732,872 |
| **Restricted Cash from the Sale of Gift Cards** | - | 1,096 | 1,099 | 1,099 | 1,099 | 5,064 | 4,296 | 4,322 | 4,322 | 22,398 | 17,660 | 14,884 | 14,884 | 14,865 |

Cosi, Inc.
13 WEEK CASH FLOW - FORECAST - 28 Store Closures - Assumptions

| | | |
|---|---|---|
| **GENERAL** | | This plan assumes the closing of 29 stores just before the petition date. It does not assume the payments for curing executory contracts or leases which amount to an estimated $1.2m (see U and V below). It does contemplate a deposit of $250k paid to the DIP lender pre-bankruptcy (amount is reflected in the opening cash balance). Please note there are three possible events that could give up side to this plan. The first is a lease breakup payment from MIT in the amount of $600k. The second is an initial franchise fee due from Purdue for $35k. The third is a premium reimbursement from Hays Insurance for $37k. None of these have been included in the plan. The plan assumes that the bankruptcy will end on the 28th of November. If that date moves, adjustments to the plan would be necessary to be sure that all payroll, trust fund taxes and other fiduciary obligations incurred in the bankruptcy are paid in full. |
| A | Store Revenue | Based 2015 store sales for the same weeks reduced by a factor of 30% and then further reduced by a blended comp base -8% for week 1, -10% for weeks 2 - 5 and trending back to -8% over the next 4 weeks. The 29% represents the average sales from the exiting stores over the last month in comparison to the total store sales. An additional adjustment was made to reduce sales of gift cards by an additional 30% assuming purchases of gift cards will be hurt be the publicity of the bankruptcy. |
| B | Franchisee Royalty Revenue | Calculated as 5% of franchisee revenue. Franchisee revenue based year over year same week franchisee store revenue reduced by -5% store comps. The -5% store comp is a bit more conservative then the recent trend of -3%. No one-time development fees or initial franchise fees have been included (see general note above). |
| C | Store Receipts | Store receipts = store sales grossed up for sales tax (7%) less cc fees (2%). The net effect of segregating gift card sales has been considered as well. A separate line tracks the restricted cash from gift card sales (see Z below) |
| D | Franchisee Receipts | Franchise receipts = franchisee royalty fees. Note that the marketing funding fees (1% of franchisee sales) have been removed from this model as the company anticipates franchisee push back in the absence of quantifiable ongoing marketing initiatives (spending). |
| E | Store Labor and Taxes | Based on recent historical labor by store for ongoing stores. Assumes a vast majority of exiting store employees are laid off prior to filing. Employees from exiting stores that remain for a period of time are there to assist in the store closing or have transferred to other stores.. |
| F | G&A Labor and Taxes | Includes all of corporate salaries and operation management salaries (no store managers). Reductions to head count made on an employee by employee basis. Per the operations manager, the is operating throughout this period with one less area manager than is optimal. |
| G | Benefits | Includes all benefits (medical, vision, dental, life, etc.). The Company is self insured for medical. A motion will be filed to allow prepetition claims to be covered. Therefore in the course of this budget, medical claim reimburse is not expected to go down. As the employees from the exiting stores represent less than 10% of the total employees on the company medical plan, the future savings is expected to be approximately $2k per week. |
| H | COGS | Includes COGS and Paper. Based on average actual cash paid for COGs from P4 - P9 2016 reduced by 29% for store closures (29% based on Sales reduction excluding -8 comp base). This was further reduced by a factor of 2.25% to account for lost volume discounts. etc. |
| I | Sales Tax | Trust Fund Tax. The first month represents payments of sales tax for September for all 72 stores. The following months represents sales tax on the 44 remaining stores. Note that the company follows a 4-4-5 month in the time period to which the sales tax being paid relates. |
| J | Rents | Assumes paying all rents on time for 44 locations. It does not contemplate curing the arrearage on these stores (see U below). |
| K | Repairs and Maintenance | This line reflects payments for our standard R&M contracts for pests, oven cleanings, maintenance, as well as payments to vendors for general R&M. It was based an average weekly cash outlay from P4-P9 2016 reduced by 30% for store closures. This amounts to approximately $40k per week. We have also included approximately $8k in what we would traditionally be called capex using the same theory (recent historical outlay less 30%). |
| L | Utilities | Utilities were based on average weekly cash outlay from P3-P6 2016 for seasonal reasons reduced by 30% store closures. |
| M | General & Administrative | Used specific identification. Includes costs for IT systems (wk. 13 $45k due for Ultipro), accounting fees (wk. 5 $75k), legal, SEC costs (wk. 5 $100k legal SEC / wk. 6 $65k Nasdaq), and insurance (WK 4 $65k / WK 11 renewal down payment $300k). |
| N | DIP Interest and Fees | DIP Lender to provide cash requirements of the financing arrangement. |
| O | Key Employee Retention Plan (KERP) | General estimate of payout under key employee retention plan. The plan assumes the payout of 30% in 30 days, 30% in 60 days and 40% in 90 days and amounts to $258k in total which was agreed to by the DIP lender. |
| P | Critical Vendor Payments/Deposits | General estimate of possible key vendor and utility deposits/prepayments. |
| Q | Unsecured Creditor Committee Legal Fees | Estimate of legal fees for the unsecured creditors committee |
| R | Company Legal Fees | Legal fees for the company's bankruptcy counsel - Mirick O'Connell |
| S | DIP Lender Legal Fees | Legal Fees incurred by the DIP lender related to the DIP financing |
| T | Professional Fees | Professional fees for the company's interim CFO - The O'Connor Group |
| U | DIP CRO Professional Fees | DIP Lenders Professional Fees include $13.8k per week in fees. $6k per month per diem in October and November and $3k in December. A maximum of $250k in success fees paid in December. |
| V | US Trustee Fees | Monthly reporting fees for payable to the US Trustee's office. It is based on fee structure that is outlined in the Operating Guidelines which is based off of total disbursements |
| W | Other Restructuring Costs | These costs relate to the cost of the store closing estimated at $2k per store. |
| X | Lease Assumption Cures | Estimated at $900k based on the expected outstanding rent on the petition date for all stores leases that will be assumed. Subject to discussion and negotiation with DIP Lender |
| Y | Executory Contract Cures | Estimated at $470k based on the estimated outstanding balance on the petition date of all other executory contracts that are expected to be assumed. Subject to discussion and negotiation with DIP Lender |
| Z | Restricted Cash from Gift Card Sales | The net cash from gift card sales has been segregated from operating cash. Sales were based off last year sales for the same months, reduced by the same negative year over year sales comps as regular stores sales and then further reduced by 30% to reflect consumers reluctance to buy gift cards when a company is in bankruptcy. Redemptions are calculated by taking 70% of each weeks sales with a six week lag in use. |