# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### (EASTERN DIVISION)

-------------------------------------------------------------x

| | | |
|---|---|---|
| | : | **Chapter 11** |
| **In re:** | : | |
| | : | **Case No. 16-13704** |
| **COSI, INC.,** *et al.,* | : | |
| | : | **Jointly Administered** |
| **Debtors.**[1] | : | |
| ----------------------------------------------------------- | : | **Re: Docket Nos. 7, 8** |

**OMNIBUS OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO (A) DEBTORS' MOTION UNDER 11 U.S.C. §§ 105(A), 361, 362(C)(2), 363(E) AND 364 AND FED. R. BANKR. P. 2002, 4001 AND 9014 FOR ORDER  (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING AND (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES AND (B) DEBTORS' MOTION FOR ENTRY OF ORDER (I) AUTHORIZING USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A HEARING ON FURTHER USE OF CASH COLLATERAL, AND (IV) <ins>GRANTING RELATED RELIEF</ins>**

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") appointed in the chapter 11 cases of Cosi, Inc. and its affiliated debtors (the "<u>Debtors</u>"), by and through its undersigned proposed counsel, hereby files this objection (the "<u>Objection</u>") to the (A) *Debtors' Motion Under 11 U.S.C. §§ 105(a), 361, 362(c)(2), 363(e) And 364 And Fed. R. Bankr. P. 2002, 4001 And 9014 For Order (I) Authorizing Debtors To Obtain Post-Petition Financing And (II) Granting Adequate Protection To Prepetition Secured Parties* [Docket No. 7] (the "<u>DIP Motion</u>") and (B) *Debtors' Motion For Entry Of Order (I) Authorizing Use Of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling A Hearing On Further Use Of Cash*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of the federal tax identification number for each of the Debtors, are Cosi, Inc. (3745), Xando Cosi of Maryland, Inc. (2196), Cosi Sandwich Bar, Inc. (0910), Hearthstone Associates, LLC (6267), and Hearthstone Partners, LLC (9433). The Debtors' corporate offices are located at 294 Washington Street, Suite 510, Boston, MA 02108.

*Collateral, And (IV) Granting Related Relief* [Docket No. 8] (the "Cash Collateral Motion"). In

support of this Objection, the Committee states as follows:[2]

## PRELIMINARY STATEMENT[3]

1.       The Committee and the DIP Lenders/Prepetition Lenders have been in discussions

regarding modifications to the final form of order approving the DIP Motion.  For example, the

Committee believes that the DIP Lenders and Prepetition Lenders have agreed that (i) the

replacement liens granted to the Prepetition Lenders will only attach to Prepetition Noteholder

Collateral to the same extent those liens existed as of the Petition Date, (ii) the DIP Liens and

replacement liens will not attach to any lien that the Debtors' estates avoid under the estates'

avoiding powers, and (iii) the fees and expenses of counsel to the DIP Lenders will be subject to

the review of the Committee and the U.S. Trustee, including the ability of counsel to the DIP

Lenders to draw down on the $250,000 advance payment provided to lenders' counsel on the eve

of the filing.[4]

2.       While many of the changes agreed to by the DIP Lenders/Prepetition Lenders

have allayed some of the Committee's concerns, the Court should still not approve the proposed

DIP Facility because it is the product of lender overreach which (a) insulates the Prepetition

Lenders from attack and (b) is designed to force a truncated auction process which results in the

Prepetition Lenders owning the company without an adequate marketing process.  At bottom, the

---

[2]       Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them the DIP Motion or the Cash Collateral Motion, as applicable.

[3]       Capitalized terms used in the Preliminary Statement but not otherwise defined shall have the meanings ascribed to them herein.

[4]       The Committee reserves the right to further brief these issues to the extent the DIP Lenders and Prepetition Lenders determine not to agree with the changes noted above.

proposed DIP Facility enriches the lenders while severely impairing the Debtors' chances of maximizing value for all unsecured creditors.

3.     The proposed DIP Lenders are the Debtors' prepetition lenders whose liens the Debtors have already acknowledged are subject to attack and avoidance.  Despite the infirmities regarding the prepetition lenders' liens, the DIP order has **no budget** for the Committee to investigate the prepetition lenders' liens and the Debtors are prohibited from such a challenge under the terms of the DIP Facility.  It is clear that the lenders have exercised undue control over the Debtors to insulate themselves from attack.  The Court should not condone such tactics and should provide the Committee with a budget to investigate and challenge the lenders' liens to maximize recoveries for the estates.

4.     Another example of lender overreach are the provisions of the DIP Facility which provide that an Event of Default occurs and the DIP must be repaid immediately if another Stalking Horse Bidder is chosen or the Stalking Horse Agreement is terminated.  The Debtors should not be prevented from carrying out their fiduciary duty to accept the highest and best value-maximizing bid for their assets.  If the Debtors are presented with an overbid that provides for repayment in full of the DIP Facility, the DIP Lenders should not be able to terminate the DIP Facility.  The only purpose of including such a provision is to chill bidding and to ensure that the prepetition lenders are the successful bidders.  The estates should not be prevented from accepting the highest offer.

5.     As described herein, the DIP Facility cannot be approved in its current form for numerous reasons.  The truncated sales timeline, combined with the estates' waiver of marshaling and section 506(c) rights and exorbitant interest rates and facility fees, all result in

the lenders enriching themselves while handicapping the estates' ability to challenge the liens and claims of the lenders.  The DIP Facility cannot be approved.

## BACKGROUND

**A.**    **General Background**

6.        On September 28, 2016 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Massachusetts (the "Court").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of an examiner has been made in these chapter 11 cases.

7.        On October 6, 2016, the Office of the United States Trustee filed the *Appointment of the Official Committee of Unsecured Creditors* [Docket No. 91] and appointed the Committee pursuant to section 1102(a) of the Bankruptcy Code.  The Committee consists of the following members: Robert J. Dourney; NStar Electric Company; and SRI Eight 399 Boylston LLC.  The Committee selected Nixon Peabody as its counsel in these chapter 11 cases on October 7, 2016, pursuant to section 1103 of the Bankruptcy Code, subject to this Court's approval.

**B.**    **Debtors' Prepetition "Secured" Debt and Challenges Thereto**

8.        As described in greater detail in the DIP Motion and the *Declaration of Patrick Bennett, Interim CEO and President of the Debtors, in Support of Chapter 11 Petition and First Day Pleadings* [Docket No. 5] (the "Bennett Declaration"), in April and May of 2014, the Debtors obtained financing (the "2014 Financing") from three lenders: MILFAM II L.P. ("Milfam"); AB Opportunity Fund LLC ("AB Opportunity"); and AB Value Partners, L.P. ("AB

Value"). These three prepetition prepetition lenders (the "Prepetition Lenders" or "DIP Lenders") are also the proposed lenders under the proposed DIP facility.

9.      As part of the 2014 Financing, Cosi, Inc. allegedly executed $7.5 million in promissory notes (the "Senior Notes") in favor of the Prepetition Lenders which have current principal balances as follows:

| Lender | Amount of Note |
|---|---|
| Milfam | $5 million |
| AB Opportunity | $2 million |
| AB Value | $500,000 |

10.      Debtors Xando Cosi of Maryland, Inc. ("Xando") and Cosi Sandwich Bar, Inc. ("CSB") have allegedly guaranteed Cosi Inc.'s obligations to the Prepetition Lenders.  As collateral for the 2014 Financing, Xando, CSB and Cosi, Inc. also allegedly provided a security interest in their assets to the Prepetition Lenders.  Cosi. Inc. is also alleged to have pledged its ownership interest in Hearthstone Associates, LLC ("HALLC").  Debtors Hearthstone Partners, LLC ("HPLLC") was not involved in the 2014 Financing and there is no allegation that any of its assets were encumbered prepetition.

11.      The Senior Notes allegedly contained a grant of an interest in each respective Debtors' collateral.  *See* Bennett Declaration, at ¶ 27.  However, the Debtors believe that the original collateral description in the Senior Notes "was an **insufficient grant of an interest** in the Debtors' collateral pursuant to the Uniform Commercial Code, Article 9, Section 108, which governs the sufficiency of collateral descriptions in a security agreement and renders ineffective 'supergeneric' collateral descriptions."  Cash Collateral Motion, at ¶ 17 (emphasis added).

12.      In seeming recognition of the inadequate security grant under the Senior Notes, "the Senior Secured Lenders requested that the Debtors confirm and further assure their lien position by executing a Collateral Agreement. As a result of the Senior Secured Lenders'

requests, on **September 9, 2016**, all of the Debtors, except HPLLC, entered into a Collateral

Agreement (the "2016 Collateral Agreement")."  DIP Motion, at ¶ 14 (emphasis added).  The

2016 Collateral Agreement was entered into a mere 19 days prior to the Petition Date and

"provided each of the Senior Secured Lenders with a significant enhancement of its collateral

position which the Debtors may be able to challenge under certain provisions of the Bankruptcy

Code including, among others, preference avoidance and recovery provisions."  Cash Collateral

Motion, at ¶ 17.  As a result, there are plausible bases to believe that the Prepetition Lenders are

unsecured creditors because (i) the grant of the security interests in 2014 was inadequate and (ii)

any grant of a security in connection with the 2016 Collateral Agreement is subject to avoidance.

As of the date hereof, the Debtors have not commenced any action to avoid the liens of the

Prepetition Lenders or sought a determination of the extent or validity of such liens.  As

explained below, the terms of the proposed DIP facility effectively handcuff the Debtors and the

Committee from investigating and challenging those liens.

**C.**      **Proposed Use of Cash Collateral and Adequate Protection**

13.      On the Petition Date, the Debtors filed the Cash Collateral Motion and indicated

that prior to the Petition Date, "the Debtors provided the lenders with a $250,000 deposit in

connection with post-petition financing by such lenders."  Cash Collateral Motion, at 2.  This

deposit was an ***advance*** on the Prepetition Lenders' fees and expenses in connection with the

DIP Facility to be applied by the Prepetition Lenders in their "sole and absolute discretion".  DIP

Term Sheet, at 12.   The Debtors were required to make the advance payment despite having an

"insurmountable burden on cash flow in both the short and long term . . . ." *See* Bennett

Declaration, at ¶ 35.

14.    Even though the Debtors believe that the Prepetition Lenders' liens are avoidable, the Debtors propose to grant adequate protection to the Prepetition Lenders in the form of Replacements Liens.  On October 5, 2016, the Court entered the *Order (I) Authorizing Use Of Cash Collateral, (II) Granting Adequate Protection, And (III) Scheduling A Hearing On Further Use Of Cash Collateral* [Docket No. 83] (the "Interim Cash Collateral Order"), which provides that:

> as adequate protection for the Debtor's use of Cash Collateral, the Senior Secured Lenders are hereby granted replacement liens (the "Replacement Liens") in and to all property of the kind presently securing the prepetition obligations of the Senior Secured Lenders, including any property purchased or acquired with the Cash Collateral and any proceeds thereof, **but excluding any causes of action under Chapter 5 of the Bankruptcy Code or the proceeds of any claims under or actions commenced pursuant to such powers**. The Replacement Liens shall only attach to and be enforceable against the same types of property, to the same extent, and in the same order of priority as existed immediately prior to the Petition Date. The Replacement Liens shall be recognized only to the extent of any post-petition diminution in value of the Secured Creditors' prepetition collateral resulting from the Debtors' use of Cash Collateral during this bankruptcy case.

Interim Cash Collateral Order, at ¶ C (emphasis added).  The adequate protection granted under the Interim Cash Collateral Order was in addition to any adequate protection to be granted to the Prepetition Lenders in connection with the DIP Facility.  *Id.*

**D.    Proposed DIP Financing**

15.    On the Petition Date, the Debtors filed the DIP Motion seeking to enter into a $4.1 million DIP facility ($1.8 million on an interim basis) provided by the Prepetition Lenders. On October 5, 2016, the Court entered an interim order [Docket No. 82] (the "Interim DIP Order") permitting the Debtors to draw $1.8 million from the DIP Facility.

## **OBJECTION**

16.     In order to obtain financing under section 364(c) of the Bankruptcy Code, the

Debtors must establish that: (i) they are unable to obtain unsecured credit on an administrative

claim basis; (ii) the financing is necessary to preserve the assets of their estates; and (iii) the

terms of the transaction are fair, reasonable and adequate given the circumstances of the debtor-

borrower and the proposed lender.  11 U.S.C. §364(c); *In re Los Angeles Dodgers LLC*, 457 B.R.

308, 312 (Bankr. D. Del. 2011).  When determining whether to approve debtor-in-possession

financing, a Court must balance the interests of the Debtors and their creditors.  *In re Ames*

*Dep't. Stores, Inc.,* 115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990).  The burden rests with the

Debtors to demonstrate that the terms of the proposed financing are fair and reasonable and in

the best interests of their estates and creditors.  *See In re The Crouse Grp., Inc*., 71 B.R. 544, 549

(Bankr. E.D. Pa. 1987).

17.     Postpetition financing should not be authorized if its primary purpose is to benefit

or improve the position of a particular secured lender.  *See, e.g., In re Aqua Assocs*., 123 B.R.

192, 195-98 (Bankr. E.D. Pa. 1991) ("[C]redit should not be approved when it is sought for the

primary benefit of a party other than the debtor."); *Ames*, 115 B.R. at 37 ("[A] proposed

financing will not be approved where it is apparent that the purpose of the financing is to benefit

a creditor rather than the estate.").  The provisions of the proposed DIP facility are designed to

improve the position of the Prepetition Lenders and cannot be approved.

**A.      Termination Events Tied to Sale Are Designed to
        Chill Bids and Should Not be Approved**

18.     The overreach of the Prepetition Lenders is perhaps best exemplified by the

provisions of the Interim DIP Order providing that an Event of Default occurs if another Stalking

Horse Bidder is chosen or the Stalking Horse Agreement is terminated.  Although the DIP

8

Facility is being provided to the Debtors to run the sale process, there is no reason why the

Debtors' acceptance of a higher and better offer than the Stalking Horse Bid for the Debtors'

assets (assuming such offers provides for repayment in full of the outstanding DIP Obligations)

should result in the termination of the DIP Facility.  The Debtors should not be constrained from

carrying out their fiduciary duty to accept the highest and best offer for their assets.

19.     Paragraph 25(r) of the Interim DIP Order provides that an Event of Default occurs

"three business days after either (i) termination of the Stalking Horse Agreement (as defined in

the DIP Term Sheet), (ii) the entering into by the Debtors of a definitive agreement for the sale

of a substantial part of their assets to a purchaser other than the Stalking Horse Bidder (as

defined in the DIP Term Sheet), or (iii) the Debtors shall withdraw the sale motion contemplated

by the DIP Term Sheet or otherwise materially alter the 363 Sale Process contemplated by the

DIP Term Sheet . . ."  Interim DIP Order, at ¶ 25(r).

20.     If an Event of Default occurs, the Prepetition Lenders have the ability to foreclose

upon the DIP Collateral on three days' notice and without further court action.  Paragraph 27 of

the Interim DIP Order provides that:

> Rights and Remedies Upon Event of Default; Termination Event. Upon the
> occurrence of an Event of Default, (i) the DIP Lenders shall be under no
> obligation to make any further advances to the Debtors and (ii) the DIP
> Lenders shall have the right to declare a "Termination Event". Upon the
> declaration of a Termination Event, (i) **the DIP Loans made pursuant to
> the DIP Loan Documents and this Interim Order shall mature, and
> together with all interest thereon and other DIP Obligations, become due
> and payable**, and (ii) the DIP Lenders may, upon three (3) business days'
> written notice to the Debtors setoff amounts in any account of the Debtors
> maintained with the DIP Lenders, and (iii) **the DIP Lenders may, upon
> three (3) business days' written notice to the Debtors, without need for
> further relief from the stay or other relief from this or any other court,
> exercise the rights and remedies available under this Interim Order
> and/or applicable law (including the Uniform Commercial Code as in
> effect in any jurisdiction), including foreclosing upon and selling all or
> any portion of the DIP Collateral**. The actions described in clauses (i), (ii),

and (iii) above may be taken without further order or application to the Bankruptcy Court as the DIP Lenders shall, in their discretion, elect, and the automatic stay is hereby modified and vacated to the extent necessary to permit such actions, so long as no order prohibiting such action is entered by the Bankruptcy Court during the above-referenced three (3) business day period. The sole issue that may be raised by any party during such three (3) business day period shall be limited to whether an Event of Default has occurred. The DIP Lenders shall be entitled to apply the payments or proceeds of the DIP Collateral to the DIP Obligations in any order whatsoever in their sole and absolute discretion.

Interim DIP Order, at ¶ 26 (emphasis added). Read together, paragraphs 25 and 26 could result in a scenario where a higher and better offer (providing for repayment in full of all DIP obligations) than the Stalking Horse Bid is obtained but the Debtors are constrained to accept such bid since it would result in a default under the DIP Facility and require immediate repayment of the DIP Obligations. The only purpose of these provisions is to ensure that the Prepetition Lenders are the prevailing bidders and to constrain the ability of the Debtors to solicit and accept higher and better offers than the one submitted by the Prepetition Lenders. If a higher and better offer comes in which provides for repayment in full of the outstanding DIP Obligations, there is no reason why the Prepetition Lenders should be permitted to terminate the DIP Facility and require immediate repayment. These provisions must be removed so that the Debtors can carry out their fiduciary duties to maximize recoveries for the benefit of all creditors.

**B.     Sales Milestones Are Truncated and Not Designed to
Maximize Value for the Debtors' Estates**

21.     It is an Event of Default under the DIP Facility if the following sales milestones are not met:

- October 6, 2016 – Filing of Sale Motion

- October 7, 2016 – Execution of Stalking Horse Agreement

- October 20, 2016 – Entry of Bidding Procedures Order

- October 24, 2016 – Debtors provide notice of sale

- November 14, 2016 – Receipt of competing bids

- November 18, 2016 – Auction

- November 22, 2016 – Entry of Sale Order

- November 28, 2016 – Sale Closing

22.     The milestones set the Debtors on a break-neck course to sell their assets with no meaningful sale process having been conducted.  The Committee objects to the DIP Motion because the milestones foreclose any possibility of conducting a sale process designed to maximize value.  In connection with this Objection, the Committee has also filed an objection (the  "Committee Sale Objection") to the *Debtors' Motion for (I) Order Establishing Bidding Procedures and Granting Related Relief and (II) Order Approving Sale of Substantially All Assets Free and Clear of Liens, Claims, Interests, and Encumbrance and Granting Related Relief* [Docket No. 105] (the "Sale Motion").  The Committee incorporates the Committee Sale Objection as if fully set forth herein.

**C.     The Interim DIP Order Restricts the Committee's Ability to Conduct its Investigation and Confers Unwarranted Protections to the Prepetition Lenders**

23.     Section 1103(c)(2) of the Bankruptcy Code provides that one of the duties of a Committee is to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor . . . and any other matter relevant to the formulation of the plan." 11 U.S.C. § 1103(c)(2). These statutory duties clearly include the investigation of the purported liens of, and potential claims against, the Prepetition Lenders.  The Interim DIP Order, however, includes extensive restrictions that unduly restrain and obstruct the Committee's ability to fulfill their duties by

11

providing **no budget** to conduct its investigation into the liens and claims of the Prepetition

Lenders.  Paragraph 24 of the Interim DIP Order provides that

> no DIP Collateral, proceeds thereof, Cash Collateral, Noteholder Prepetition
> Collateral, or proceeds thereof, may be used by . . . . any committee
> appointed in these Chapter 11 Cases, . . . .to . . . (b) assert, join, commence,
> support or prosecute any action for any claim, counter-claim, action,
> proceeding, application, motion, objection, defense, or other contested matter
> seeking any order, judgment, determination or similar relief against, or
> adverse to the interests of, in any capacity, the DIP Lenders and Existing
> Lenders, or any of their respective officers, directors, employees, agents,
> members, partners, attorneys, affiliates, assigns, or successors, with respect to
> any transaction, occurrence, omission, or action, including, without
> limitation,
>
>> (i) any actions arising under chapter 5 of the Bankruptcy Code,
>>
>> (ii) any so-called "lender liability" claims and causes of action,
>>
>> (iii) any action with respect to the validity and extent of the DIP
>> Obligations or the obligations to Existing Lenders, or the validity,
>> extent, and priority of the DIP Liens, the liens on the Noteholder
>> Prepetition Collateral or the Replacement Liens,
>>
>> (iv) any action seeking to invalidate, set aside, avoid or
>> subordinate, in whole or in part, the DIP Liens, the liens on the
>> Noteholder Prepetition Collateral or the Replacement Liens, or
>>
>> (v) any action that has the effect of preventing, hindering or
>> delaying (whether directly or indirectly) the DIP Lenders and
>> Existing Lenders in respect of their liens and security interests in
>> the DIP Collateral or the Noteholder Prepetition Collateral.

Interim DIP Order, at ¶ 24.  It is patently unreasonable to handicap the Committee's ability to

fulfill its fiduciary duty to unsecured creditors and undertake a thorough investigation.

Accordingly, the Committee seeks an investigation budget of $125,000.

24.     An investigation budget is all the more appropriate because the Debtors are

essentially prohibited from challenging the liens and claims of the Prepetition Lenders even

though the Debtors have acknowledged that their liens are subject to avoidance.  First, the

Debtors have already agreed "that they will not take any steps to investigate or challenge or assist any person in investigating or challenging the allowance and enforceability of the Existing Note Obligations." Interim DIP Order, at 11. **This provision should be modified to provide that the Debtors must be required to comply with applicable law or court order.** If, in connection with an investigation of the Existing Note Obligations, the Debtors receive an appropriate document request or other discovery, the Debtors should be required to comply with such a request. The DIP order should not permit the Debtors to obstruct an otherwise appropriate investigation.

25.     Second, the Debtors are prohibited from using the DIP proceeds to investigate and challenge the liens and claims of the Prepetition Lenders and an Event of Default occurs if they do conduct such an investigation and challenge. *See* Interim DIP Order, at ¶ 24. Specifically, paragraph 25(l) of the Interim DIP Order provides that an Event of Default occurs upon "the commencement of any action by any of the Debtors against the Existing Lenders or the DIP Lenders, or their respective agents and affiliates, to subordinate or avoid any liens or object to or seek the subordination of any portion of any claim made in connection with the DIP Loan Documents and Existing Loan Documents." *Id.* at ¶ 25(l).

26.     The Interim DIP Order in its current form effectively insulates the Prepetition Lenders from challenge even though there are serious doubts concerning the nature and extent of their liens. The Court should not condone such tactics and should equip the Committee with the tools to maximize the value of the estates for their unsecured creditors. The failure to do so will

enable the Prepetition Lenders to run roughshod over all parties — as they have already done

with the Debtors.[5]

**D.      Section 506(c) Waiver is Inappropriate**

27.      Under paragraph 36 Interim DIP Order, the Debtors propose to permanently

waive their right to surcharge the Prepetition Lenders and DIP Lenders under section 506(c) of

the Bankruptcy Code:

> Limitation on Charging Expenses Against DIP Collateral and
> Noteholder Prepetition Collateral. In consideration of the financial
> accommodations provided by the DIP Lenders hereunder and
> Existing Lenders consent to the DIP Loans, no expenses of
> administration of the Chapter 11 Cases or any future proceeding
> that may result therefrom including liquidation in bankruptcy or
> other proceedings under the Bankruptcy Code, shall be charged
> against or recovered from the DIP Collateral or the Noteholder
> Prepetition Collateral under section 506(c) of the Bankruptcy Code
> or any similar principle of law, or otherwise, without the prior
> written consent of Existing Lenders and DIP Lenders, and no such
> consent shall be implied from any action, inaction, acquiescence or
> otherwise.

Interim DIP Order, at ¶ 36.   Section 506(c) provides that: "The trustee may recover from

property securing an allowed secured claim the reasonable, necessary costs and expenses of

preserving, or disposing of, such property to the extent of any benefit to the holder of such claim,

including the payment of all ad valorem property taxes with respect to the property."  11 U.S.C.

§ 506(c).  Section 506(c) is a rule of fundamental fairness for all parties in interest, providing

that secured creditors should share some of the burden of administrative expenses in a

---

[5]      Paragraph 31(a) of the Interim DIP Order provides that: "Nothing in this Interim Order or in any of the
First Lien Loan Documents or DIP Loan Documents shall in any way be construed or interpreted to impose
or allow the imposition upon Existing Lenders or the DIP Lenders of any liability for any claims arising
from any and all activities by the Debtors or any of their subsidiaries or affiliates in the operation of their
businesses or in connection with their restructuring efforts either before or following the Petition Date."
This provision should be modified to provide that nothing in any DIP order extinguishes any lender liability
claims that may exist against the Prepetition Lenders.

bankruptcy case where it is reasonable and appropriate for surcharges to be ordered. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 12 (2000). Section 506(c) is designed to "prevent a windfall to the secured creditor…[it] understandably shifts to the secured party . . . the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate." *Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.),* 57 F.3d 321, 325 (3d Cir. 1995).

28.     Through the section 506(c) waiver, the Debtors irrevocably waive their and the estates' rights to charge certain costs or expenses of the administration of the bankruptcy cases against not only the DIP Collateral but also the alleged collateral of the Prepetition Lenders. This blanket waiver of the right to surcharge collateral under section 506(c) is not appropriate in these cases.  As noted above, there are valuable unencumbered assets — such as HPLLC — and the value of those unencumbered assets must be preserved for the benefit of all unsecured creditors.  The Committee has just begun its investigation of the prepetition liens and until the investigation is complete the degree to which the Prepetition Lenders are secured is uncertain. The Debtors should, at a minimum, retain their right to surcharge the estates' administrative costs against the DIP Collateral and the Noteholder Prepetition Collateral.  Where there are potentially unencumbered assets, unsecured creditors should not bear the weight of the estates' costs to preserve and maximize the value of the lenders' alleged collateral. *See In re Codesco, Inc.,* 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs.").

15

29.     Under such circumstances, the Debtors must retain the right to surcharge secured

creditors' collateral under section 506(c).  Waivers of 506(c) have been denied by courts in

similar circumstances.  *See e.g. In re American LaFrance, LLC*, Case No. 08-10178 [Docket No.

202] at ¶ 83 (Bankr. D. Del. Feb. 26, 2008) (declining to waive estate's rights to 506(c) claims);

*In re Colad Group, Inc.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) ("506(c) speaks only to the

payment of reasonable and necessary costs. This court can discern no basis to allow a secured

creditor to ignore its application"); *Hartford Fire Ins. Co. v. Norwest Bank Minn., N.A. (In re*

*Lockwood Corporation)*, 223 B.R. 170, 176 ) (8th. Cir. B.A.P. 1998) (agreements to immunize

secured creditor from section 506(c) are unenforceable); *In re Brown Bros, Inc.,* 136 B.R. 470,

474 (W.D. Mich. 1991) (agreement to immunize secured creditor from 506(c) not enforceable).

**E.      Lenders Should Be Subject to Marshaling Doctrine**

30.     Paragraph 29 of the Interim DIP Order provides that: "The DIP Lenders and

Existing Lenders shall not be subject to the equitable doctrine of "marshaling" or any other

similar doctrine with respect to any of the DIP Collateral or the Noteholder Prepetition

Collateral."  Interim DIP Order, at ¶ 29.  The proposed marshaling wavier could destroy value

otherwise available to unsecured creditors.  The lenders should not have the indisputable ability

to recover first from the Debtors' assets that were unencumbered on the Petition Date.  At a

minimum, the Committee, at a later date, should have the right to demonstrate to the Court that

marshaling is appropriate.

31.     While marshaling is generally an equitable remedy to be invoked only by junior

secured or lien creditors, sections 544(a) and 1107 of the Bankruptcy Code confer upon a debtor

in possession the power to invoke marshaling.  *See Kittay v. Atl. Bank (In re Global Serv. Grp.*

*LLC),* 316 B.R. 451, 463 (Bankr. S.D.N.Y. 2004) ("The trustee has standing to invoke

16

marshaling because he has the status of a hypothetical lien creditor."); *see also Berman v. Green (In re Jack Green's Fashions for Men Big & Tall, Inc.),* 597 F.2d 130, 133 (8th Cir. 1979) ("Federal courts of bankruptcy are courts of equity and may apply the doctrine of marshaling in proper cases . . . In this case it would be in the highest degree inequitable to allow the [secured lender] to exhaust the business assets of the corporate bankrupt without first looking to the real estate mortgaged to it. To permit such a course would leave the general creditors of the business with nothing.") (citation omitted).  Further, if a debtor in possession refuses to bring a colorable claim of marshaling, then an unsecured creditors committee may be granted derivative standing to do so.  *See, e.g., In re Newcorn Enters. Ltd.*, 287 B.R. 744, 750 (Bankr. E.D. Mo. 2002) (granting unsecured creditors' committee derivative standing to bring marshaling claim against secured lender, and thereby increase pay-out to unsecured creditors, where debtor refused to do so); *Official Comm. of Unsecured Creditors v. Hudson United Bank (In re America's Hobby Ctr., Inc.)*, 223 B.R. 275, 287 (Bankr. S.D.N.Y. 1998) ("[S]tanding in the shoes of the debtor in possession, the Committee can assert [marshaling] claim.").

32.     The Debtors themselves admit that there are significant doubts concerning the extent to the Prepetition Lenders' liens. Under the circumstances, preservation of the estates' rights to request marshaling will be critical to preserving value for unsecured creditors. The Debtors should not be allowed to waive the protections at the outset of these cases at the behest of their lenders.  The Court should (i) preserve the ability of the parties in interest to invoke the equitable doctrine of marshaling and (ii) grant the Committee standing to bring a marshaling claim against any prepetition or postpetition secured lender.

17

**F.**      **Other Objections**

33.      The Committee also objects to the following provisions of the Interim DIP Order:

a)      *Time to Challenge Termination Remedies of DIP Lender*

34.      Paragraph 26(c) of the Interim DIP Order provides that upon an Event of Default, "upon three (3) business days' written notice to the Debtors, without need for further relief from the stay or other relief from this or any other court, exercise the rights and remedies available under the  Interim Order and/or applicable law (including the Uniform Commercial Code as in effect in any jurisdiction), including foreclosing upon and selling all or any portion of the DIP Collateral. . . . The sole issue that may be raised by any party during such three (3) business day period shall be limited to whether an Event of Default has occurred."

35.      The Committee objects to that provision because during the three (3) business day period, the Committee should not be limited to arguing whether an Event of Default occurred. There may be equitable reasons why the DIP Lenders should not be permitted to foreclose.  At bottom, it is inappropriate to foreclose potential arguments at this early juncture.

b)      *Interest Rate, Exit Fee and Facility Fee are Excessive*

36.      The DIP Term Sheet provides that the Debtors must pay the following interest rates and fees in connection with drawing on the DIP Facility:

- Interest Rate: 12% per annum.

- Facility Fee: 3.00% of committed amount under DIP Facility.

- Exit Fee: 3:00 % of principal amount to be repaid.

DIP Term Sheet, at 7-8.  These fees are excessive and should not be approved.  For example, in the recent chapter 11 cases of *In re Buffets, LLC*, Case No. 16-50557 (Bankr. W.D. Tex.), another restaurant chapter 11 case, the post-petition lenders offered a $2 million new-money loan at an interest rate of 7%, an origination fee of 1% and no exit fee.  *See Emergency Motion for*

18

*Interim and Final Authority for the Debtors to Use Cash Collateral, Obtain Debtor in*

*Possession Financing, and Determining Adequate Protection, Superpriority Claims and Liens*,

*In re Buffets, LLC*, Case No. 16-50557 (Bankr. W.D. Tex.) [Docket No. 16].  Moreover, the

lenders were only entitled to be reimbursed legal fees not to exceed $10,000.  *Id.*  Here, by

contrast, the DIP Lenders were provided a $250,000 advance payment on legal fees and are

charging excessive interest rates and origination/exit fees.  The proposed interest rate and fees

are excessive and should not be approved. *See also In re Rita Restaurant, Corp.*, Case No. 16-

52272 (Bankr. W.D. Tex.) [Docket No. 18] (providing $750,000 loan with 10% interest, $10,000

origination fee and no exit fee).

      **c)**     ***Final DIP Order Should Not Require Existing Note Obligations be Paid
in Full***

    37.    Paragraph 35 of the Interim DIP Order provides that until all

> Existing Note Obligations are indefeasibly paid in full in cash and
> completely satisfied and the commitments under the DIP Loan
> Documents and the First Lien Loan Documents are terminated in
> accordance therewith, (a) the protections afforded to the DIP
> Lenders and Existing Lenders under this Interim Order, and any
> actions taken pursuant thereto, shall survive the entry of an order
> (i) confirming a plan of reorganization, (ii) dismissing any of these
> cases or (iii) converting any of these cases into a case pursuant to
> chapter 7 of the Bankruptcy Code, and (b) the DIP Liens, the
> Replacement Liens, the Superpriority DIP Claims, and the
> Adequate Protection Claim shall continue in the Chapter 11 Cases,
> in any such successor case or after any such dismissal.

Interim DIP Order, at ¶ 35.  The Existing Loan Obligations are likely unsecured claims due to

the avoidability of the liens securing those obligations. If they are unsecured claims, they will

only be entitled to a *pro rata* distribution along with other unsecured creditors – not payment in

full.  Paragraph 35 should be modified to provide that the protections under the Final DIP Order

and the liens and claims thereunder survive unless the Existing Note Obligations are satisfied by payment in full or pursuant to an order of the court.

## RESERVATION OF RIGHTS

38.    The Interim DIP Order grants the Debtors authority to enter into a Credit Agreement or "one or more 'Secured Debtor-in-Possession Promissory Note' in an aggregate principal amount of $[1,800,000] . . . ."  Interim DIP Order, at 2 (brackets in original).  No form of finalized DIP Loan Agreement was attached to the Interim DIP Order and none has been provided to the Committee.  The Committee reserves all its rights with respect to the final form of any DIP Loan Agreement, including the right to raise further objections at the hearing to approve any such agreement.

**WHEREFORE**, the Committee respectfully requests that the Court deny approval of the DIP Motion and grant the Committee such other and further relief as is just and proper.

Dated:  October 19, 2016

**NIXON PEABODY LLP**

By: _/s/Lee Harrington_
Lee Harrington
100 Summer Street
Boston, MA 02110-2131
Telephone: (617) 345-1000
lharrington@nixonpeabody.com

-and-

Christopher M. Desiderio
Christopher J. Fong
437 Madison Avenue
New York, NY 10022
Telephone: (212) 940-3000
cdesiderio@nixonpeabody.com
cfong@nixonpeabody.com

_Proposed Counsel to the Official Committee
of Unsecured Creditors_

20

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## (EASTERN DIVISION)

-------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re: | : | **Chapter 11** |
|  | : |  |
|  | : | **Case No. 16-13704** |
| **COSI, INC.,** *et al.,* | : |  |
|  | : | **Jointly Administered** |
| Debtors.[1] | : |  |

------------------------------------------------------------- :

### CERTIFICATE OF SERVICE

      I hereby certify that on October 19, 2016, I caused a copy of the *Omnibus Objection Of Official Committee Of Unsecured Creditors To (A) Debtors' Motion Under 11 U.S.C. §§ 105(a), 361, 362(c)(2), 363(e) And 364 And Fed. R. Bankr. P. 2002, 4001 And 9014 For Order  (I) Authorizing Debtors To Obtain Post-Petition Financing And (II) Granting Adequate Protection To Prepetition Secured Parties And (B) Debtors' Motion For Entry Of Order (I) Authorizing Use Of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling A Hearing On Further Use Of Cash Collateral, And (IV) Granting Related Relief* to be served via CM/ECF upon the individuals who have filed notices of appearance in the Court's CM/ECF database, including the Debtors' counsel.

Dated:  October 19, 2016

**NIXON PEABODY LLP**

By: */s/Lee Harrington*
Lee Harrington
100 Summer Street
Boston, MA 02110-2131
Telephone: (617) 345-1000
Facsimile: (617) 345-1300

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of the federal tax identification number for each of the Debtors, are Cosi, Inc. (3745), Xando Cosi of Maryland, Inc. (2196), Cosi Sandwich Bar, Inc. (0910), Hearthstone Associates, LLC (6267), and Hearthstone Partners, LLC (9433). The Debtors' corporate offices are located at 294 Washington Street, Suite 510, Boston, MA 02108.